Nos. 23-2032, 23-2063 & 23-2089

*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

———————————————

ASTELLAS PHARMA INC, ET AL.,

*Plaintiffs-Appellants,*

– v. –

SANDOZ INC. ET AL.,

*Defendants-Appellees.*

———————————————

On appeal from a final judgment of the
United States District Court for the District of Delaware
Nos. 20-cv-1589, 21-cv-425, and 21-cv-664 (consolidated)
Hon. Joseph F. Bataillon

———————————————

## PLAINTIFFS-APPELLANTS' OPENING BRIEF
———————————————

Simon D. Roberts
Jason A. Leonard
  *McDermott Will & Emery LLP*
  *One Vanderbilt Avenue*
  *New York, NY 10017*
  *(212) 547-5700*

Daniel M. Silver
  *McCarter & English, LLP*
  *405 N. King St. 8th Floor*
  *Wilmington, DE 19801*
  *(302) 984-6331*

Paul W. Hughes
Andrew A. Lyons-Berg
Charles Seidell
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Plaintiffs-Appellants*

# PATENTS AT ISSUE

Claim 1 of U.S. Patent No. 10,842,780:

**1.** A pharmaceutical composition, comprising 10 mg to 200 mg of ®-2-(2-aminothiazol-4-yl)-4'-[2-[2)2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof, in a sustained release hydrogel-forming formulation comprising a hydrogel-forming polymer having an average molecular weight of 100,000 to 8,000,000 and an additive having a water solubility of at least 0.1 g/mL at 20±5° C.,

> wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and a carboxyvinyl polymer,

> wherein the additive is at least one selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene hydrogenated castor oil, polyoxyethylene polyoxypropylene glycol, polyoxyethylene sorbitan hugher fatty acid ester, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, (3-alanine, lysine hydrochloride, and meglumine, and

> wherein a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm.

Claim 5 of U.S. Patent No. 10,842,780:

**5.** The pharmaceutical composition according to claim **1**, wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, and hydroxypropyl cellulose.

Claim 20 of U.S. Patent No. 10,842,780:

**20.** A method for treating overactive bladder comprising administering the tablet according to claim **18** to a subject in need thereof.

Claim 25 of U.S. Patent No. 10,842,780:

**25.** A tablet, comprising the pharmaceutical composition according to claim **23**.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---:|:---|
| **Case Number** | 23-2032 |
| **Short Case Caption** | Astellas Pharma, Inc. v. Sandoz Inc. |
| **Filing Party/Entity** | Astellas Pharma, Inc.; Astellas Ireland Co. LTD.; Astellas Pharma Global Development, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/27/23

Signature:   /s/ Paul W. Hughes

Name:   Paul W. Hughes

iii

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Astellas Pharma, Inc. | | |
| Astellas Ireland Co. LTD. | Astellas Pharma, Inc. | Astellas B.V. |
| Astellas Pharma Global Development, Inc. | Astellas Pharma, Inc. | Astellas U.S. Holding, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☑   Additional pages attached

| | | |
|---|---|---|
| McDermott Will & Emery LLP | Nitya Anand | Chika S. Seidel |
| Vincent Li | Andrew Lyonsberg | Charles Seidell |
| Jayita Guhaniyogi | McCarter & English, LLP | Meng Xu |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

Astellas Pharma, Inc. v. Sandoz Inc.
Case No. 23-2032 COI Additional Page

Celine Jiminez Crowson
Hogan Lovells
Alexandra M. Joyce
Christopher M. Bruno
Kyle Sorenson
Maxwell A. Fox
Alexander T. Piala
Connor Romm
Steven M. Hash
Rodney Swartz, Ph.D.

# TABLE OF CONTENTS

Table of Authorities ........................................................................ viii

Statement of Related Cases ............................................................. xvi

Introduction ...................................................................................... 1

Jurisdiction ........................................................................................ 3

Issues Presented for Review ............................................................. 4

Statement ........................................................................................... 4

    A.   Factual background. ................................................................. 4

    B.   The '780 patent. ...................................................................... 7

    C.   Procedural background. ......................................................... 11

Summary of the Argument ............................................................... 18

Standard of Review .......................................................................... 21

Argument .......................................................................................... 22

I.    The district court erred by *sua sponte* injecting a Section 101
     defense into this litigation. ......................................................... 22

    A.   The district court misunderstood that the issue posed for
        judicial review is whether *defendants* proved the claims
        *in*valid. ................................................................................... 24

    B.   In improperly resurrecting a forfeited argument, the
        district court grossly departed from the principle of party
        presentation. .......................................................................... 28

    C.   The district court's decision—in departing from
        fundamentals of due process—gravely prejudiced Astellas. ..........36

II.    The district court fundamentally erred in its Section 101
     analysis. ...................................................................................... 40

    A.   The district court invented and applied its own subject-
        matter test. ............................................................................. 41

    B.   The '780 Patent does not claim ineligible subject matter. ............ 46

III.   A remand is necessary to address defendants' alternative
     arguments. ................................................................................... 52

IV.   Reassignment on remand is warranted. ...................................... 53

Conclusion ........................................................................................ 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  890 F.3d 1354 (Fed. Cir. 2018) ........................................ 40

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013) ......................................... 43

*Alexander v. Primerica Holdings, Inc.*,
  10 F.3d 155 (3d Cir. 1993) .................................... 21, 53, 54

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  573 U.S. 208 (2014)........................................... *passim*

*Allergan, Inc. v. Barr Labs., Inc.*,
  808 F. Supp. 2d 715 (D. Del. 2011).................................... 31

*Alta Wind I Owner Lessor C v. United States*,
  897 F.3d 1365 (Fed. Cir. 2018) ......................................... 53

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
  569 U.S. 576 (2013)................................................ 42, 49

*Baude v. United States*,
  955 F.3d 1290 (Fed. Cir. 2020) ......................................... 29

*In re Baxter Int'l, Inc.*,
  698 F.3d 1349 (Fed. Cir. 2012) ......................................... 26

*Berkheimer v. HP, Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) ......................................... 39

*Bilski v. Kappos*,
  561 U.S. 593 (2010).................................................... 44

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*,
  402 U.S. 313 (1971).................................................... 27

# Cases—Continued

*Brown v. Philip Morris Inc.*,
250 F.3d 789 (3d Cir. 2001) ................................................................ 34

*CardioNet, LLC v. InfoBionic, Inc.*,
955 F.3d 1358 (Fed. Cir. 2020) ........................................................ 44

*Castro v. United States*,
540 U.S. 375 (2003) .................................................................. 34, 35

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
2021 WL 1421612 (N.D. Cal. Apr. 14, 2021) ...................................... 40

*Chamberlain Grp., Inc. v. One World Techs., Inc.*,
944 F.3d 919 (Fed. Cir. 2019) .......................................................... 37

*Chevron (HK) Ltd. v. One World Techs., Inc.*,
2023 WL 2372938 (D. Del. Mar. 6, 2023) ........................................ 32

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*,
717 F.3d 1269 (Fec. Cir. 2013) ........................................................ 44

*Cohesive Techs., Inc. v. Waters Corp.*,
543 F.3d 1351 (Fed. Cir. 2008) ........................................................ 33

*Colas Solutions, Inc. v. Blacklidge Emulsions, Inc.*
759 F. App'x 986, 990 (Fed. Cir. 2019) ............................................ 31

*Constant v. Advances Micro-Devices, Inc.*,
848 F.2d 1560 (Fed. Cir. 1988) ........................................................ 37

*Coop. Ent., Inc. v. Kollective Tech., Inc.*,
50 F.4th 127 (Fed. Cir. 2022) .......................................................... 39

*Day v. McDonough*,
547 U.S. 198 (2006) ........................................................................ 35

*Diamond v. Chakrabarty*,
447 U.S. 303 (1980) ........................................................................ 47

## Cases—Continued

*Educ. Testing Servs. v. Katzman*,
  793 F.2d 533 (3d Cir. 1986) ................................................................. 38

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) .......................................................... 45

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
  276 F. Supp. 3d 629 (E.D. Tex. 2017)............................................... 30

*Ethicon, Inc. v. Quigg*,
  849 F.2d 1422 (Fed. Cir. 1988) .......................................................... 26

*Fortinet, Inc. v. Forescout Techs., Inc.*,
  2021 WL 5565836 (N.D. Cal. Nov. 29, 2021)...................................... 40

*Fractus, S.A. v. Samsung Elecs. Co.*,
  876 F. Supp. 2d 802 (E.D. Tex. 2012)................................................ 31

*Fujifilm Corp. v. Motorola Mobility LLC*,
  182 F. Supp. 3d 1014 (N.D. Cal. 2016) ............................................. 31

*In re Glumetza Antitrust Litig.*,
  2021 WL 1817092 (N.D. Cal. May 6, 2021).........................................57

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
  527 F.3d 1318 (Fed. Cir. 2008) ................................................... 17, 52

*Gonzalez v. Thaler*,
  565 U.S. 134 (2012)............................................................................. 35

*In re Google Tech. Holdings LLC*,
  980 F.3d 858 (Fed. Cir. 2020) ........................................................... 30

*Gottschalk v. Benson*,
  409 U.S. 63 (1972)............................................................................... 42

*Gov't of Virgin Islands v. Walker*,
  261 F.3d 370 (3d Cir. 2001) ......................................................... 54, 59

## Cases—Continued

*Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*,
620 F.3d 1287 (Fed. Cir. 2010) ........................................... 53

*Greenlaw v. United States*,
554 U.S. 237 (2008) .............................................. 29, 34, 36

*Haines v. Liggett Grp. Inc.*,
975 F.2d 81 (3d Cir. 1992) ................................................. 54

*Intellectual Ventures I LLC v. Symantec Corp.*,
725 F. App'x 976 (Fed. Cir. 2018) ....................................... 39

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) ..................................... 27, 44

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) .......................................... 30

*Jackson v. Danberg*,
594 F.3d 210 (3d Cir. 2010) .............................................. 38

*Kajeet, Inc. v. Gryphon Online Safety, Inc.*,
2021 WL 780737 (D. Del. Mar. 1, 2021) ............................. 40

*Lannom Mfg. Co. v. U.S. Int'l Trade Comm'n*,
799 F.2d 1572 (Fed. Cir. 1986) ..................................... 29, 35

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
730 F.2d 1452 (Fed. Cir. 1984) .......................................... 26

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012) .................................................. *passim*

*McNeil v. Wisconsin*,
501 U.S. 171 (1991) ........................................................ 29

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) ..................................... 22, 45

## Cases—Continued

*Mendenhall v. Cedarapids, Inc.*,
  5 F.3d 1557 (Fed. Cir. 1993) ...................................................... 26, 27

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91 (2011) ............................................................................... 25

*Natural Alternatives Int'l., Inc. v. Creative Compounds LLC*,
  918 F.3d 1338 (Fed. Cir. 2019) ................................................... 47, 50

*Offutt v. United States*,
  348 U.S. 11 (1954) ............................................................................... 54

*Paice LLC v. Ford Motor Co.*,
  881 F.3d 894 (Fed. Cir. 2018) ............................................................ 53

*Panduit Corp. v. Dennison Mfg. Co.*,
  810 F.2d 1561 (Fed. Cir. 1987) .......................................................... 26

*Parker v. Flook*,
  437 U.S. 584 (1978) ....................................................................... 44, 51

*Pharmacyclics LLC v. Cipla Limited*,
  2020 WL 6581643 (D. Del. Nov. 10, 2020) ...................................... 32

*Philips North Am. LLC v. Fitbit LLC*,
  626 F. Supp. 3d 292 (D. Mass. 2022).................................................. 40

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
  827 F.3d 1042 (Fed. Cir. 2016) ............................................. 42, 48, 49

*Rolls-Royce Ltd. v. GTE Valeron Corp.*,
  800 F.2d 1101 (Fed. Cir. 1986) .......................................................... 52

*Rsch. Corp. Techs., Inc. v. Microsoft Corp.*,
  536 F.3d 1247 (Fed. Cir. 2008) .......................................................... 59

*Rsch. Corp. Techs., Inc. v. Microsoft Corp.*,
  627 F.3d 859 (Fed. Cir. 2010) ...................................................... 25, 45

## Cases—Continued

*Sanchez-Llamas v. Oregon,*
  548 U.S. 331 (2006)............................................................... 29

*Sanderling Mgmt. Ltd. v. Snap Inc.,*
  65 F.4th 698 (Fed. Cir. 2023)............................................. 39

*Sapphire Crossing LLC v. Quotient Tech., Inc.,*
  2020 WL 1550786 (D. Del. Apr. 1, 2020)......................... 40

*In re School Asbestos Litig.,*
  977 F.2d 764 (3d Cir. 1992) ............................................... 58

*Shelcore, Inc. v. Durham Indus., Inc.,*
  745 F.2d 621 (Fed. Cir. 1984) .......................................... 26

*SmithKline Beecham Corp. v. Apotex Corp.,*
  403 F.3d 1331 (Fed. Cir. 2005) ........................................ 47

*SmithKline Beecham Corp. v. Apotex Corp.,*
  439 F.3d 1312 (Fed. Cir. 2006) ........................................ 33

*Stevenson v. Sears, Roebuck & Co.,*
  713 F.2d 705 (Fed. Cir. 1983) .......................................... 26

*Strub v. Axon Corp.,*
  168 F.3d 1321................................................................... 34

*Svindland v. The Nemours Found.,*
  287 F. App'x 193 (3d Cir. 2008) ....................................... 55

*Synopsys, Inc. v. Mentor Graphics Corp.,*
  839 F.3d 1138 (Fed. Cir. 2016) ........................................ 43

*TD Bank N.A. v. Hill,*
  928 F.3d 259 (3d Cir. 2019) .............................................. 38

*TecSec, Inc. v. Adobe Inc.,*
  978 F.3d 1278 (Fed. Cir. 2020) ........................................ 45

## Cases—Continued

*Tone Bros, Inc. v. Sysco Corp.*,
  28 F.3d 1192 (Fed. Cir. 1994) ............................................................. 53

*TriMed, Inc. v. Stryker Corp.*,
  608 F.3d 1333 (Fed. Cir. 2010) ........................................................... 53

*United States v. Bergin*,
  682 F.3d 261 (3d Cir. 2012) ................................................................. 55

*United States v. Dowdell*,
  70 F.4th 134 (3d Cir. 2023) ............................................. 22, 28, 29, 30

*United States v. Jackson*,
  2023 WL 2755578 (3d Cir. Apr. 3, 2023) ........................................... 58

*United States v. Kennedy*,
  682 F.3d 244 (3d Cir. 2012) .......................................................... 54, 55

*United States v. Ming He*,
  94 F.3d 782 (2d Cir. 1996) .................................................................. 58

*United States v. Sineneng-Smith*,
  140 S. Ct. 1575 (2020) ................................................................. *passim*

*United States v. Thomas*,
  357 F.3d 357 (3d Cir. 2004) ................................................................. 56

*United States v. Wecht*,
  541 F.3d 493 (3d Cir. 2008) ................................................................. 55

*Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*,
  887 F.3d 1117 (Fed. Cir. 2018) ........................................................... 49

*Vaporstream, Inc. v. Snap Inc.*,
  2020 WL 136591 (C.D. Cal. Jan. 13, 2020) ....................................... 40

*Versata Software, Inc. v. Callidus Software, Inc.*,
  780 F.3d 1134 (Fed. Cir. 2015) ........................................................... 21

## Cases—Continued

*Wood v. Milyard*,
  566 U.S. 463 (2012).............................................................35

## Statutes and Rules

28 U.S.C.
  § 455(a)...........................................................................55
  § 1295(a)..........................................................................4
  § 1331 ..............................................................................3
  § 1338(a)..........................................................................3

35 U.S.C.
  § 101 .......................................................................*passim*
  § 112 .......................................................................*passim*
  § 271 ...............................................................................3
  § 282 ....................................................................25, 32

Fed. R. Civ. P.
  12(b)(6) ..........................................................................39
  26(a)...............................................................................32
  37(c)(1)............................................................................32
  50(b)...............................................................................30
  52 ...........................................................................*passim*

## STATEMENT OF RELATED CASES

This case has not previously been before this Court. Astellas is engaged in two other cases pending in the District of Delaware concerning claims of the '780 patent. *See Astellas Pharma Inc. v. Ascent Pharmaceuticals, Inc.*, No. 23-cv-486 (D. Del. 2023); *Astellas Pharma Inc. v. MSN Pharmaceuticals Inc.*, No. 23-cv-689 (D. Del. 2023). Counsel for Appellants is not aware of any other case pending in this or any other tribunal, outside of these consolidated cases, that will directly affect or be directly affected by this Court's decision in this case.

## INTRODUCTION

After years of pretrial preparation, a five-day bench trial, and hundreds of pages of post-trial briefing, the parties had a well-defined understanding of the issues presented by this ANDA litigation. Astellas asserted three claims of U.S. Patent No. 10,842,780 (the '780 patent) against three defendants, who in turn argued that those claims were not infringed and were invalid for failing to comply with various requirements contained in 35 U.S.C. § 112.

Months after post-trial briefing was complete, the district court issued a four-page opinion invalidating the '780 patent for claiming patent-ineligible subject matter in violation of Section 101—a theory that no party had ever advanced. In so holding, the court expressly refused to allow Astellas to even brief the issue, much less develop an evidentiary record regarding the court's newfound Section 101 arguments.

The court's sole justification for this acknowledged departure from the parties' arguments was a belief that it was duty-bound to conduct a *de novo* analysis of the patent's validity. That, of course, is simply not the role of a district court in a patent case. Instead, a court determines only whether particular challengers have carried their burden to prove a patent invalid by clear and convincing evidence. Even if the court finds that the chal-

lengers have failed to carry that burden, nonparties remain free to challenge the patent anew in future litigation.

What is more, the court's approach abandoned basic principles of American jurisprudence. Courts in our system follow the party presentation principle—they sit to resolve issues brought to them and framed by the parties in each case. The exceptions to this general rule are extremely narrow and plainly not applicable here. And in abandoning the party presentation principle, the district court disregarded the waiver and forfeiture doctrines as well, which are rooted in fairness and constitutional due process.

One reason courts address only questions briefed and argued by the parties is a belief that they are more likely to reach a correct result with the benefit of adversarial argument—and this case illustrates the dangers that can occur when judges depart from their ordinary role. Without the benefit of party presentation, the district court disregarded all guidance from this Court and the Supreme Court on how to conduct the Section 101 inquiry. And in doing so, it reached an indefensible result. Contrary to the district court's conclusion, the claims here cover pharmaceutical formulations containing a synthetic compound (and a method of treatment by administering those compositions) that are unquestionably "compositions of matter" and articles of "manufacture" (35 U.S.C. § 101), as opposed to nat-

ural laws or phenomena. And the claims provide significant structure, confirming that Astellas did not attempt to patent some general discovery.

In engaging in this extraordinary conduct, the court expressed frustration that the defendants dropped their obviousness arguments on the eve of trial. Rather than decide the issue on grounds actually argued by the parties, the court attempted to use Section 101 as a back door to import its instincts about whether the invention was worthy of a patent. What is more, a reasonable observer would understand the court as having expressly criticized the innovator pharmaceutical industry as a whole. Citing antitrust litigation having no connection to the parties or products in this case, the court asserted that "[t]he pharmaceutical industry" has "perverted" the "intent" of the Hatch-Waxman Amendments, claiming that "brand and generic drug manufacturers have colluded to protect weak or invalid patents." Appx8513. Taken together, these circumstances and commentary suggest that the Court should order reassignment on remand.

## JURISDICTION

This action consists of claims for patent infringement against appellees under 35 U.S.C. § 271. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

The district court entered an order of judgment in favor of Appellees—and dismissed the action—on June 9, 2023. Appx5. This is a final or-

der of judgment disposing of all of Astellas' claims. Astellas filed its notices of appeal on June 13, 2023, in 20-cv-1589 and on June 21, 2023, in 21-cv-664 and 21-cv-425. After the district court denied the defendants' Federal Rule of Civil Procedure 52(b) motion (Appx8512-8514), Astellas filed corresponding, timely amended notices of appeal. Appx8551-8556. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a).

## ISSUES PRESENTED FOR REVIEW

1.    Did the district court err by invalidating the claims at issue on grounds that no party had asserted, briefed, argued, or presented evidence on at trial?

2.    Alternatively, did the district court err on the merits in holding the claims at issue invalid as a matter of law for claiming invalid subject matter?

## STATEMENT

### A.    Factual background.

Overactive bladder (OAB) is a condition that affects millions of Americans each year. OAB is characterized by urinary urgency, which is a sudden and compelling need to urinate. Appx6724. This urinary urgency is far more intense than the feeling that ordinarily accompanies the need to urinate, and adults suffering from OAB have difficulty controlling or de-

ferring the need to urinate, often leading to leakage and incontinence. Appx6724-6725. OAB patients can also present with urinary frequency (the need to urinate too often) and nocturia (interruption of nighttime sleep due to a need to urinate). *Id.*

The symptoms of OAB are significantly detrimental for patients' quality of life. Appx6724-6725. The frequent and irresistible need to urinate causes those with OAB to be perpetually preoccupied with staying close to a bathroom. Individuals suffering from OAB experience feelings of anxiety, embarrassment, and isolation because of their urinary frequency and potential incontinence. *Id.* Elderly patients with OAB have a higher incidence of hip fractures due to hurried trips to the bathroom. *Id.* And because OAB is a chronic condition, most patients suffering from it will experience symptoms for an extended period of time, if not forever. *Cf.* Appx6725.

Prior to Astellas' introduction of Myrbetriq®, the only medications approved for the treatment of OAB belonged to a class of drugs called "antimuscarinics." Appx6725. Antimuscarinics work by blocking muscarinic receptors in the body, which helps inhibit involuntary contractions of the bladder. *Id.* But muscarinic receptors are found in various other systems throughout the body too, and there are no antimuscarinics that can specifically target only those receptors in the bladder. Appx6725. Antimusca-

rinics thus have a variety of problematic side effects. *Id.* Muscarinic receptors, for example, are found in the salivary glands. Appx6725. Blocking these receptors prevents the salivary glands from excreting, which causes severe dry mouth. *Id*. Similarly, blocking the muscarinic receptors in the gastrointestinal tract causes constipation. *Id*. Of particular concern, antimuscarinics can also affect cognitive function, including by causing dementia. *Id*.

The severity of antimuscarinics' side effects made them difficult for many patients to tolerate, especially given the chronic nature of their symptoms. Appx6725-6726. While OAB can be severe, and can have devastating implications for patients, it is not ordinarily a life-threatening condition. Appx6725-6726. When patients balance the negative impacts from the side effects of antimuscarinic medications against their immediate OAB symptoms, they sometimes make the difficult choice to cease taking their medication. Appx6725-6726. Indeed, seventy to eighty percent of patients stopped taking most antimuscarinics by the end of one year. Appx6725-6726.

Myrbetriq® is a life-changing, FDA-approved treatment for OAB. Mirabegron, the active ingredient in Myrbetriq®, is a first-in-class drug with a completely different mechanism of action from antimuscarinics. Appx6725-6726. Instead of blocking muscarinic receptors, mirabegron (a

beta-3 agonist) *stimulates* beta receptors in the bladder. Appx6726. Rather than merely preventing involuntary bladder contractions, mirabegron induces bladder relaxation, leading to improved bladder function. *Id.* Because mirabegron has a different mechanism of action from the antimuscarinics, it also has a different side-effect profile that can be less severe, particularly when certain sustained-release formulations are used. Appx6725-6726; *see infra* pages 7-9. The less severe side-effect profile of Myrbetriq® in turn increases patient compliance. *Id.* This outcome is quite surprising given that mirabegron (and other beta-3 agonists) were initially developed to treat diabetes, not OAB. Appx6771.

Because of its efficacy and its favorable side-effect profile, Myrbetriq® has become a first-line therapy in the treatment of OAB. Appx6725-6726. Myrbetriq® was approved by the FDA in June 2012 and launched later that year. Appx6725.

### B. The '780 patent.

During the development process of what would become Myrbetriq®, Astellas initially explored immediate release formulations containing mirabegron. Appx6821. But its initial trials determined that these formulations suffered from a problematic feature known as a "food effect," which is where a drug's bioavailability (i.e., absorption) is affected by the presence

or absence of food in a patient's body. Appx6727-6728; Appx6768; Appx6821; Appx6823.

On the one hand, mirabegron was ineffective in patients who took these initial formulations of the drug with a meal; the levels of mirabegron in their blood fell short of the concentration required to achieve any therapeutic results. Appx-6727-6728; Appx6768; Appx6821; Appx6823. And taken without food, mirabegron proved potentially dangerous. If a patient has an empty stomach, mirabegron is rapidly absorbed into the blood. Appx6768. The concentration of the drug in patients' blood could cross into toxic levels. Appx-6727-6728; Appx6768; Appx6821; Appx6823. Mirabegron is a beta-3 agonist, a class of compounds that are frequently associated with effects on the function of the heart. *Id.* Toxic levels of mirabegron in the blood could potentially cause adverse cardiovascular effects, including increased blood pressure and heart rate. *Id*.

Mirabegron's considerable food effect threatened its viability as a therapeutic drug. Because OAB is not a life-threatening condition, patients only adhere to treatment routines that have a net quality-of-life benefit—*i.e.* a successful treatment must have side effects less bad than the benefit the patient receives from treatment. Appx6725-2726. Physicians are unlikely to prescribe a drug with significant toxicity, particularly potential cardiovascular toxicity, to treat a non-life-threatening condition.

8

Appx6727. The existence of such a food effect therefore threatened the product's safety and viability. *Id.*

Mirabegron's food effect was so pronounced that Astellas was on the verge of cancelling the entire development program. Appx6727; Appx6768; Appx6771. However, Astellas' inventors determined that they could reduce the food effect by administering mirabegron in a sustained-release formulation, when that formulation used certain hydrogel-forming polymers and had a specific drug release profile. Appx6724; Appx6727-6728; Appx6769-6770; Appx6822-6823; Appx6828. These "oral controlled absorption systems" (OCAS) were one way to create a product with a less acute rise in drug concentration. Appx6769.

The idea was entirely unconventional, to the point that the inventors were at first denied permission to even begin OCAS formulation research, but eventually they obtained permission to move ahead. Appx6770. Their research bore fruit, and they invented the formulations claimed by the '780 patent. Appx6770-6771. With this solution in hand, Astellas was able to complete development of Myrbetriq®, obtain FDA approval, and substantially improve the lives of countless Americans.

These formulations—containing specific hydrogel-forming polymers and meeting specified dissolution profiles—are the formulations covered

by the claims of the '780 patent. Astellas first filed what would become the '780 patent in 2008. Appx188.

Claim 1 of the '780 patent covers a subset of sustained release mirabegron formulations: (1) sustained release hydrogel formulations; (2) containing a hydrogel-forming polymer selected from a list of 6 options; (3) containing a water-soluble additive selected from a list of 23 options; and (4) meeting a specific set of dissolution parameters. Claim 5 depends on Claim 1, limiting the list of hydrogel-forming polymers to three options. Claim 20 depends (indirectly) on Claim 1 and covers a method for treating OAB by administering a tablet containing the free base of mirabegron that meets the specifications of Claim 1. Finally, Claim 25 claims tablets containing mirabegron containing a "means for forming a hydrogel and a means for ensuring penetration of water into the pharmaceutical composition" that meets the same dissolution limitation as Claim 1.

After the '780 patent issued, Astellas timely listed it in the Orange Book as related to Myrbetriq®—indicating that Astellas was entitled to exclusivity in the drug's production, marketing, and distribution until both the patent and associated pediatric exclusivity expire. Appx4504; Appx4508.

### C.    Procedural background.

**1.** Appellees are three drug manufacturers—Sandoz, Lupin, and Zy-dus—that sought to develop and market generic copies of Myrbetriq®. Appx4510-4511; Appx4514; Appx4518; Appx6819.

Astellas filed suit against these generic manufacturers on November 24, 2020, under the Hatch-Waxman Amendments,[1] alleging that the generic product each company sought to market will infringe the '780 patent. Appx145-186. The district court's scheduling order expressly "incorporated" the District of Delaware's Default Standard for Discovery "by reference." Appx501. The Default Standard required the defendants to "produce to [Astellas] [their] invalidity contentions for each asserted claim." U.S. Dist. Ct. for the Dist. of Del., *Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI")*, at 5, perma.cc/MT9P-8VAX (*Default Standard*). On July 7, 2021, the defendants produced their invalidity contentions. Appx651-652. They claimed that the asserted claims were invalid for reasons of anticipation (under Section 102), obviousness (under Section 103), lack of written description and enablement (under Section 112), and indefiniteness (under Section 112).

---

[1]    Astellas later filed an amended complaint. Appx442-456.

Appx669, Appx766-Appx928. The defendants did not assert any defense sounding in Section 101.

The district court's scheduling order also required the defendants to produce final invalidity contentions. Appx504. On August 29, 2022, the defendants served their final invalidity contentions, again identifying anticipation, obviousness, written description, enablement, and indefiniteness as the basis for their claim of invalidity. Appx1501-1502, Appx1519, Appx1798-Appx2158. Again, the defendants did not assert any defense under Section 101.

As the case proceeded to trial, the parties continued to narrow their theories of the case. On January 17, 2023, they filed a joint proposed pretrial order (PTO), along with their statements of the legal issues in the case.[2] In their Statement of Issues of Law that Remain to be Litigated (filed alongside the pretrial order), the defendants identified four theories of invalidity that they intended to present at trial: "Enablement," "Lack of Written Description," "Indefiniteness," and "Obviousness." Appx6513 (Section III.C), Appx6520 (Section III.D), Appx6528 (Section III.B (sic.)), Appx6533 (Section IV). Defendants explained that they "identif[ied]" []

---

[2]   Defendants filed an amended statement on January 25, 2023, to correct the omission of various material from the version filed alongside the PTO. Appx6501-6503.

12

these legal issues … based on their understanding of the pleadings served and discovery taken in th[e] action to date." Appx6510.

As the February 5, 2023, trial date neared, the parties worked extensively to narrow the issues to be presented to the Court. On January 30, 2023, the parties notified the district court that Astellas had agreed to narrow its case to five asserted claims, and that the defendants had correspondingly agreed to narrow their obviousness case to two specific theories. Appx6581-6582.

Two days later, on February 1, the parties filed a stipulation and proposed order further narrowing the issues in dispute. Appx6591-6593. In that stipulation, Astellas agreed to assert only three claims of the '780 patent, and the defendants correspondingly agreed "not [to] present any evidence on or assert as a defense at trial that the Asserted Claims are invalid for" obviousness. *Id.* Each defendant then filed a stipulation to reflect the specific invalidity contentions that it *would* advance. Appx6594-6597 (Sandoz, "including indefiniteness, non-enablement and inadequate written description"); Appx6611-6614 (Lupin, same); Appx6615-6618 (Zydus, listing "indefiniteness"). No defendant mentioned Section 101.

The case proceeded to a bench trial, which lasted from February 6 to February 10, 2023. Astellas presented its infringement case, and then the defendants presented their invalidity case, limited to contentions arising

under Section 112. The defendants presented arguments concerning only "lack of enablement, lack of written description, and … indefiniteness." Appx6716. Their sole invalidity witness, Dr. Chambliss, opined that "the asserted claims of the '780 patent are invalid for three separate distinct reasons": "First, lack of enablement;" "[s]econd, lack of written description"; "[a]nd third indefiniteness." Appx6961. This was consistent with the opinions he expressed in his expert report, which focused only on an asserted lack of enablement, lack of written description, indefiniteness, and obviousness, the last of which was abandoned before trial. Appx3813-3817. At trial, no defendant ever contended that the claims are invalid for reasons of Section 101.

After the trial, the parties engaged in parallel briefing on the issues of invalidity and infringement. In their opening invalidity brief, the defendants argued that "the Asserted Claims are invalid under 35 U.S.C. § 112 for three separate and discrete reasons: lack of enablement, lack of written description, and indefiniteness." Appx7310-7311. They concluded by urging the court to "find that the Asserted Claims are invalid for lack of enablement, lack of written description, and indefiniteness." Appx7369. Similarly, in their reply brief, the defendants discussed only non-enablement, inadequate written description, and indefiniteness as bases

14

for invalidity. Appx7739-7740. They again made no arguments based on Section 101.

**2.** The district court issued its order and supporting memorandum decision on June 9, 2023, which invalidated the asserted claims of the '780 patent. Appx1-4. Rather than resolve any of the invalidity theories advanced by the defendants or address plaintiffs' infringement evidence, the court declared that the '780 patent claims "a natural law applied via routine, conventional, and well-known methods" in violation of Section 101. Appx2.

In so holding, the court acknowledged that the defendants "on validity, challenged the '780 patent for (primarily) failing the enablement requirement of 35 U.S.C. § 112." Appx2. But the district court took the view that it does "not" "sit[]" as "an arbiter to resolve disputes on the parties' favored terrain." Appx3-4. Rather, the court determined that its role was to resolve the validity of the asserted claims *de novo*. *Id*. The district court specifically noted that it would not even allow the parties to brief the Section 101 issues that it *sua sponte* identified: "Further briefing on this matter would bring unnecessary delay and undue prejudice." *Id*.

**3.** Astellas timely appealed. Appx8501-8506. After Astellas filed its notices of appeal, the defendants—who had *entirely prevailed* in light of the district court's decision—filed a motion under Federal Rule of Civil

Procedure 52(b) asking the district court to make additional factual findings and conclusions of law. Appx8507-8511. In particular, the defendants asked the district court to resolve the issues actually presented by the parties—infringement and appellees' invalidity contentions arising under Section 112. Appx8508; Appx8510.

The defendants clearly recognized the shortcomings of the district court's decision: Astellas, they foresaw, would "assert on appeal that the record does not support a § 101 defense that was not presented at trial or in the post-trial briefing and is currently not set forth in the Court's opinion in terms of the claim language itself." Appx8508-8509. Quoting *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020), appellees argued that "[o]ur adversarial system usually 'follow[s] the principle of party presentation,' and thus, courts generally rely 'on the parties to frame the issues for decision.'" Appx8509.

Beyond explaining to the district court that it had departed from the essential principle that courts resolve the issues presented by the parties, the defendants predicted that, unless the district court resolved the infringement and Section 112 invalidity issues, a remand would be inevitable:

> Because appellate courts also generally will not undertake fact-finding, if Defendants attempt to argue on appeal that the '780

16

patent is invalid under 35 U.S.C. § 112 or that Astellas failed to establish infringement (as Defendants presented at trial), then the case will in all likelihood be remanded to this Court for further fact-finding. *See, e.g.*, *Golden Bridge Technology, Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1323 (Fed. Cir. 2008) ("Appellate courts review district court judgments; we do not find facts."). In other words, although Defendants agree with the Court's judgment and ultimate conclusion of invalidity, Defendants are not likely to succeed in arguing the defenses they presented at trial to the Federal Circuit as alternative grounds for affirmance, absent further action by the Court under Rule 52(b), because of the lack of factual findings on these issues.

Appx8509.

A few days later, the district court denied the motion. Appx8512-8514. In the district court's view, its Section 101 conclusion—an argument never advanced by appellees—reflected "a settled point of foundational patent law." Appx8512.

The district court then went much farther. Although this point was not at issue in the trial—no party presented evidence or argument regarding it—the court asserted as its own apparent view that "[t]he pharmaceutical industry, to put it mildly, has perverted" Congress's "intent" expressed by the Hatch-Waxman Amendments. Appx8513. Citing antitrust litigation having no relationship to Astellas or the product at issue, the district court asserted that "brand and generic drug manufacturers have colluded to protect weak or invalid patents and share in the startling profits." Appx8513.

17

The court further criticized the USPTO for having "accommodated" pharmaceutical "innovation" patents. Appx8513 (using scare quotes around "innovation"). And it chastised appellees for having failed to detect its strong hints at trial as to the arguments that the court believed appellees should have raised: "What *did* surprise the Court was defendants' failure to articulate this critical defense," especially notwithstanding "the Court [having] made explicit its concerns about validity," "to no avail." Appx8513-8514.

Astellas filed timely amended notices of appeal. Appx8551-8556.

## SUMMARY OF THE ARGUMENT

After a full trial and extensive post-briefing, the district court jettisoned the parties' framing of the case and raised *sua sponte* an affirmative defense that no party had ever discussed in years of extensive litigation. This alone was error. Moreover, the substantive result the district court reached was irredeemably wrong.

**I.A.** Below, the court conceived its role as conducting an independent inquiry into the validity of the '780 patent, out of concern that rejecting the defendants' actual challenge would cement the patent's validity. In doing so, it turned the proper role of a trial court on its head. A trial court considering an invalidity challenge has a single job: to determine whether the challengers proved invalidity by clear and convincing evidence. A finding

18

that the challengers failed to carry their burden does not bar future challenges by other parties. The court's misapprehension of its proper role was the root of its error.

**B.** The American system of adjudication depends on the principle of party presentation, under which courts sit as neutral arbiters to resolve the issues brought to them by the parties. The Supreme Court has made it clear that courts "should not[] sally forth … looking for wrongs to right." *Sineneng-Smith*, 140 S. Ct. at 1579. This principle is immediately related to forfeiture: Arguments that parties fail to advance are forfeited, and courts are not to step into the role of litigant to assert an otherwise forfeited defense. Abandoning these principles is an abuse of discretion in all but the narrowest of exceptional cases—and those few exceptions have no applicability here.

**C.** In departing from the traditional judicial role, the district court also ran roughshod over key principles of constitutional due process. Separate theories of patent invalidity are separate defenses. When the defendants made the intentional choice to omit a Section 101 defense, they waived that defense going forward. This Court and the Third Circuit have announced that such waivers are to be enforced, not least because basic fairness and due process require notice and an opportunity to rebut the merits of any theory before a patent-holder can be deprived of a valuable

property right. And the prejudice to Astellas is apparent: It never had an opportunity to develop a factual record relevant to the Section 101 theory concocted by the district court.

**II.** On the merits, the district court's Section 101 analysis is indefensible.

**A.** To start with, the court invented its own test instead of applying the well-established *Alice*/*Mayo* framework. And rather than focusing on the text of the asserted claims, like this Court has repeatedly directed, the district court abstracted the claims beyond recognition. It did this to smuggle intuitions about obviousness or novelty into the case in the guise of a Section 101 inquiry. That alone was error.

**B.** Applying the actual Section 101 test, the asserted claims cover only eligible subject matter. They claim synthetic pharmaceutical formulations, which definitionally are "composition[s] of matter" or articles of "manufacture." 35 U.S.C. § 101. There is simply no sensible way to understand the district court's conclusion that such claims are instead directed to a law of nature. This suffices to end the Section 101 inquiry.

But even so, it bears emphasis that where a claim *involves* a law of nature, or where an invention was inspired by a natural discovery, the claim is not necessarily directed to a law of nature—indeed, all pharma-

ceutical patents (and many others) involve or are inspired by natural phenomena, but are not invalid on that basis. And even if, somehow, the Court were to conclude that the claims *were* so directed, the language of the claims adds sufficient structure to ensure that Astellas was not trying to patent a discovery, but rather patent a useful invention inspired by it.

**III.** There is no basis to affirm on any other grounds, as the district court made *no* factual findings. Remand is the only viable course of action.

**IV**. This case is the rare one in which reassignment upon remand is warranted. The district court made clear its hardened belief that the '780 patent is invalid, and a reasonable observer could not help but suspect that the court's opinion would affect its future judgments in this case. This conclusion is reinforced by the court's clear departure from the principle of party presentation and its pointed commentary regarding the pharmaceutical industry. Reassignment on remand is appropriate to "preserve not only the reality but also the appearance of the proper functioning of the judiciary as a neutral, impartial administrator of justice." *Alexander v. Primerica Holdings, Inc*., 10 F.3d 155, 167 (3d Cir. 1993).

## STANDARD OF REVIEW

The Court "appl[ies] regional circuit law" to "procedural issue[s] not unique to patent law." *Versata Software, Inc. v. Callidus Software, Inc.*, 780 F.3d 1134, 1136 (Fed. Cir. 2015). Departures from the principle of par-

ty presentation are reviewed for abuse of discretion. *See Sineneng-Smith*, 140 S. Ct. at 1578; *United States v. Dowdell*, 70 F.4th 134, 146 (3d Cir. 2023). While there are "circumstances in which a modest initiating role for a court is appropriate," a court must not "depart[] so drastically from the principle of party presentation as to constitute an abuse of discretion." *Sineneng-Smith*, 140 S. Ct. at 1578-79. Additionally, the Court "review[s] de novo whether a claim is invalid under the judicially created exceptions to § 101." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1311 (Fed. Cir. 2016).

## ARGUMENT

### I. The district court erred by *sua sponte* injecting a Section 101 defense into this litigation.

The district court's insertion of a Section 101 defense into this case—in a post-trial decision, without affording any party so much as the right to brief the issue—was profound error. Because no party ever raised the defense, Section 101 was irrelevant to the issues before the district court. The Court should simply hold that there is no proper Section 101 defense in this action, and then remand for resolution of the issues actually presented by the parties.

The factual background is clear. Over more than two years, the parties prepared for trial. During this time, the parties focused their argu-

ments: Astellas reduced the claims it asserted were infringed, and the defendants narrowed the range of invalidity contentions concerning those claims. *See* pages 11-13, *supra*. On the eve of trial, the parties agreed that, in exchange for Astellas asserting even fewer claims (thus waiving the claims not asserted), the defendants would entirely abandon their obviousness defense. Appx6591-6593. Defendants deliberately narrowed their invalidity case to three Section 112 contentions: They urged the district court to "find that the Asserted Claims are invalid for lack of enablement, lack of written description, and indefiniteness." Appx7369. Ultimately, the parties—all represented by sophisticated counsel—chose the issues that they believed warranted judicial resolution.

At no time did the defendants *ever* develop a Section 101 defense. They did not raise such a defense in either their preliminary or final invalidity contentions, at trial, or in their post-trial briefs. Defendants decided which arguments to advance—and Section 101 was not among them. The defendants plainly see it the same way: After defendants *won* judgment from the district court, they asked that court for a redo. As defendants told the district court, Astellas would undoubtedly "assert on appeal that the record does not support a § 101 defense that was not presented at trial or in the post-trial briefing." Appx8508.

In at least three distinct ways, the district court misapprehended the role it was to play in this proceeding. *First*, the district court failed to recognize the critical question before it: The issue was whether the defendants had carried *their* burden in proving the patent claims invalid based on the arguments they raised, *not* whether Astellas proved its claims valid. *Second*, the district court failed to appreciate the fundamental principles of party presentation and forfeiture: Courts are to assess the arguments actually presented by the parties, not to advance wholly new theories or defenses it believes its favored side should have argued. *Third*, the district court failed to apprehend the stark due process consequences implicated by its decision to invalidate substantial intellectual property held by Astellas, without so much as providing Astellas the right to develop a record or respond to the district court's original argument. It was manifestly prejudicial for the district court, at the end of trial, to inject Section 101 for the first time, with no opportunity for fact development, briefing, or argument.

## A.   The district court misunderstood that the issue posed for judicial review is whether *defendants* proved the claims *in*valid.

At the outset, the district court misapprehended its function in patent litigation. Disclaiming its role to "sit[] [as] an arbiter to resolve disputes on the parties' favored terrain" (much more on this below), the court

24

suggested that it was "charged to apply the law given by Congress as interpreted by the Supreme Court and the Courts of Appeals for the Third and Federal Circuits." Appx3-4. As the court apparently saw it, its task was to test the patent against all "settled point[s] of foundational patent law." Appx8512. If, in the district court's own estimate, a patent is invalid for reasons apart from those raised by the defendant, a court is duty-bound to invalidate it. Rather than weigh the parties' arguments, the court engaged in a free-floating examination of a patent's validity.

That badly misunderstands patent litigation. It is foundational that a judgment for a plaintiff in patent litigation does not establish that the claim is *valid*; rather, it establishes that the particular defendant failed to prove the claim *in*valid.

To start with, by statute, "[a] patent shall be presumed valid," and further "[e]ach claim of a patent … shall be presumed valid independently of the validity of other claims." 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 101 (2011). Moreover, "the party asserting invalidity has the burden of persuasion to show the contrary by clear and convincing evidence." *Rsch. Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 870 (Fed. Cir. 2010).

This has a critical implication for the conduct of a trial. "Under the statute," the trial court's role "is to determine whether the patent's chal-

lenger carried the burden of establishing invalidity." *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1457 n.1 (Fed. Cir. 1984). Thus, when a patent owner succeeds, "[a] patent is not held valid for all purposes but, rather, not invalid on the record before the court." *Shelcore, Inc. v. Durham Indus., Inc.*, 745 F.2d 621, 627 (Fed. Cir. 1984). The Court has repeatedly stressed the distinction: a finding that a challenger failed to carry its burden in proving a patent claim *in*valid does *not* establish that the claim is in fact *valid*.[3]

Since courts cannot declare a patent "valid," a "decision upholding a patent's validity is not ordinarily binding on *another* challenge to the patent's validity … in either the courts or the PTO." *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1429 n.3 (Fed. Cir. 1988) (emphasis added). Indeed, this Court has explained that, "[a]s a matter of due process," each party

---

[3]   *See, e.g.*, *In re Baxter Int'l, Inc.*, 698 F.3d 1349, 1351 (Fed. Cir. 2012) (O'Malley, J., concurring in denial of rehearing en banc) ("In a court proceeding, a patent is not found 'valid.' A judgment in favor of a patent holder in the face of an invalidity defense or counterclaim merely means that the patent challenger has failed to carry its burden of establishing invalidity by clear and convincing evidence in that particular case—premised on the evidence presented there."); *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1571 (Fed. Cir. 1993); *Panduit Corp. v. Dennison Mfg. Co*., 810 F.2d 1561, 1569 (Fed. Cir. 1987); *Stevenson v. Sears, Roebuck & Co*., 713 F.2d 705, 707 (Fed. Cir. 1983).

against whom a patent is asserted "is entitled to make its own defense." *Mendenhall*, 5 F.3d at 1571. As these parties are entitled to marshal their own evidence to support their burden, "[t]here can be no collateral estoppel against a defendant who has not had 'a full and fair opportunity to litigate the'" patent's validity. *Id.* (quoting *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971)).

The district court's decision appears to follow from a misapprehension of these principles. The primary motivation for the decision below was the court's concern for "the obviousness implications" of claims like those in the '780 patent. Appx8513. Unable to fit these concerns into the framework of the Section 112 arguments the parties presented at trial, the court instead repackaged them into a Section 101 argument. This was incorrect—as explained in more detail below, obviousness "is of *no relevance* in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016). But even more fundamentally, it ignored the basic role of a judge in a patent trial.

In a patent case, a district court's role is not to canvass *all* "law given by Congress" and construed by this Court. *Cf.* Appx4. Rather, as relevant here, it is to determine whether the defendant, through its choice of argument, has succeeded in proving the patent *in*valid. With this appropriate

27

framing in mind, the district court's central error—its failure to adhere to the party presentation and forfeiture doctrines—comes into sharp focus.

### B. In improperly resurrecting a forfeited argument, the district court grossly departed from the principle of party presentation.

As the defendants forthrightly acknowledge, they never asserted a Section 101 defense prior to trial, at trial, or after trial. Appx8508 (defendants admitting that "a § 101 defense … was not presented at trial or in the post-trial briefing"). They therefore forfeited the argument; indeed, the court itself criticized defendants for failing to "articulate this critical defense." Appx8513. In fact, the defendants *expressly waived* an obviousness defense on the eve of trial in exchange for Astellas' agreement to drop previously-asserted claims. Appx6591-6593. The district court erred substantially in nonetheless injecting a Section 101 defense into this action.

**1.** "In our adversarial system of adjudication, we follow the principle of party presentation" (*Sineneng-Smith*, 140 S. Ct. at 1579), which the Third Circuit has described as "the bedrock of our adversarial system." *Dowdell*, 70 F.4th at 145. Thus, "in both civil and criminal cases, in the first instance and on appeal," our system "rel[ies] on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Sineneng-Smith*, 140 S. Ct. at 1579 (quoting

*Greenlaw v. United States*, 554 U.S. 237, 243 (2008)); *see also Dowdell*, 70 F.4th at 145 (party presentation rule "ensures that courts decide only those issues argued by interested and motivated litigants."). In other words, "[i]t is not the job of the court, the 'neutral arbiter,' to raise questions that are not presented by the parties." *Baude v. United States*, 955 F.3d 1290, 1303-04 (Fed. Cir. 2020) (citing *Greenlaw*, 554 U.S. at 244.

The Supreme Court has therefore instructed that courts—as "essentially passive instruments of government"—"do not, or should not, sally forth each day looking for wrongs to right." *Sineneng-Smith*, 140 S. Ct. at 1579. Rather, "[t]hey wait for cases to come to [them], and when cases arise, courts normally decide only questions presented by the parties," departing from this role only in exceptional circumstances. *Id*. This is a distinguishing feature of the American courts, as opposed to "the sort of magistrate-directed, inquisitorial legal system characteristic of many … other countries." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 357 (2006); *accord, e.g.*, *McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2 (1991).

Expressing this principle in the patent context, this Court has explained that "it is beyond cavil that a district court does not have authority to invalidate a patent at its own initiative if validity is not challenged by a party." *Lannom Mfg. Co. v. U.S. Int'l Trade Comm'n*, 799 F.2d 1572, 1579 (Fed. Cir. 1986). Yet that is just what the district court did here.

**2.** The principle of party presentation is immediately related to the doctrine of forfeiture.[4] Enforcing forfeiture in the patent context is critical because "a party's argument should not be a moving target" but "should be consistent, thereby ensuring a clear presentation of the issue to be resolved, an adequate opportunity for response and evidentiary development by the opposing party, and a record reviewable by the appellate court that is properly crystallized around and responsive to the asserted argument." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1346-47 (Fed. Cir. 2001). For this reason, to take just one example, a judge of this Court refused to allow a party to present a new argument in a Rule 50(b) motion, because doing so would deprive the opposing party "at trial of any opportunity to respond to that theory and develop a record in support" of its contrary argument. *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276

---

[4]    Although related—indeed, the terms are often used interchangeably—the concepts of "waiver" and "forfeiture" are formally distinct. The Third Circuit has recently explained that "[w]aiver is the intentional relinquishment or abandonment of a known right," whereas "forfeiture is the failure to make the timely assertion of a right." *Dowdell*, 70 F.4th at 140. *See also In re Google Tech. Holdings LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020) (similar).

F. Supp. 3d 629, 653-54 (E.D. Tex. 2017) (Bryson, J., sitting by designation).[5]

It is noncontroversial that, when a party fails to *ever* present a particular defense throughout the entirety of the district court proceedings, that argument is forfeited. In *Colas Solutions, Inc. v. Blacklidge Emulsions, Inc.*, for example, this Court recently observed that, "since obviousness based on inherency was the only invalidity theory Colas advanced" in the district court, "all other theories were waived regardless of how they are styled." 759 F. App'x 986, 990 n.8 (Fed. Cir. 2019). Where a challenger's briefs "and its evidence were tailored to prove" a particular theory and "[t]hat theory failed," the Court will not permit the challenger's "belated attempt to stretch that evidence to fit [some] alternative … theory." *Id.* at 990.

In the District of Delaware in particular, defendants raising a defense of patent invalidity must serve their final invalidity contentions by a

---

[5]   *See also Allergan, Inc. v. Barr Labs., Inc.*, 808 F. Supp. 2d 715, 735 (D. Del. 2011) (refusing to allow defendants to "switch[] horses by combining pieces of testimony" to support "a different theory of obviousness" presented "post-trial" because "defendants did not allow Allergan to mount a defense" to that theory "at trial"); *Fujifilm Corp. v. Motorola Mobility LLC*, 182 F. Supp. 3d 1014, 1038 (N.D. Cal. 2016) (similar); *Fractus, S.A. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 802, 838 (E.D. Tex. 2012) (similar).

specified date. *See Default Standard*, at 4. Since courts in the district have consistently held that "invalidity contentions are disclosures subject to Rule 26(a)," Rule 37(c)(1) precludes defendants from relying on any legal theory not included in the contentions. *Chevron (HK) Ltd. v. One World Techs., Inc.*, 2023 WL 2372938, at *1 & n.1 (D. Del. Mar. 6, 2023) (collecting cases); *accord Pharmacyclics LLC v. Cipla Limited*, 2020 WL 6581643, at *2 (D. Del. Nov. 10, 2020) ("By failing to seek Plaintiffs' consent or leave from the Court to amend its final contentions, Sandoz waived its right to present at trial an invalidity theory not disclosed in its final contentions.").

In this way, waiver and forfeiture play a crucial role in providing the parties certainty as to the issues in play *before* the trial. Allowing the district court's approach below would place patent-holders in an untenable position at trial. Not only would they need to present evidence to rebut their opponents' actual invalidity contentions, but they would also need to present evidence to rebut *every* possible invalidity claim to prevent the court from invalidating claims on a barren record. Such a system would be grossly inefficient, ballooning the time and expense for already costly trials. And the notion that patent-holders must present a full justification for their patents is fundamentally at odds with the statutory presumption of validity. 35 U.S.C. § 282.

This Court takes forfeiture seriously: An argument advanced by footnote to this Court, it is well understood, is deemed forfeited. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319-20 (Fed. Cir. 2006). Surely, a party's failure to *ever* advance a Section 101 defense during the entirety of a district court proceeding triggers forfeiture, too.

**3.**  Because the defendants never advanced a Section 101 defense, they long ago forfeited it—and the district court's *sua sponte* adoption of the argument violates the party presentation rule. The district court's "radical transformation of this case goes well beyond the pale." *Sineneng-Smith*, 140 S. Ct. at 1581-82.

To start with, the Court has held that "separate conditions of patentability" give rise to "separate defenses available in an infringement action." *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1363 (Fed. Cir. 2008). Below, defendants asserted only obviousness (under Section 103), and written description, enablement, and indefiniteness (under Section 112) as potential theories of invalidity. *See* Appx1503-1519. Then, on the eve of trial, the defendants expressly abandoned their Section 103 defense. *See* Appx6591-6593. And, following the bench trial, defendants again solely advanced arguments pursuant to Section 112. Appx7300-7370. This is no doubt why defendants recognized that Astellas "will assert on appeal

that the record does not support a § 101 defense that was not presented at trial or in the post-trial briefing." Appx8508-8509.

**4.** While forfeiture and the party presentation doctrine may be overcome in cases involving "exceptional circumstances" (*Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001); *see also Sineneng-Smith*, 140 S. Ct. at 1579), no such circumstances are present when the forfeiture results from a party's intentional "strategic decision[s] to concentrate what little time it had for trial" on its preferred theories. *Strub v. Axon Corp.*, 168 F.3d 1321 (Table), at *11 (Fed. Cir. 1998).

Courts may, for example, "depart[] from the party presentation principle" in rare cases in order to "protect a *pro se* litigant's rights." *Sineneng-Smith*, 140 S. Ct. at 1579 (quoting *Greenlaw*, 544 U.S. at 244); *see Castro v. United States*, 540 U.S. 375, 381-82 (2003). This power is generally invoked "in criminal cases," where a party often has a right to counsel and individual liberties are at stake. *Greenlaw*, 554 U.S. at 244. But this is a civil case in which both sides were represented by "learned patent-counsel." Appx4. In circumstances like these, our system "is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Sineneng-Smith*, 140 S. Ct. at 1579 (quot-

ing *Castro*, 540 U.S. at 386 (Scalia, J., concurring in part) (alterations in original)).[6]

Not only are no exceptional circumstances present here, the district court did not so much as acknowledge the governing standard for advancing an argument never made by a party—and the court certainly did not find that this standard is satisfied. The district court's complete failure to grapple with the appropriate test or make any findings to excuse forfeiture is an independent abuse of discretion. *See Wood v. Milyard*, 566 U.S. 463, 472-73 (2012).

To the contrary, the district court's sole justification for its departure from the issues presented by the parties was its view that it "sits not [as] an arbiter to resolve disputes on the parties' favored terrain." Appx3-4.

---

[6] Other exceptions to party presentation are rare—and not implicated here. For example, while courts *sua sponte* raise questions of subject-matter jurisdiction (*Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)), Section 101 is decidedly not a question of subject matter jurisdiction. *Cf. Lannom Mfg. Co.*, 799 F.2d at 1579 (holding that patent invalidity cannot be raised *sua sponte*). And in an idiosyncratic situation, the Supreme Court has allowed a court to *sua sponte* raise AEDPA's statute of limitations when a State's failure to raise it was based on a miscalculation, and thus inadvertent. *Day v. McDonough*, 547 U.S. 198, 201-04 (2006). This exception exists because AEDPA's barriers to review "implicat[e] values beyond the concerns of the parties." *Id.* at 205. That is not true here—a finding that the defendants failed to carry their burden affects no other parties and has no effect on future litigation.

But, as we have repeatedly explained, that is *precisely*—indeed, almost verbatim—what a court *is* supposed to do: "[O]ur adversarial system of adjudication … assign[s] to courts the role of *neutral arbiter of matters the parties present.*" *Sineneng-Smith*, 140 S. Ct. at 1579 (quoting *Greenlaw*, 554 U.S. at 243) (quotation marks omitted) (emphasis added).

By thus "sally[ing] forth … looking for wrongs to right," rather than operating as an "essentially passive instrument[] of government" (*Sineneng-Smith*, 140 S. Ct. at 1579), the district court manifestly abused its discretion. The proper remedy is to "remand the case for an adjudication … attuned to the case shaped by the parties." *Id.* at 1578.

## C. The district court's decision—in departing from fundamentals of due process—gravely prejudiced Astellas.

**1**.  In resolving this case on an argument that the district court itself injected into the litigation, the court compounded its error by refusing to allow Astellas even to *brief* the applicability of Section 101 in this case. In the court's words, "[f]urther briefing on this matter would bring unnecessary delay and undue prejudice." Appx3. The Court's use of the word "[f]urther" is rather curious—there was *no* briefing, *ever*, on the applicability of Section 101 to these claims.

But a patent owner has a constitutional right to at least *address* an argument proffered to invalidate its property rights. The Court has long recognized that, because patents are property interests, invalidating patent claims mandates a "constitutionally required degree of due process." *Constant v. Advances Micro-Devices, Inc.*, 848 F.2d 1560, 1565 (Fed. Cir. 1988); *see also Chamberlain Grp., Inc. v. One World Techs., Inc.*, 944 F.3d 919, 924 (Fed. Cir. 2019) (holding that due process requires notice and an opportunity to meet invalidity arguments in the IPR context).

In the usual course, "federal judicial proceedings, with their extensive notice, opportunity to be heard, and procedural protections" "satisfy the constitutional requirement of procedural due process required for the invalidation of a patent." *Constant*, 848 F.2d at 1565. But those features of normal litigation were absent here. Astellas had no notice whatsoever as to a Section 101 defense. It thus had no opportunity to rebut Section 101 arguments, in part because the district court held that "reopening of expert discovery, retrial, and redrafting of extensive post-trial briefing" would "be an unnecessary delay and unduly prejudicial to defendants." Appx4. In denying Astellas the right to be heard on this issue—along with the right to develop a meaningful record to support its position—the district court squarely violated Astellas' due process rights.

**2**. What is more, the district court erred under Rule 52, which obligates a court in a bench trial to "find the facts specially and state its conclusions of law separately." Federal Rule of Civil Procedure 52(a)(1). Here, the district court made no separate findings of fact—no doubt because the parties never developed the factual record necessary to adjudicate the Section 101 issue that the district court itself minted.

Rule 52 is necessary because appellate courts "must examine the findings to ascertain if they are adequate to explain sufficiently the basis" for the district court's ruling. *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 537 (3d Cir. 1986), *abrogated on other grounds TD Bank N.A. v. Hill*, 928 F.3d 259, 278-279 (3d Cir. 2019). "Indeed, the omission of such reasons makes [review] needlessly arduous, and sometimes even practically impossible." *Jackson v. Danberg*, 594 F.3d 210, 230 (3d Cir. 2010). When "findings are inadequate to explain the basis for that ruling or to permit meaningful review," vacatur and remand are an appropriate remedy. *Educ. Testing Servs.*, 793 F.2d at 537. Because no such findings were made here, Rule 52(a) separately renders the decision below error.

**3**. The prejudice to Astellas from the district court's action was severe. To be clear, the district court's violation of the forfeiture and party presentation principles, along with the manifest due process violation, are reason enough to reverse independent of prejudice. But the failure to allow

Astellas the right to develop a record has material bearing on the Section 101 issues present here, and severely prejudices Astellas.

It is now established that "[t]he patent eligibility inquiry may contain underlying issues of fact." *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 703 (Fed. Cir. 2023) (quoting *Berkheimer v. HP, Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018)). "In particular, at step two of the *Alice* test, 'whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact.'" *Id*. (quoting *Berkheimer*, 881 F.3d at 1368).

In performing this analysis, courts will consider extrinsic factual evidence, such as expert testimony and information instructive of what a skilled artisan would believe to have been well-understood, routine or conventional. *See*, *e.g.*, *Coop. Ent., Inc. v. Kollective Tech., Inc*., 50 F.4th 127, 133 (Fed. Cir. 2022) ("Determining whether the claimed network is well-understood, routine, or conventional is a question of fact that cannot be resolved at the Rule 12(b)(6) stage, and the district court erred in resolving this factual issue against Cooperative."); *Intellectual Ventures I LLC v. Symantec Corp.*, 725 F. App'x 976, 978 n.1 (Fed. Cir. 2018) (resolving an *Alice* step two question where a party "did not offer expert testimony");

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354 (Mem),

1357 (Fed. Cir. 2018) (considering an expert declaration).[7]

Astellas, however, never had the opportunity to develop—much less

present—a factual record here, because defendants never made a Section

101 argument. The district court's refusal to allow Astellas to defend itself

against the Section 101 claim was not just error several times over, but it

caused Astellas manifest prejudice.

## II.   The district court fundamentally erred in its Section 101 analysis.

For reasons just described, the district court should have never em-

barked on its Section 101 foray. Because no party ever raised it, Section

---

[7]   *See also Philips North Am. LLC v. Fitbit LLC*, 626 F. Supp. 3d 292, 302
(D. Mass. 2022) (considering expert reports); *Kajeet, Inc. v. Gryphon
Online Safety, Inc.*, 2021 WL 780737, at *7 (D. Del. Mar. 1, 2021) (relying
on an expert declaration included in a complaint); *Sapphire Crossing LLC
v. Quotient Tech., Inc.*, 2020 WL 1550786, at *2 (D. Del. Apr. 1, 2020)
(same); *Fortinet, Inc. v. Forescout Techs., Inc.*, 2021 WL 5565836, at *11
(N.D. Cal. Nov. 29, 2021) ("Absent further developments in this case such
as claim construction or expert testimony, the Court cannot conclude at
this juncture whether there is an 'inventive concept.'"); *Cellspin Soft, Inc.
v. Fitbit, Inc.*, 2021 WL 1421612 (N.D. Cal. Apr. 14, 2021) (extensively con-
sidering expert testimony); *Vaporstream, Inc. v. Snap Inc.*, 2020 WL
136591, at *7 (C.D. Cal. Jan. 13, 2020) (noting a denial of summary judg-
ment on *Alice* step two because the court "had been presented with com-
peting expert testimony as to that specific question of fact" and denying
reconsideration on that basis).

101 is not relevant to this litigation. And the court compounded its error by failing to allow Astellas to defend itself, including through the creation of a factual record. That resolves this appeal. For completeness, however, we pause to observe that the district court's decision below was also wrong on the merits.

Though it phrased its opinion in terms of subject-matter eligibility, the district court did not undertake a legitimate Section 101 analysis. Instead, it based its conclusions on its asserted views as to "the obviousness implications" of patents like the '780 patent. Appx8513. The court was wrong to rely on its intuitions concerning obviousness in place of the appropriate Section 101 standard; courts may not "substitute §§ 102, 103, and 112 inquiries for the … inquiry under § 101." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 91 (2012). And Section 101 was certainly no basis for the district court to obviate defendants' knowing waiver of their obviousness contentions.

## A.    The district court invented and applied its own subject-matter test.

Section 101 of the Patent Act describes the outer boundaries of patentable subject matter: "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The Supreme Court has "long held that this provision

contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). These categories encompass "'the basic tools of scientific and technological work,'" and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Mayo*, 566 U.S. at 71 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

The Supreme Court has thus articulated a two-part test for identifying patent-ineligible claims. A court "must first determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 573 U.S. at 218. "If the answer is no, the inquiry is over: the claim falls within the ambit of § 101." *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1047 (Fed. Cir. 2016).

If the claims *are* so directed, then the court "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice,* 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 79). Courts are to consider whether these elements are "'well-understood, routine, conventional activit[ies]' previously known to the industry." *Alice,* 573 U.S. at 225. In conducting the Section 101 analysis, this

Court has instructed that the "inquiry must focus on the language of the Asserted Claims themselves." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016); *accord Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013).

The district court's analysis below does not remotely resemble the prescribed inquiry. Rather than begin with the language of the claims, the court seized on a single sentence from Astellas' post-trial brief: "The inventive concept of the '780 Patent was *discovering* the dissolution rate that would address the food effect and achieving it using *previously known* formulation technology." Appx2. From this and this alone the district court concluded that the patent "claims invalid subject matter: a natural law applied via routine, conventional, and well-known methods." *Id.* The opinion contains not a single quotation from the relevant claim language. It contains no discussion of whether that claim language is directed to ineligible subject matter. And the court did not discuss whether the claims contain sufficient inventive material to render the claims compliant with Section 101.

The opinion in this case illustrates precisely why the Supreme Court has required adherence to the two-part *Alice/Mayo* framework and respect for the text of the relevant claims. Rather than actually engage in the Section 101 analysis, the district court here based its opinion on "the obvious-

ness implications" of patents claiming "extended-release formulas [sic]" of pharmaceutical compositions. Appx8513. But "[t]he eligibility inquiry is not an inquiry into obviousness, novelty, enablement, or any other patent law concept." *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1302 (Fec. Cir. 2013) (en banc) (Rader, C.J. and Linn, Moore & O'Malley, JJ. concurring in part). The Supreme Court has thus repeatedly rejected attempts to "substitute §§ 102, 103, and 112 inquiries for the … inquiry under § 101." *Mayo*, 566 U.S. at 91; *see also Parker v. Flook*, 437 U.S. 584, 588 (1978) ("This case turns entirely on the proper construction of § 101. … It does not involve the familiar issues of novelty and obviousness that routinely arise under §§ 102 and 103 when the validity of a patent is challenged.").

Rather, the novelty or obviousness of an invention "is of *no relevance* in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Intellectual Ventures I*, 838 F.3d at 1315; *accord CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372 (Fed. Cir. 2020) ("[T]he novelty or nonobviousness of the invention has little to no bearing on the question of what the claims are 'directed to.'"). Section 101 was never meant to simply "confirm[] our preconceived notions of what should be patentable." *Bilski v. Kappos*, 561 U.S. 593, 624 (2010) (Stevens, J., concurring). In other words, "[S]ection 101 does not

permit a court to reject subject matter categorically because it finds that a claim is not worthy of a patent." *Rsch. Corp.*, 627 F.3d at 868.[8]

Nor was the district court's error harmless. In denying the defendants' Rule 52(b) motion, the court cast doubt on all pharmaceutical patents except "a patent claiming an active ingredient." Appx8513. But the Supreme Court has emphasized the need to "tread carefully in construing" Section 101's "exclusionary principle lest it swallow all of patent law." *Alice*, 573 U.S. at 217. This Court, in turn, has "reiterated the Supreme Court's caution against 'overgeneralizing claims' in the §101 analysis, explaining that characterizing the claims at 'a high level of abstraction' that is 'untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.'" *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016)); *accord McRO,* 837 F.3d at 1313 (explaining that courts "'must be careful to avoid oversimplifying the

---

[8]  The district court's attempt to backdoor an obviousness analysis into the Section 101 inquiry is particularly concerning in this case, where the defendants have intentionally waived any obviousness argument. While they originally pressed obviousness as a theory of invalidity, each stipulated to abandoning any obviousness arguments before trial. Appx6591-6593.

claims' by looking at them generally and failing to account for the specific requirements of the claims").

That is the precise result here. By conceptualizing the claims at a high level and disregarding their specific language, the district court replaced structured reasoning with its own general sense about the patents and parties. In doing so, it threatened to undermine a broad swath of well-accepted pharmaceutical patents, which would throw an entire industry into chaos.

**B.    The '780 Patent does not claim ineligible subject matter.**

Unsurprisingly, by applying the wrong test for Section 101, the district court reached the wrong result. The asserted claims of the '780 patent cover only patent-eligible subject matter.

**1.** None of the asserted claims is even arguably "directed to" ineligible subject matter. Claims 1 and 22 of the '780 patent, from which asserted claims 5, 20, and 25 derive, claim "[a] pharmaceutical composition, comprising" between 10mg and 200mg of mirabegron, a synthetic drug. Appx202-203. The claims embrace only sustained release, hydrogel-forming formulations wherein "the drug dissolution rate" is 39% or less after 1.5 hours and at least 75% after 7 hours. *Id*. As the district court observed, claims 5 and 25 "narrow[] the list of hydrogel-forming polymers to

employ, exclud[e] salt forms of mirabergron," and "formulate[] the dosage into a tablet." Appx3.

Each of the claimed compositions is "a nonnaturally occurring manufacture or composition of matter—a product of human ingenuity." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). Just as in *Diamond*, Astellas has "produced a new [formulation] with markedly different characteristics from any found in nature and one having the potential for significant utility." *Id.* at 310. This Court has held that "a synthetic, man-made compound" is "eligible for patent protection" since it "is without question a 'composition of matter' or article of 'manufacture' within the terms of § 101." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1342 (Fed. Cir. 2005). These compositions are "not nature's handiwork, but [Astellas'] own." *Diamond*, 447 U.S. at 310.

Indeed, this Court has expressly rejected the argument that "a claim to the manufacture of a non-natural [composition] would be directed to [a] law of nature or natural product." *Natural Alternatives Int'l., Inc. v. Creative Compounds LLC*, 918 F.3d 1338, 1350 (Fed. Cir. 2019). "With that conclusion, the inquiry under § 101 ends." *SmithKine Beecham*, 403 F.3d at 1342.

True, the inventors of the '780 patent "*discover*[ed] the dissolution rate that would address the food effect and achiev[ed] it using *previously*

*known* formulation technology." Appx8513 (emphasis added). And true, the relationship between mirabegron administered under a certain dissolution profile and the food effect "exists in principle apart from any human action." *Id.* (quoting *Mayo*, 566 U.S. at 77). But the '780 patent does not simply describe that relationship.

The same was true in *Rapid Litigation Management*, where the inventors had "discovered [hepatocyte] cells' ability to survive multiple freeze-thaw cycles." 827 F.3d at 1048. "[B]ut that is not where they stopped, nor is it what they patented." *Id.* The claims were "not simply an observation or detection of" the natural principle. *Id.* Rather, they were "like thousands of others that recite processes *to achieve a desired outcome*," such as "methods of treating disease." *Id.* at 1048-49 (emphasis added). The Court thus has distinguished between directing claims to the natural principle discovered and directing them to a "constructive process, carried out by an artisan to achieve a 'new and useful end'" *using* the discovery of the natural process. *Id.* at 1048 (quoting *Alice*, 573 U.S. at 217). "That one way of describing the [invention] is to describe the natural" principle underlying it "does not make the claim 'directed to' that" principle. *Id.* at 1049.

Like the hepatocytes in *Rapid Litigation Management*, the compositions claimed by the '780 patent were inspired by knowledge—here, the

knowledge that delivering mirabegron at a certain rate ameliorates its food effect. But Astellas did not attempt to patent that discovery. Instead, it claimed a narrow new category of pharmaceutical formulations, whose utility derived in large part from their ability to combat the food effect while still treating overactive bladder. This is not an improper monopoly on all scientific knowledge, but the ordinary and desirable course of innovation—"as the first part[ies] with knowledge of" the relationship between the dissolution rate of mirabegron and the food effect, the inventors were simply "in an excellent position to claim applications of that knowledge." *Rapid Litigation Management*, 827 F.3d at 1048 (quoting *Myriad*, 569 U.S. at 596). And "*applications of* that knowledge" (*id.* (emphasis added)) are all the patent claims.

The same holds true for Claim 20, which claims "[a] method for treating overactive bladder comprising administering the tablet … to a subject in need thereof." Appx203. The Federal Circuit has considered and rejected arguments much like the district court's below. *See, e.g.*, *Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117 (Fed. Cir. 2018). In *Vanda*, this Court considered a challenge to method-of-treatment claims analogous to Claim 20. West-Ward argued that the method-of-treatment claims were "directed to a natural relationship between iloperidone, CYP2D6 metabolism, and QT prolongation, and add nothing inventive to

those natural laws and phenomena." *Id.* at 1133. The Court held instead that the claims were "directed to a method of using iloperidone to treat schizophrenia." *Id.* at 1135. While "[t]he inventors recognized the relationships between iloperidone, CYP2D6 metabolism, and QTc prolongation, … that is not what they claimed." *Id.* Instead, "[t]hey claimed an *application* of that relationship." *Id.* (emphasis added). Because the claims were "directed to a specific method of treatment for specific patients using a specific compound at specific doses to achieve a specific outcome," the Court had no trouble concluding that they passed muster under Section 101. *Id.* at 1136.

Direct application of this same reasoning to Claim 20 yields the same result. The method-of-treatment claim here is "directed to [a] particular method[] of treatment" which is "patent eligible." *Natural Alternatives*, 918 F.3d at 1344. It is typical and appropriate for inventors to "recognize[] the underlying relationships," so long as "those were not what was claimed." *Id.* Indeed, all such claims "rely on the relationship between the administration of the drug and the physiological effects in the patient." *Id.* at 1345. But "[t]he fact that the human body responds to the treatment through biochemical processes does not convert the claim into an ineligible one." *Id.*

**2.** At the very least, the language of the asserted claims provides "an 'inventive concept' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself." *Mayo*, 566 U.S. at 72-73 (quoting *Flook*, 437 U.S. at 594). The claims provide substantial additional structure beyond the fact that dissolving mirabegron at a certain rate may ameliorate the food effect.

The '780 patent claims cover formulations using a specific technology (hydrogel-forming polymers) to achieve the desired dissolution profile. The claimed formulations include only those where the hydrogel-forming polymer is selected from a specified list. And the claimed formulations are further limited to those that also include a listed water-soluble additive. The claims further restrict these claimed formulations to those made into a tablet, and specify a method of treatment using that tablet. Accordingly, the claims represent an infinitesimal sliver of the possible pharmaceutical applications of mirabegron that could achieve the dissolution element of the claims. And there is no evidence that these formulations existed before Astellas invented them. If it had been given an opportunity below, Astellas would have developed a factual record proving as much.

## III.   A remand is necessary to address defendants' alternative arguments.

As we described, defendants never advanced a Section 101 argument below—and for good reason. Rather, defendants offered a variety of invalidity arguments, all based on Section 112. A remand is necessary to adjudicate those contentions, as well as Astellas' unresolved, but nonetheless critical, infringement arguments. Given the many factual disputes that remain unresolved—below, defendants plainly acknowledged "the lack of factual findings on these issues" (Appx8509)—this Court certainly should not wade into these complex issues in the first instance.[9]

Defendants have appropriately recognized that this Court "generally will not undertake fact-finding," meaning that "the case will in all likelihood be remanded … for further factfinding" to resolve defendants' noninfringement and Section 112 invalidity contentions. Appx8509. *See Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1323 (Fed. Cir. 2008) ("Appellate courts review district court judgments; we do not find facts."); *Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986) ("This court does not sit to reweigh the evidence presented to the district court, nor will it draw its own inferences, nor make its own fact

---

[9]   Indeed, to the extent that the district court made *any* factual or credibility determinations, it was to credit Astellas' expert, Dr. Little. Appx2-3.

findings."). Indeed, this Court has explained that it "will not undertake the indefiniteness and enablement inquiries in the first instance." *Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1299 (Fed. Cir. 2010). The same is true for written description (*Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 910 (Fed. Cir. 2018)) and infringement (*Tone Bros, Inc. v. Sysco Corp.*, 28 F.3d 1192, 1195 n.2 (Fed. Cir. 1994)).

As defendants foresaw below: "If [d]efendants attempt to argue on appeal that the '780 patent is invalid under § 112 or that Astellas failed to establish infringement," the proper course is therefore to "remand[] to" the district court "for further fact-finding." Appx8509.

## IV. Reassignment on remand is warranted.

Finally, Astellas respectfully submits "that this is one of those rare cases where reassignment is appropriate on remand." *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1382 (Fed. Cir. 2018). Here, "reassignment is appropriate to preserve the appearance of fairness." *Id*.

**a.** In considering a "request to reassign a matter to a different judge," this Court applies "the law of the relevant regional circuit." *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1343 (Fed. Cir. 2010). The Third Circuit orders reassignment when it is necessary to "preserve not only the reality but also the appearance of the proper functioning of the judiciary as a neutral, impartial administrator of justice." *Alexander*, 10

53

F.3d at 167 (quoting *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 98 (3d Cir. 1992)).

Because the crux of the issue is the appearance of neutrality, whether a district court has shown "actual bias or prejudice in this case" is explicitly "not the test." *Alexander*, 10 F.3d at 167; *see also United States v. Kennedy*, 682 F.3d 244, 258 (3d Cir. 2012) ("An objective inquiry, this test is not concerned with the question whether a judge actually harbors bias against a party."). Rather, "impartiality and the *appearance* of impartiality in a judicial officer are the *sine qua non* of the American legal system." *Gov't of Virgin Islands v. Walker*, 261 F.3d 370, 376 (3d Cir. 2001) (quoting *Alexander*, 10 F.3d at 167) (emphasis added). That is, "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954).

The Third Circuit has thus directed a new judge on remand where the "conduct and comments of the trial judge … make it exceedingly difficult to resurrect an appearance of impartiality." *Walker*, 261 F.3d at 376. And "the need to preserve the appearance of impartiality is especially pronounced" where, as here, "the judge is the actual trier of fact." *Alexander*, 10 F.3d at 166.

The "conduct and comments of the trial judge" are not the only things that can destroy the fairness and solemnity required in judicial proceedings. *Walker*, 261 F.3d at 376. The appearance of impropriety can also

arise when a "case has progressed so unusually" as to give the Court pause. *United States v. Wecht*, 541 F.3d 493, 511 (3d Cir. 2008); *see also Svindland v. The Nemours Found.*, 287 F. App'x 193, 196 (3d Cir. 2008) (ordering reassignment in part because the Court was "unable to fathom the reasons why the District Court judge ruled as he did"). Both factors cut in favor of reassignment here.

**b.** Here, the district court's "impartiality might reasonably be questioned"—necessitating reassignment on remand. *Kennedy*, 682 F.3d at 258 (quoting 28 U.S.C. § 455(a)).[10] Taken together, the district court's two posttrial decisions are rather extraordinary.

To start with, as discussed in substantial detail above (see pages 11-13, 22-24, *supra*), the district court forthrightly admitted to intentionally injecting issues into the trial which no party had raised. Appx8512-8513. The court expressly disclaimed any obligation to "sit[]" as "an arbiter to resolve disputes" as framed by the parties. Appx3-4. It thus recognized that it was going far beyond the "parties' framing of issues." Appx8512.

---

[10]   While the Third Circuit has held that "a case generally must involve apparent bias deriving from an extrajudicial source" to "warrant reassignment *under § 455(a)*," it has also held that reassignment under the court's general supervisory powers is "not necessarily constrained by that limitation." *United States v. Bergin*, 682 F.3d 261, 282 (3d Cir. 2012) (emphasis added).

In fact, the district court admonished the defendants for failing to pick up on its hints at trial. Appx8513-8514. The court expressed "surprise" at "defendants' failure to articulate" a Section 101 "defense," because "to no avail, the Court made explicit its concern about validity." *Id.*

Rather than act as an umpire, calling balls and strikes, the district court took command of the field, overriding the considered decisions made by the parties. In all, the district court acted in plain defiance of the Third Circuit's admonitions—and, indeed, a general precept of the judicial system—that a "district court … should not assume the role of advocate by directing the defendant to pursue particular lines of strategy or defense." *United States v. Thomas*, 357 F.3d 357, 365 (3d Cir. 2004).

Standing alone, that is enough to warrant reassignment. But the district court's explanation as to why it was taking these astonishing measures further compounds the concerns at issue. In a remark that had no apparent relationship to any issue in the case, the district court explained its conduct by asserting that "[t]he pharmaceutical industry, to put it mildly, has perverted" the "intent" of the Hatch-Waxman Amendments. Appx8513. Yet more pointedly, it accused "brand and generic manufacturers" of "collud[ing] to protect weak or invalid patents and shar[ing] in the startling profits." *Id.*

In making these comments, the court cited an antitrust opinion from another district court that has nothing at all to do with Astellas or the products at issue here. *See* Appx8513 (citing *In re Glumetza Antitrust Litig.*, 2021 WL 1817092, at *1 (N.D. Cal. May 6, 2021)). By citing antitrust litigation that has no bearing whatsoever on the products or parties at issue in this case—and rather could appear to represent a criticism of the industry as a whole—an objective observer might conclude that the court's decision was at least partially motivated by its own individualized views as to the innovator pharmaceutical industry. In all, reasonable minds would see an appearance of bias.

The district court's pointed commentary did not end with the parties. Using scare quotes to describe the "innovation" at issue—a literary device known to connote sarcasm—the district court appeared to question why "the USPTO has accommodated" "the pharmaceutical industry's long-standing 'innovation' of patenting extended-release formulas for soon-to-expire active-ingredient patents." Appx8513. The court explained that "[t]his case is not about a patent claiming an active ingredient" (Appx8513), and thus the district court noted its view as to "the obviousness implications." *Id*. But, as explained above, defendants—sophisticated litigants with sophisticated counsel—expressly waived their obviousness defense via stipulation prior to trial. *See* pages 11-13, *supra*.

57

**c.** In view of the district court's comments, and the unusual decision rendered, a reasonable observer would question whether, on remand, the district court would potentially inject extrinsic views into its consideration of the parties' arguments. Put differently, a reasonable observer would conclude that "the District Court judge will have 'substantial difficulty in putting out of [his] mind [his] previously expressed views' of the evidence and the [parties]," rendering reassignment "a necessity." *United States v. Jackson*, 2023 WL 2755578, at *4 (3d Cir. Apr. 3, 2023) (quoting *United States v. Ming He*, 94 F.3d 782, 795 (2d Cir. 1996)).

Neither this Court nor the Third Circuit has hesitated to order reassignment in similar circumstances. In one of the Third Circuit's seminal cases on reassignment, the district court made comments at a pretrial conference which "might be read to suggest that he believed that the defendants' products clearly were dangerous"—one of the key issues in the litigation. *In re School Asbestos Litig.*, 977 F.2d 764, 782 (3d Cir. 1992). On appeal, the Third Circuit explained that, while "it would not necessarily be improper for him to reach that view through the adjudication of record-based motions, … reasonable but suspicious minds might question whether he had already concluded this issue prior to trial." *Id.* Thus, "regardless of his actual impartiality, a reasonable person might perceive bias to exist, and this cannot be permitted." *Id.*

Likewise, this Court has explained that "a pattern of error based on previously-expressed views or findings may make it difficult for a trial court to approach a remanded case with an open mind" and ordered reassignment because "the strongly expressed convictions of the trial court in this case may not be easily and objectively reconsidered." *Rsch. Corp. Techs., Inc. v. Microsoft Corp.*, 536 F.3d 1247, 1255 (Fed. Cir. 2008).

Ultimately, because the "the aforementioned conduct and comments of the trial judge … make it exceedingly difficult to resurrect an appearance of impartiality" here, reassignment is warranted. *Walker*, 261 F.3d at 376.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's order and remand: The district court facially violated the principles of party presentation, forfeiture, and due process in deciding an issue no party advanced; and the court's Section 101 analysis lacks any colorable merit in any event. Further, Astellas respectfully submits that the Court should remand with instructions that the case be reassigned.

Respectfully submitted,

Dated: October 27, 2023

/s/ *Paul W. Hughes*

Paul W. Hughes
Andrew A. Lyons-Berg
Charles Seidell

Simon D. Roberts
Jason A. Leonard

*McDermott Will & Emery LLP*
*500 North Capitol Street NW*
*Washington, DC 20001*
*(202) 756-8000*

*McDermott Will & Emery LLP*
*One Vanderbilt Avenue*
*New York, NY 10017*
*(212) 547-5700*

Daniel M. Silver
*McCarter & English, LLP*
*405 N. King St. 8th Floor*
*Wilmington, DE 19801*
*(302) 984-6331*

*Counsel for Appellants*

# ADDENDUM

## TABLE TO ADDENDUM

| Description | Appx. No. |
|---|---|
| Memorandum & Order (20-cv-1589) | Appx1-4 |
| Judgment (20-cv-1589) | Appx5 |
| Memorandum & Order (21-cv-664) | Appx6-9 |
| Judgment (21-cv-664) | Appx10 |
| Memorandum & Order (21-cv-425) | Appx11-14 |
| Judgment (21-cv-425) | Appx15 |
| U.S. 10, 842,780 | Appx188-203 |
| Order Denying Defendants' 52(b) Motion (20-cv-1589) | Appx8512-8514 |
| Certificate of Correction to U.S. 10, 842,78 | Appx8617-8618 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ASTELLAS PHARMA INC., *et al.*

                Plaintiffs,

      v.

SANDOZ INC., *et. al.*
                Defendants.

**1:20CV1589**

**MEMORANDUM AND ORDER**

       This matter is before the Court for final decision on patent-infringement charges arising under the Hatch-Waxman Act. D.I. 531, 532, 533, 534.

       On the heels of a previous suit involving different patents but the same Abbreviated New Drug Applications, plaintiffs, Astellas Pharma Inc., Astellas Ireland Co., Ltd., and Astellas Pharma Global Development, Inc., have sued to enjoin defendants, Lupin Ltd. and Lupin Pharmaceuticals, Inc., Sandoz Inc. and Lek Pharmaceuticals d.d., and Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited (among a number of now-settled defendants), from marketing generic versions of Myrbetriq, Astellas's extended-release formulation of the active drug mirabegron for the treatment of overactive bladder. Solving what is referred to as the "food effect"—that is, the drug's dangerous potency on an empty stomach contrasted by its inefficacy on a full one—U.S. Patent No. 10,842,780 claims the extended-release formulation of mirabegron comprising (as set out in Claim 1) a hydrogel-forming polymer, hydrophilic additive, and a dissolution limitation: that the dosage has dissolved no more than 39% at 1.5 hours and at least 75% after 7 hours. Following discovery and settlement by many defendants, the active parties convened for a five-day bench trial in February 2023.

1

**Appx1**

On infringement, defendants contested only their proposed generics' satisfaction of the dissolution limitation (for reasons not relevant here) and, on invalidity, challenged the '780 patent for (primarily) failing the enablement requirement of 35 U.S.C. § 112. In brief, defendants argued that the '780 patent specification offers insufficient clarity to enable one skilled in the art to make the invention without undue experimentation. Astellas disagreed, arguing that the admittedly brief specification directs routine activity by highly-skilled artisans in a predictable art.

For present purposes, the Court assumes Astellas's version of the facts and accepts its argument, which it distilled in the following statement:

> The inventive concept of the '780 Patent was *discovering* the dissolution rate that would address the food effect and achieving it using *previously known* formulation technology.

D.I. 541 at 5 (emphasis added throughout). As the Court gathers, Astellas concedes that the '780 patent is enabled because it claims invalid subject matter: a natural law applied via routine, conventional, and well-known methods. *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66 (2012).

Claim 1 illustrates. The extended-release dissolution limitation (Mirabegron itself having been long known, *e.g.*, U.S. Pat. No. 6,346,532; *Astellas Pharma Inc. v. Actavis Elizabeth LLC*, No. 16-cv-905, D.I. 1, ¶ 23), as Astellas admits, reflects merely the discovery of the food-effect-resolving dissolution profile. Such relation, which "exists in principle apart from any human action," sets forth a natural law. *Mayo*, 566 U.S. at 77.

And Astellas's Dr. Steven Little confirmed that the polymer and additive limitations amounted to no more than the directive, "apply it:"

> Q. Were sustained release hydrogel formulations *well-known* as of September 2008?

A. Yes, they were.

Q. And were sustained release hydrogels *well characterized* as of September 2008?

A. Yes, in fact, I think I would go so far to say *they were probably the most well characterized extended[-]release oral dosage form* for all of the different ones. There were more products approved, to my recollection, than any other of that type, they were the most well characterized.

Q. In September 2008, were sustained release hydrogels difficult to formulate?

A. Well, from a pharmaceutical formulator's standpoint, no.

Q. Were, as of September 2008, were sustained release hydrogels difficult to tune to achieve a specific dissolution profile?

A. No, they weren't. *It's not just that the mechanisms are well understood and taught to somebody even before they got out of college*, but that you would have experience doing it yourself just because of the number of products on the market. And just given the amount of time, there is a large, large body of literature that shows over and over again the same kind of things that you see stated in the patent specification.

D.I. 530 at 60–61(Tr. 5-1243:15–44:15); *Mayo*, 566 U.S. at 79–80.

The asserted claims only simplify matters. Between narrowing the list of hydrogel-forming polymers to employ, excluding salt forms of mirabegron, formulating the dosage into a tablet, and claiming a method which employs the overactive-bladder remedy to treat, unsurprisingly, overactive bladder, asserted claims 5, 20, and 25 merely ease the skilled artisan's already routine task and tell doctors to administer the drug according to its intended use. *Mayo*, 566 U.S. at 78–79.

Further briefing on this matter would bring unnecessary delay and undue prejudice. To be clear, no substantive question remains—the Court directed the parties to brief the asserted claims' validity, D.I. 530 at 184 (Tr. 5-1367:12–17); this Court sits not an arbiter

3

to resolve disputes on the parties' favored terrain but as a United States District Court charged to apply the law given by Congress as interpreted by the Supreme Court and the Courts of Appeals for the Third and Federal Circuits; *Mayo* is settled, hornbook law with which learned patent-counsel is presumed familiar; and Astellas's precise and continued invocation of its facts and language (well beyond that cited here) sets the matter to rest. The question is instead whether further briefing might somehow absolve Astellas and permit it to recant its fundamental validity position. The Court, in its discretion, finds reopening of expert discovery, retrial, and redrafting of extensive post-trial briefing to be an unnecessary delay and unduly prejudicial to defendants.

In sum, Astellas's zealous defense has conceded more fundamental ground. Embodying no more than the discovery of a natural law applied via "well known techniques for formulating sustained release tablets," D.I. 541 at 1, the '780 patent claims ineligible subject matter.

THEREFORE, IT IS ORDERED THAT claims 5, 20, and 25 of U.S. Patent No. 10,842,780 are invalid. All pending motions are denied as moot.

Dated this 9th day of June, 2023.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ASTELLAS PHARMA INC., *et al.*

                    Plaintiffs,

        v.

SANDOZ INC., *et. al.*

                    Defendants.

**1:20CV1589**

**JUDGMENT**

Pursuant to the accompanying order declaring the asserted claims of U.S. Patent No. 10,842,780 invalid, judgment is ordered in favor of defendants and against plaintiffs. This action is dismissed.

Dated this 9th day of June, 2023.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

1

**Appx5**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ASTELLAS PHARMA INC., *et al.*

Plaintiffs,

v.

SANDOZ INC., *et. al.*
Defendants.

**1:20CV1589**

**MEMORANDUM AND ORDER**

This matter is before the Court for final decision on patent-infringement charges arising under the Hatch-Waxman Act. D.I. 531, 532, 533, 534.

On the heels of a previous suit involving different patents but the same Abbreviated New Drug Applications, plaintiffs, Astellas Pharma Inc., Astellas Ireland Co., Ltd., and Astellas Pharma Global Development, Inc., have sued to enjoin defendants, Lupin Ltd. and Lupin Pharmaceuticals, Inc., Sandoz Inc. and Lek Pharmaceuticals d.d., and Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited (among a number of now-settled defendants), from marketing generic versions of Myrbetriq, Astellas's extended-release formulation of the active drug mirabegron for the treatment of overactive bladder. Solving what is referred to as the "food effect"—that is, the drug's dangerous potency on an empty stomach contrasted by its inefficacy on a full one—U.S. Patent No. 10,842,780 claims the extended-release formulation of mirabegron comprising (as set out in Claim 1) a hydrogel-forming polymer, hydrophilic additive, and a dissolution limitation: that the dosage has dissolved no more than 39% at 1.5 hours and at least 75% after 7 hours. Following discovery and settlement by many defendants, the active parties convened for a five-day bench trial in February 2023.

1

On infringement, defendants contested only their proposed generics' satisfaction of the dissolution limitation (for reasons not relevant here) and, on invalidity, challenged the '780 patent for (primarily) failing the enablement requirement of 35 U.S.C. § 112. In brief, defendants argued that the '780 patent specification offers insufficient clarity to enable one skilled in the art to make the invention without undue experimentation. Astellas disagreed, arguing that the admittedly brief specification directs routine activity by highly-skilled artisans in a predictable art.

For present purposes, the Court assumes Astellas's version of the facts and accepts its argument, which it distilled in the following statement:

> The inventive concept of the '780 Patent was *discovering* the dissolution rate that would address the food effect and achieving it using *previously known* formulation technology.

D.I. 541 at 5 (emphasis added throughout). As the Court gathers, Astellas concedes that the '780 patent is enabled because it claims invalid subject matter: a natural law applied via routine, conventional, and well-known methods. *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66 (2012).

Claim 1 illustrates. The extended-release dissolution limitation (Mirabegron itself having been long known, *e.g.*, U.S. Pat. No. 6,346,532; *Astellas Pharma Inc. v. Actavis Elizabeth LLC*, No. 16-cv-905, D.I. 1, ¶ 23), as Astellas admits, reflects merely the discovery of the food-effect-resolving dissolution profile. Such relation, which "exists in principle apart from any human action," sets forth a natural law. *Mayo*, 566 U.S. at 77.

And Astellas's Dr. Steven Little confirmed that the polymer and additive limitations amounted to no more than the directive, "apply it:"

> Q. Were sustained release hydrogel formulations *well-known* as of September 2008?

A. Yes, they were.

Q. And were sustained release hydrogels *well characterized* as of September 2008?

A. Yes, in fact, I think I would go so far as to say *they were probably the most well characterized extended[-]release oral dosage form* for all of the different ones. There were more products approved, to my recollection, than any other of that type, they were the most well characterized.

Q. In September 2008, were sustained release hydrogels difficult to formulate?

A. Well, from a pharmaceutical formulator's standpoint, no.

Q. Were, as of September 2008, were sustained release hydrogels difficult to tune to achieve a specific dissolution profile?

A. No, they weren't. *It's not just that the mechanisms are well understood and taught to somebody even before they got out of college*, but that you would have experience doing it yourself just because of the number of products on the market. And just given the amount of time, there is a large, large body of literature that shows over and over again the same kind of things that you see stated in the patent specification.

D.I. 530 at 60–61(Tr. 5-1243:15–44:15); *Mayo*, 566 U.S. at 79–80.

The asserted claims only simplify matters. Between narrowing the list of hydrogel-forming polymers to employ, excluding salt forms of mirabegron, formulating the dosage into a tablet, and claiming a method which employs the overactive-bladder remedy to treat, unsurprisingly, overactive bladder, asserted claims 5, 20, and 25 merely ease the skilled artisan's already routine task and tell doctors to administer the drug according to its intended use. *Mayo*, 566 U.S. at 78–79.

Further briefing on this matter would bring unnecessary delay and undue prejudice. To be clear, no substantive question remains—the Court directed the parties to brief the asserted claims' validity, D.I. 530 at 184 (Tr. 5-1367:12–17); this Court sits not an arbiter

to resolve disputes on the parties' favored terrain but as a United States District Court charged to apply the law given by Congress as interpreted by the Supreme Court and the Courts of Appeals for the Third and Federal Circuits; *Mayo* is settled, hornbook law with which learned patent-counsel is presumed familiar; and Astellas's precise and continued invocation of its facts and language (well beyond that cited here) sets the matter to rest. The question is instead whether further briefing might somehow absolve Astellas and permit it to recant its fundamental validity position. The Court, in its discretion, finds reopening of expert discovery, retrial, and redrafting of extensive post-trial briefing to be an unnecessary delay and unduly prejudicial to defendants.

In sum, Astellas's zealous defense has conceded more fundamental ground. Embodying no more than the discovery of a natural law applied via "well known techniques for formulating sustained release tablets," D.I. 541 at 1, the '780 patent claims ineligible subject matter.

THEREFORE, IT IS ORDERED THAT claims 5, 20, and 25 of U.S. Patent No. 10,842,780 are invalid. All pending motions are denied as moot.

Dated this 9th day of June, 2023.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ASTELLAS PHARMA INC., *et al.*

        Plaintiffs,

    v.

SANDOZ INC., *et. al.*

        Defendants.

**1:20CV1589**

**JUDGMENT**

       Pursuant to the accompanying order declaring the asserted claims of U.S. Patent No. 10,842,780 invalid, judgment is ordered in favor of defendants and against plaintiffs. This action is dismissed.

       Dated this 9th day of June, 2023.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

1

**Appx10**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ASTELLAS PHARMA INC., *et al.*

        Plaintiffs,

    v.

SANDOZ INC., *et. al.*
        Defendants.

**1:20CV1589**

**MEMORANDUM AND ORDER**

      This matter is before the Court for final decision on patent-infringement charges arising under the Hatch-Waxman Act. D.I. 531, 532, 533, 534.

      On the heels of a previous suit involving different patents but the same Abbreviated New Drug Applications, plaintiffs, Astellas Pharma Inc., Astellas Ireland Co., Ltd., and Astellas Pharma Global Development, Inc., have sued to enjoin defendants, Lupin Ltd. and Lupin Pharmaceuticals, Inc., Sandoz Inc. and Lek Pharmaceuticals d.d., and Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited (among a number of now-settled defendants), from marketing generic versions of Myrbetriq, Astellas's extended-release formulation of the active drug mirabegron for the treatment of overactive bladder. Solving what is referred to as the "food effect"—that is, the drug's dangerous potency on an empty stomach contrasted by its inefficacy on a full one—U.S. Patent No. 10,842,780 claims the extended-release formulation of mirabegron comprising (as set out in Claim 1) a hydrogel-forming polymer, hydrophilic additive, and a dissolution limitation: that the dosage has dissolved no more than 39% at 1.5 hours and at least 75% after 7 hours. Following discovery and settlement by many defendants, the active parties convened for a five-day bench trial in February 2023.

1

**Appx11**

On infringement, defendants contested only their proposed generics' satisfaction of the dissolution limitation (for reasons not relevant here) and, on invalidity, challenged the '780 patent for (primarily) failing the enablement requirement of 35 U.S.C. § 112. In brief, defendants argued that the '780 patent specification offers insufficient clarity to enable one skilled in the art to make the invention without undue experimentation. Astellas disagreed, arguing that the admittedly brief specification directs routine activity by highly-skilled artisans in a predictable art.

For present purposes, the Court assumes Astellas's version of the facts and accepts its argument, which it distilled in the following statement:

> The inventive concept of the '780 Patent was *discovering* the dissolution rate that would address the food effect and achieving it using *previously known* formulation technology.

D.I. 541 at 5 (emphasis added throughout). As the Court gathers, Astellas concedes that the '780 patent is enabled because it claims invalid subject matter: a natural law applied via routine, conventional, and well-known methods. *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66 (2012).

Claim 1 illustrates. The extended-release dissolution limitation (Mirabegron itself having been long known, *e.g.*, U.S. Pat. No. 6,346,532; *Astellas Pharma Inc. v. Actavis Elizabeth LLC*, No. 16-cv-905, D.I. 1, ¶ 23), as Astellas admits, reflects merely the discovery of the food-effect-resolving dissolution profile. Such relation, which "exists in principle apart from any human action," sets forth a natural law. *Mayo*, 566 U.S. at 77.

And Astellas's Dr. Steven Little confirmed that the polymer and additive limitations amounted to no more than the directive, "apply it:"

> Q. Were sustained release hydrogel formulations *well-known* as of September 2008?

2

**Appx12**

A. Yes, they were.

Q. And were sustained release hydrogels *well characterized* as of September 2008?

A. Yes, in fact, I think I would go so far to say *they were probably the most well characterized extended[-]release oral dosage form* for all of the different ones. There were more products approved, to my recollection, than any other of that type, they were the most well characterized.

Q. In September 2008, were sustained release hydrogels difficult to formulate?

A. Well, from a pharmaceutical formulator's standpoint, no.

Q. Were, as of September 2008, were sustained release hydrogels difficult to tune to achieve a specific dissolution profile?

A. No, they weren't. *It's not just that the mechanisms are well understood and taught to somebody even before they got out of college*, but that you would have experience doing it yourself just because of the number of products on the market. And just given the amount of time, there is a large, large body of literature that shows over and over again the same kind of things that you see stated in the patent specification.

D.I. 530 at 60–61(Tr. 5-1243:15–44:15); *Mayo*, 566 U.S. at 79–80.

The asserted claims only simplify matters. Between narrowing the list of hydrogel-forming polymers to employ, excluding salt forms of mirabegron, formulating the dosage into a tablet, and claiming a method which employs the overactive-bladder remedy to treat, unsurprisingly, overactive bladder, asserted claims 5, 20, and 25 merely ease the skilled artisan's already routine task and tell doctors to administer the drug according to its intended use. *Mayo*, 566 U.S. at 78–79.

Further briefing on this matter would bring unnecessary delay and undue prejudice. To be clear, no substantive question remains—the Court directed the parties to brief the asserted claims' validity, D.I. 530 at 184 (Tr. 5-1367:12–17); this Court sits not an arbiter

3

**Appx13**

to resolve disputes on the parties' favored terrain but as a United States District Court charged to apply the law given by Congress as interpreted by the Supreme Court and the Courts of Appeals for the Third and Federal Circuits; *Mayo* is settled, hornbook law with which learned patent-counsel is presumed familiar; and Astellas's precise and continued invocation of its facts and language (well beyond that cited here) sets the matter to rest. The question is instead whether further briefing might somehow absolve Astellas and permit it to recant its fundamental validity position. The Court, in its discretion, finds reopening of expert discovery, retrial, and redrafting of extensive post-trial briefing to be an unnecessary delay and unduly prejudicial to defendants.

In sum, Astellas's zealous defense has conceded more fundamental ground. Embodying no more than the discovery of a natural law applied via "well known techniques for formulating sustained release tablets," D.I. 541 at 1, the '780 patent claims ineligible subject matter.

THEREFORE, IT IS ORDERED THAT claims 5, 20, and 25 of U.S. Patent No. 10,842,780 are invalid. All pending motions are denied as moot.

Dated this 9th day of June, 2023.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ASTELLAS PHARMA INC., *et al.* | |
| Plaintiffs, | **1:20CV1589** |
| v. | |
| SANDOZ INC., *et. al.* | **JUDGMENT** |
| Defendants. | |

Pursuant to the accompanying order declaring the asserted claims of U.S. Patent

No. 10,842,780 invalid, judgment is ordered in favor of defendants and against plaintiffs.

This action is dismissed.

Dated this 9th day of June, 2023.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

1

**Appx15**

US010842780B2

(12) **United States Patent**
Takaishi et al.

(10) Patent No.: **US 10,842,780 B2**
(45) **Date of Patent:** **Nov. 24, 2020**

(54) **PHARMACEUTICAL COMPOSITION FOR MODIFIED RELEASE**

(71) Applicant: **ASTELLAS PHARMA INC.**, Tokyo (JP)

(72) Inventors: **Yuuki Takaishi**, Tokyo (JP); **Yutaka Takahashi**, Tokyo (JP); **Takashi Nishizato**, Tokyo (JP); **Daisuke Murayama**, Tokyo (JP); **Emiko Murayama**, Tokyo (JP); **Soichiro Nakamura**, Tokyo (JP); **Kazuhiro Sako**, Tokyo (JP)

(73) Assignee: **ASTELLAS PHARMA INC.**, Tokyo (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/432,854**

(22) Filed: **Feb. 14, 2017**

(65) **Prior Publication Data**

US 2017/0231965 A1    Aug. 17, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 12/568,313, filed on Sep. 28, 2009, now abandoned.

(60) Provisional application No. 61/101,338, filed on Sep. 30, 2008.

(51) **Int. Cl.**
*A61K 31/426* (2006.01)
*A61K 9/20* (2006.01)
*A61K 9/28* (2006.01)

(52) **U.S. Cl.**
CPC .......... *A61K 31/426* (2013.01); *A61K 9/2009* (2013.01); *A61K 9/2013* (2013.01); *A61K 9/2031* (2013.01); *A61K 9/2054* (2013.01); *A61K 9/2095* (2013.01); *A61K 9/2853* (2013.01); *A61K 9/2866* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,929,629 | A | 5/1990 | Jeffery |
| 5,681,582 | A | 10/1997 | Gilis et al. |
| 6,204,285 | B1 | 3/2001 | Fabiano et al. |
| 6,346,532 | B1 | 2/2002 | Maruyama et al. |
| 6,368,628 | B1 | 4/2002 | Seth |
| 6,436,441 | B1 | 8/2002 | Sako et al. |
| 6,699,503 | B1 | 3/2004 | Sako et al. |
| 7,442,387 | B2 | 10/2008 | Sugihara et al. |
| 8,877,214 | B2 | 11/2014 | Takaishi et al. |
| 2001/0006982 | A1 | 7/2001 | Cruz et al. |
| 2003/0198619 | A1 | 10/2003 | Dong et al. |
| 2003/0203024 | A1 | 10/2003 | Sako et al. |
| 2004/0033263 | A1 | 2/2004 | Seroff et al. |
| 2004/0213845 | A1 | 10/2004 | Sugihara et al. |
| 2005/0100602 | A1 | 5/2005 | Sako et al. |
| 2005/0100603 | A1 | 5/2005 | Sako et al. |
| 2005/0261328 | A1 | 11/2005 | Wienrich |
| 2005/0287185 | A1 | 12/2005 | Wong et al. |
| 2006/0099257 | A1 | 5/2006 | Langridge et al. |
| 2006/0115540 | A1 | 6/2006 | Takasu et al. |
| 2008/0275076 | A1 | 11/2008 | Holm et al. |
| 2009/0011018 | A1 | 1/2009 | Kondo et al. |
| 2009/0093529 | A1 | 4/2009 | Takasu et al. |
| 2010/0144807 | A1 | 6/2010 | Takaishi et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 199889288 B2 | 5/1999 |
| CA | 2263659 A1 | 2/1998 |
| CA | 2315235 A1 | 6/1999 |
| CA | 2328348 A1 | 10/1999 |
| CA | 2336853 A1 | 1/2000 |
| CA | 2507266 A1 | 6/2004 |
| CA | 2144077 C | 5/2005 |
| CA | 2490299 C | 8/2008 |
| CA | 2305802 C | 11/2008 |
| CA | 2387705 C | 6/2009 |
| EP | 1 205 190 A1 | 5/2002 |
| EP | 1 440 969 A1 | 7/2004 |
| EP | 1 559 427 A1 | 8/2005 |
| EP | 1 974 725 A1 | 10/2008 |
| EP | 2 345 410 A1 | 7/2011 |
| EP | 2 554 168 B1 | 1/2018 |
| GB | 2356197 A | 5/2001 |
| JP | S40-2053 | 2/1965 |

(Continued)

OTHER PUBLICATIONS

Daewoong Pharmaceutical Co., Ltd.; Petitioner's Brief; 2017 Dang 473 Patent Invalidation Action; Feb. 21, 2017.
Australian Patent Application No. 2009300752, Examination Report, dated Dec. 14, 2012, 11 pages.
Canadian Patent Application No. 2,740,342, Office Action, dated Jun. 3, 2013, 3 pages.
Canadian Patent Application No. 2,740,342, Second Office Action, dated Feb. 14, 2014, 2 pages.
Chinese Patent Application No. 200980138691.9, Decision on Rejection, dated Feb. 14, 2014, 5 pages.

(Continued)

*Primary Examiner* — Jeffrey S Lundgren
*Assistant Examiner* — Michael J Schmitt
(74) *Attorney, Agent, or Firm* — Venable LLP

(57) **ABSTRACT**

A pharmaceutical composition for modified release, comprising (1) (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof, (2) at least one additive which ensures penetration of water into the pharmaceutical composition and which has a solubility such that the volume of water required for dissolving 1 g of the additive is 10 mL or less, and (3) a hydrogel-forming polymer having an average molecular weight of approximately 100,000 or more, or a viscosity of 12 mPa·s or more at a 5% aqueous solution at 25° C. is disclosed.

**25 Claims, 1 Drawing Sheet**

# US 10,842,780 B2

Page 2

(56)          **References Cited**

FOREIGN PATENT DOCUMENTS

| JP | 3140465 B2 | 3/2001 |
| JP | 2001-114736 A | 4/2001 |
| JP | 2005-162736 A | 6/2005 |
| JP | 2008-532953 A | 8/2006 |
| JP | 3815496 B2 | 8/2006 |
| JP | 5625855 B2 | 11/2014 |
| JP | 5849946 B2 | 2/2016 |
| KR | 10-0355130 B | 1/2003 |
| KR | 2005-0072809 A | 7/2010 |
| KR | 2005-0107298 A | 9/2011 |
| WO | 94/06414 A1 | 3/1994 |
| WO | 02/00622 A2 | 1/2002 |
| WO | 02/48134 A2 | 6/2002 |
| WO | 2004/041276 A1 | 5/2004 |
| WO | 2009/019599 A2 | 2/2009 |
| WO | 2009/052353 A2 | 4/2009 |
| WO | 2010/038690 A1 | 4/2010 |

OTHER PUBLICATIONS

Chinese Patent Application No. 200980138691.9, first Office Action, dated Jun. 18, 2013, 14 pages (English translation).

Chinese Patent Application No. 200980138691.9, second Office Action, dated Jun. 18, 2013, 13 pages (English translation).

Decision of the Rejection, dated Jul. 3, 2015, CN Patent Application No. 200980138691.9, 43 pages (includes English translation).

Extended Search Report, dated Oct. 30, 2014, EP application No. 09 81 7723, 5 pages.

Final Office Action, dated May 17, 2013, U.S. Appl. No. 13/073,721.

Final Office Action, dated Nov. 21, 2013, U.S. Appl. No. 13/073,677.

Hercules Incorporated, "Klucel Hydroxypropylcellulose, Physical and Chemical Properties," Aqualon Division, http://www.brenntagspecialties.com/en/downloads/product/multi_market_principals/aqualon/klucel_hpc_booklet.pdf, 2001, 26 pages.

Intellectual Property Office of the Philippines; Subsequent Substantive Examination Report; PH Application No. 1/2011/500628; 3 pages; dated Jan. 11, 2016.

International Search Report of Application No. PCT/JP2009/066742 dated Nov. 10, 2009.

Ishikawa et al., "Preparation of rapidly disintegrating tablet using new types of microcrystalline cellulose (PH-M series) and low-substituted-hydroxypropylceliulose or spherical sugar granules by direct compression method," Chem. Pharm. Bull. 49(2) 134-139, 2001.

Israeli Patent Application No. 212033, First Substantive Examination Report, 4 pages (English translation).

Japanese Patent Application No. 2010-531838, first Office Action, dated Oct. 12, 2010, 8 pages (English translation).

Japanese Patent Application No. 2010-531838, first Office Action, dated Dec. 28, 2010, 4 pages (English translation).

Korean Patent Application No. 10-2011-7009897, Notice of Final Rejection, dated Nov. 17, 2014 (with English translation) 6 pages.

Korean Patent Application No. 10-2011-7009897, Notice of Preliminary Rejection, dated Mar. 20, 2014, 10 pages (includes English translation).

Mexican Institute of Industrial Property; First Office Action from Examiner; MX Application No. MX/a/2011/003445; 7 pages; dated Mar. 1, 2016.

Michel et al.,The Pharmacokinetc Profile of Tamsulosin Oral Controlled Absorption System (OCAS®), 2005, European Urology Supplements, vol. 4, pp. 15-24.

MX Application No. MX/a/2011/003445, Second Office Action dated Sep. 2, 2016, 2 pgs. (English translation 3 pgs.).

Non-Final Office Action; U.S. Appl. No. 14/584,933 dated Nov. 17, 2016, 17 pgs.

Office Action, dated May 13, 2013, U.S. Appl. No. 13/073,677.

Office Action, dated Oct. 18, 2012, U.S. Appl. No. 13/073,721.

Office Action, dated Sep. 17, 2012, U.S. Appl. No. 13/073,677.

PH Patent Application No. 1/2011/500628, Second Examination Report (Office Action), dated May 26, 2014, 2 pages.

Philippines Patent Application No. 1/2011/500628, Examination Report, dated Jul. 18, 2013, 2 pages.

Reexamination Notice, dated Jan. 30, 2015, Chinese Patent Application No. 200980138691.9, 14 pages (includes English translation).

Russia Patent Application No. 2011117274/15, Office Action, dated Mar. 6, 2013, 6 pages (English translation).

Shin-Etsu Chemical Co., Ltd, "Low-substituted hydroxypropyl cellulose NF, L-HPC" http://www.elementoorgankia.ru/files/lhpc.pdf, Cellulose & Pharmaceutical Department, 23 pages, accessed on Jun. 30, 2014.

U.S. Non—Final Office Action, U.S. Appl. No. 13/073,721, dated Jul. 30, 2014, 24 pages.

Indonesian Patent Application No. W00201101572, First Office Action dated Aug. 1, 2018, 4 pages.

Andersson, et al; Pharmacological treatment of overactive bladder: report from the International Consultation on Incontinence; Current Opinion in Urology; 2009; 19:380-394.

Benner et al; Patent-reported reasons for discontinuing overactive bladder medication; Journal Complication; 2009, BJU International; 105; 1276-1282.

Non-final Office Action; U.S. Appl. No. 14/584,933; dated Jan. 19, 2018.

The U.S. Patent and Trademark Office; Final Office Action in U.S. Appl. No. 14/584,933 dated Jul. 18, 2017.

D'Souza, et al; Persistence, Adherence, and Switch Rates Among Extended-Release and Immediate-Release Over Active Bladder Medications in a Regional Managed Care Plan; JMCP vol. 14, No. 3, Apr. 2008, pp. 291-301.

Controller of Patents, Indian Patent Office; Examination Report; dated May 29, 2017; Application No. 2738/CHENP/2011.

State Intellectual Property Office of the People's Republic of China; First Office Action; CN Patent Application No. 201510642287.2; dated Nov. 3, 2017.

European Patent Office; Communication Pursuant to Article 94(3) EPC dated Feb. 14, 2017 in Application No. 11 762 748.9-1468.

European Patent Office; Communication Pursuant to Article 114(2) EPC dated Feb. 2, 2017 in Application No. 11762748.9-1468/2554168.

BETMIGA® Tablets—Annex I, Summary of Product Characteristics; Dec. 2012.

Prescribing Information of MYRBETRIQ®; Aug. 2016.

European Medicines Agency—Assessment Report; dated Oct. 2012.

The U Co., Ltd; Petitioner's Brief; Korean Case No. 2017 Dang 569 Patent Invalidation Action in re KR 10-1524164; Apr. 14, 2017.

Mexican Institute of Industrial Property; Communication of results of the examination on the merits; PCT Patent Application No. MX/a/2011/003445; dated Mar. 22, 2017.

State Intellectual Property Office of the People's Republic of China; Chinese Patent Application No. 201510642287.2; Notification of the Second Office Action; dated Jul. 25, 2018.

European Patent Office; First Official Communication pursuant to Article 94(3)EPC; Application No. 09817723.1-1114; dated Apr. 30, 2018.

European Patent Office; Third Party Observation—Communication pursuant to Rule 114(2)EPC; Application No. 09817723.1-1114; dated May 8, 2018.

Final Office Action dated Jan. 23, 2019 in U.S. Appl. No. 14/584,933.

European Patent Office; Official Communication pursuant to Article 94(3)EPC in European Application No. 09817723.1 dated Dec. 20, 2018.

Summons to Attend Oral Proceedings in re Opposition to European Patent No. 2 554 168 B1 (Jul. 17, 2019).

"<711> Dissolution" in USP30-NF25, vol. 1; The United States Pharmacopeial Convention: Rockville, pp. 277-284 (May 2007).

Guidance for Industry: Food-Effect Bioavailability and Fed Bioequivalence Studies, pp. 1-9, 2 (Dec. 2002) (emphasis added).

Sathish Ummadi et al., "Overview on Controlled Release Dosage Form," 3(4) Int. J. Pharma Sci. 258-269 (2013).

Christer Tannergren et al., "Toward an Increased Understanding of the Barriers to Colonic Drug Absorption in Humans Implications for

(56)        **References Cited**

OTHER PUBLICATIONS

Early Controlled Release Candidate Assessment," 6(1) Mol. Pharmaceutics 60-73 (Feb. 2009).

Marilyn N. Martinez et al., "A Mechanistic Approach to Understanding the Factors Affecting Drug Absorption: A Review of Fundamentals," 42 J. Clin. Pharmacol. 620-643 (2002).

"Colonic Drug Absorption and Metabolism," Bieck ed., pp. 21-22 (1993).

Center for Drug Evaluation and Research, Application Number: 202611orig1s000, Clinical Pharmacology and Biopharmaceutics Review(s)—Mirabegron, 218 pages (Mar. 2012).

Preliminary Office Action in Brazilian Application No. PI0919466-5 (dated Sep. 2, 2019).

Submission by Lederer & Keller Patentanwälte Partnerschaft mbB in re Opposition to European Patent No. 2 554 168 (Oct. 10, 2019).

Submission by Hexal AG in re Opposition to European Patent No. 2 554 168 (Oct. 10, 2019).

"Yamanouchi Shaklee Pharma Licenses OCAS Drug Delivery Technology from Yamanouchi Pharmaceutical Co., Ltd.," Pharmaceutical Online, pp. 1-2 (May 1999).

Submission by STADA Arzneimittel AG in re Opposition to European Patent No. 2 554 168 (Oct. 10, 2019).

Communication pursuant to Article 94(3) EPC in European Application No. 09817723.1 (dated Sep. 4, 2019).

Center for Drug Development Assistance, National Institute of Food and Drug Safety Evaluation 11-1470550-000003-08, Dec. 2009, 121 pages and 5 pages English translation, Korea.

Chapple, Christopher R., The Development of the Oral Controlled Absorption System (OCAS®): A New Improved Formulation of Tamsulosin, European Urology Supplements, 2005, pp. 1-4, vol. D4, Elsevier B.V., UK.

Takasu, T., et al., Effect of ®-2-(2-aminothiazol-4-yl)-4'-{2-[(2-hydroxy-2-phenylethyl)amino]ethyl} acetanilide (YM178), a novel selective beta3-adrenoceptor agonist, on bladder function, J Pharmacol Exp Ther., May 2007, p. 321-322, vol. 642-7, Epub 2007. (Abstract only).

Hoffmann Eitle, Letter to European Patent Office responding to Official Action dated Feb. 14, 2017 in European Patent Application No. 11 762 758.9, dated Aug. 2, 2017, 5 pages.

clinicaltrials.gov, Pharmacokinetics of Oral Mirabegron With Different Release Rates Versus Intravenous (IV) Mirabegron, U.S. National Library of Medicine, Jul. 2013, 6 pages.

clinicaltrials.gov, History of Changes for Study: NCT00940121, Pharmacokinetics of Oral Mirabegron With Different Release Rates Versus Intravenous (IV) Mirabegron, U.S. National Library of Medicine, Jul. 2013, 7 pages.

Anlage A with Translation of the evidence during Opposition proceeding from opponent Notice of Opposition from STADA Arzneimittel AG dated Oct. 24, 2018 (99 pages) See #33 below.

Mauger et al., Intrinsic Dissolution Performance Testing of the USP Dissolution Apparatus 2 (Rotating Paddle) Using Modified Salicylic Acid Calibrator Tablets: Proof of Principle, Dissolution Technologies, Aug. 2003, pp. 6-15.

Andersson, Karl-Erik, Prospective Pharmacologic Therapies for the Overactive Bladder, Therapeutic Advances in Urology, 2009, 1(2) 71-83.

Dressman, et al., Oral Drug Absorption Prediction and Assessment, Drugs and the Pharmaceutical Sciences, 2000, Pages Preface, 183-228, Marcel Dekker, Inc., New York, USA.

Skelly et al., In Vitro and In Vivo Testing and Correlation for Oral Controlled/Modified Release Dosage Forms. Report of the 2nd Workshop Held Dec. 1988, Washington, DC, U.S.A., Journal of Controlled Release, 1990, pp. 95-106, vol. 14, Elsevier Science Publishers B.V., Amsterdam, The Netherlands.

The European Agency for the Evaluation of Medicinal Products, Note for Guidance on Modified Release Oral and Transdermal Dosage Forms: Section II (Pharmacokinetic and Clinical Evaluation), Jul. 1999, 12 pages, London.

Lachman et al., Sustained Release Dosage Forms, The Theory and Practice of Industrial Pharmacy, 3rd Edition, Chapter 14, Aug. 10, 2011, pp. 430-456.

Chapple et al., "Add-on" Tolterodine Extended Release Improves Overactive Bladder Symptoms in Men Receiving Alpha-Blocker Therapy, Eur Urol Suppl 2008; 7(3):239, Abstract 674.

Andersson et al., Pharmacological Treatment of Overactive Bladder: Report from the International Consultation on Incontinence, Current Opinion in Urology, 2009, pp. 380-394, vol. 19, Wolfers Klower Health.

clinicaltrials.gov, History of Changes for Study: NCT00662909, Study to Test the Efficacy and Safety of the Beta-3 Agonist YM178 in Patients with Symptoms of Overactive Bladder, U.S. National Library of Medicine, Nov. 2017, 8 pages.

clinicaltrials.gov, History of Changes for Study: NCT00912964, A Study to Test the Efficacy and Safety of the Beta-3 Agonist YM178 in Subjects with Symptoms of Overactive Bladder, U.S. National Library of Medicine, Nov. 2017, 8 pages.

clinicaltrials.gov, History of Changes for Study: NCT00689104, Study to Test the Efficacy and Safety of the Beta-3 Agonist YM178 in Subjects with Symptoms of Overactive Bladder, U.S. National Library of Medicine, Nov. 2017, 8 pages.

clinicaltrials.gov, History of Changes for Study: NCT00940121, Pharmacokinetics of Oral Mirabegron With Different Release Rates Versus Intravenous (IV) Mirabegron, U.S. National Library of Medicine, Jul. 2013, 8 pages.

clinicaltrials.gov, History of Changes for Study: NCT00965926, A Study to Investigate the Food Effect on the Pharmacokinetics of YM178 in Healthy, Non-elderly Volunteers, U.S. National Library of Medicine, Jul. 2013, 6 pages.

clinicaltrials.gov, History of Changes for Study: NCT00939757, Study of the Effect of Food on the Pharmacokinetics of Mirabegron, U.S. National Library of Medicine, Jul. 2013, 6 pages.

Bikiaris et al., New Aspects in Sustained Drug Release Formulations, Recent Patents on Drug Delivery & Formulation, 2007, pp. 201-213, vol. 1, No. 3, Bentham Science Publishers Ltd., Greece.

Wen et al., Oral Controlled Release Formulation Design and Drug Delivery, Theory to Practice, 2010, Pages preface and 1-9, John Wiley & Sons, Inc.

Siepmann et al., Polymer Blends for Controlled Release Coatings, Journal of Controlled Release, 2008, pp. 1-15, vol. 125, Elsevier B.V.

Gupta et al., Recent Trends in Oral Drug Delivery: A Review, Recent Patents on Drug Delivery & Formulation, 2009, pp. 162-173, vol. 3, Bentham Science Publishers Ltd.

Notice of Opposition to a European Patent, Patent No. EP2554168 to Astellas Pharma Inc., Opponent Hexal AG, Dated Oct. 24, 2018.

Notice of Opposition to a European Patent, Patent No. EP2554168 to Astellas Pharma Inc., Opponent STADA Arzneimittel AG, Dated Oct. 24, 2018.

Notice of Opposition to a European Patent, Patent No. EP2554168 to Astellas Pharma Inc., Opponent Alfred E. Tiefenbacher (GmbH & Co. KG), Dated Oct. 30, 2018.

Notice of Opposition to a European Patent, Patent No. EP2554168 to Astellas Pharma Inc., Opponent Lederer & Keller Patentanwalte Partnerschaft mbB, Dated Oct. 24, 2018.

Decision of Rejection in Chinese Application No. 201510642287.2 (dated Nov. 5, 2019).

European Patent Office, Official Communication pursuant to Rule 114(2) EPC in European Application No. 09817723.1 dated Jan. 10, 2019.

Amendment submitted dated May 30, 2012 by Applicant in U.S. Appl. No. 12/568,313—identified as T1 in the Official Communication cited herein.

Amendment submitted dated Aug. 26, 2013 by Applicant in U.S. Appl. No. 12/568,313—identified as T2 in the Official Communication cited herein.

Response to Communication Pursuant to Art. 94(3) EPC in European Application No. 09817723.1 (dated May 13, 2013).

Mitsuru Hashida (ed.), "Design and Evaluation of Formulations for Oral Administration," pp. 33, 35, 293-294 (Feb. 1995) (Exhibit A1).

## US 10,842,780 B2

Page 4

(56)            **References Cited**

OTHER PUBLICATIONS

A. Dokoumetzidis et al., "IVIVC of Controlled Release Formulations: Physiological—Dynamical Reasons for Their Failure," 129 J. Control. Release 76 (2008) (Exhibit A2).

Guidelines for the Design and Evaluation of Oral Prolonged Release Dosage Forms, Pharmaceutical Affairs Council, Ministry of Health and Welfare, Japan, (1), No. 5, pp. 1-4 (Mar. 1988) (Exhibit A3).

Idada Sadao et al. (eds.), "Comprehensive Techniques for Development System of New Formulations, Volume for Bases and Additive," pp. 424-429 (Jul. 1985) (Exhibit A4).

Kazuhiro Sako, "Formulations and Particle Design: Design of Novel Oral Controlled-Release System (OCAS) for Continuous Drug Absorption," 14(6) Pharm Tech Japan 85-98 (Jun. 1998) (Exhibit A5).

Hiroyasu Ogata, "1. Pharmacokinetics: Absorption," 30 (3) Jpn. J. Clin. Pharmacol. Ther. 617, 619 (May 1999) (Exhibit A9).

Written Demand for Trial for Invalidation of Japanese Patent No. 5849946 (dated Apr. 2020).

Non-Final Office Action in U.S. Appl. No. 14/584,933 (dated Jun. 10, 2020).

Response to Communication Pursuant to Rules 70(2) and 70a(2) EPC in European Application No. 11762748.9 (dated Nov. 2015).

Response to Communication Pursuant to Art. 94(3) EPC and Third Party Observations in European Application No. 11762748.9 (dated Aug. 2, 2017).

Observations in Response to Oppositions to European Patent No. 2 554 168 B1 (Mar. 25, 2019).

Response to Summons in Oppositions to European Patent No. 2 554 168 B1 (Oct. 10, 2019).

Response to Submissions of Opponents in Oppositions to European Patent No. 2 554 168 B1 (Oct. 18, 2019).

Decision in Oppositions and Oral Proceeding Minutes in European Patent No. 2 554 168 B1 (Mar. 2, 2020).

Response to Communication Pursuant to Rules 70(2) and 70a(2) EPC in European Application No. 09817723.1 (dated May 18, 2015).

Response to Communication Pursuant to Art. 94(3) EPC and Third Party Observations in European Application No. 09817723.1 (dated Aug. 28, 2018).

Response to Communication Pursuant to Art. 94(3) EPC and Third Party Observations in European Application No. 09817723.1 (dated May 20, 2019).

Response to Communication Pursuant to Art. 94(3) EPC in European Application No. 09817723.1 (dated Mar. 13, 2020).

Communication Pursuant to Art. 94(3) EPC in European Application No. 09817723.1 (dated Apr. 2, 2020).

Yoshinobu Yamazaki et al., "Species Differences in the Distribution of β3-Adrenoceptor Subtypes in Bladder Smooth Muscle," 124 Brit. J. Pharmacol. 593-599 (1998).

Osamu Yamaguchi, "β3-Adrenoceptors in Human Detrusor Muscle", 59 (Suppl. 5A) Urology 25-29 (2002).

Peter G. Welling, "Effects of Food on Drug Absorption," 16 Annu. Rev. Nutr. 383-415 (1996).

Nobuyuki Tanaka et al., "β3-Adrenoceptor Agonists for the Treatment of Frequent Urination and Urinary Incontinence: 2-[4-(2-{[(1S,2R)-2-Hydroxy-2-(4-hydroxyphenyl)-1-methylethyl]amino}ethyl)phenoxy]-2-methylpropionic Acid," 9 Bioorgan. Med. Chem. 3265-3271 (2001).

Nobuyuki Tanaka et al., "Discovery of Novel N-Phenylglycine Derivatives as Potent and Selective β3-Adrenoceptor Agonists for the Treatment of Frequent Urination and Urinary Incontinence," 44 J. Med. Chem. 1436-1445 (2001).

Hiro Takeda et al., "Role of the β3-Adrenoceptor in Urine Storage in the Rat: Comparison Between the Selective β3-Adrenoceptor Agonist, CL316,243, and Various Smooth Muscle Relaxants," 293 J. Pharmacol. Exp. Ther. 939-945 (2000).

Brahma N. Singh, "Effects of Food on Clinical Pharmacokinetics," 37(3) Clin. Pharmacokinet. 213-255 (Sep. 1999).

Paul Abrams et al., "The Standardisation of Terminology in Lower Urinary Tract Function: Report from the Standardisation Sub-Committee of the International Continence Society," 21 Neurourol. Urodyn. 167-178 (2002).

K.-E. Andersson, "Overactive Bladder—Pharmacological Aspects," 210 Scand. J. Urol. Nephrol. Suppl. 72-81 (2002).

Richard J. Bastin et al., "Salt Selection and Optimisation Procedures for Pharmaceutical New Chemical Entities," 4(5) Org. Process Res. Dev. 427-435 (2000).

David P. Benziger et al., "Differential Effects of Food on the Bioavailability of Controlled-Release Oxycodone Tablets and Immediate-Release Oxycodone Solution," 85(4) J. Pharm. Sci. 407-410 (1996).

Harry G. Brittain, "Methods for the Characterization of Polymorphs and Solvates," Ch. 6 in Polymorphism in Pharmaceutical Solids, pp. 227-278 (1999).

Artur Burger, "The Relevance of Polymorphism," in Topics in Pharmaceutical Sciences 1983, pp. 347-358 (1983).

Stephen R. Byrn, Solid-State Chemistry of Drugs, pp. 6-11 (1982).

Stephen Bym et al., "Pharmaceutical Solids: A Strategic Approach of Regulatory Considerations," 12(7) Pharm. Res. 945-954 (1995).

Mino R. Caira, "Crystalline Polymorphism of Organic Compounds," in Topics in Current Chemistry, vol. 198, pp. 163-208 (1999).

Jens T. Carstensen, "Preformulation," Ch. 7 in Modem Pharmaceutics 213-237 (1996).

Drug Data Report, 21(7), p. 619.

Daniel S. Elliott et al., "Medical Management of Overactive Bladder," 76(4) Mayo Clin Proc. 353-355 (Apr. 2001).

Guideline for Industry: Guideline for Submitting Supporting Documentation for the Manufacture of and Controls for Drug Products, Center for Drugs and Biologics, Food and Drug Administration, pp. 1-17 (Feb. 1987).

David Fleisher et al., "Drug, Meal and Formulation Interactions Influencing Drug Absorption After Oral Administration," 36(3) Clin. Pharmacokinet. 233-254 (Mar. 1999).

Takao Fujimura et al., "Expression and Possible Functional Role of the β3-Adrenoceptor in Human and Rat Detrusor Muscle," 161 J. Urol. 680-685 (1999).

Janice J. MacKichan et al., "Pharmacokinetic Considerations for Drug Delivery," Ch. 2 in Gibaldi's Drug Delivery Systems in Pharmaceutical Use, pp. 11-22 (2007).

Dharmesh H. Doshi, "Oral Delivery Systems," Ch. 3 in Gibaldi's Drug Delivery Systems in Pharmaceutical Use, pp. 23-41 (2007).

Philip L. Gould, "Salt Selection for Basic Drugs," 33(1-3) Int. J. Pharm. 201-217 (1986).

John Haleblian et al., "Pharmaceutical Applications of Polymorphism," 58(8) J. Pharm. Sci. 911-929 (Aug. 1969).

Bruno C. Hancock et al., "Characteristics and Significance of the Amorphous State in Pharmaceutical Systems," 86(1) J. Pharm. Sci. 1-12 (Jan. 1997).

Y. Igawa et al., "Possible β3-Adrenoceptor-Mediated Relaxation of the Human Detrusor", 164 Acta Physiol Scand 117-118 (1998).

Rajendra K. Khankari et al., "Pharmaceutical Hydrates," 248 Thermochimica Acta 61-79 (1995).

Penelope A. Longhurst et al., "Pharmacological techniques for the in vitro study of the urinary bladder," 45 J. Pharmacol. Tox. Met. 91-108 (2001).

"Hydrates," in Encyclopedia of Pharmaceutical Technology, vol. 7, p. 393 (1993).

Donna J. Sellers et al., "Potential therapeutic targets for treatment of overactive bladder," 19 World J. Ural. 307-311 (2001).

Technical Examination Report in Brazilian Application No. PI0919466-5 (dated Jul. 10, 2020).

Technical Examination Report in Brazilian Application No. BR122019026041-9 (dated Jul. 10, 2020).

Nov. 24, 2020        US 10,842,780 B2



US 10,842,780 B2

1

# PHARMACEUTICAL COMPOSITION FOR MODIFIED RELEASE

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 12/568,313, filed Sep. 28, 2009, which application claims the benefit of priority to U.S. Patent Application No. 61/101,338, filed Sep. 30, 2008, the teachings of which are hereby incorporated by reference.

## TECHNICAL FIELD

The present invention relates to a pharmaceutical composition for modified release capable of reducing food effects, which are observed in conventional tablets, by combining an active ingredient with specific ingredients to control a releasing rate of the active ingredient.

More particularly, the present invention relates to a pharmaceutical composition comprising (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide or a pharmaceutically acceptable salt thereof, an additive which ensures penetration of water into the pharmaceutical composition (hereinafter sometimes referred to as a hydrophilic base), and a polymer which forms a hydrogel, in which the changes in AUC and Cmax caused by the intake of food can be decreased by controlling a releasing rate of the active ingredient.

## BACKGROUND ART

(R)-2-(2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide has been created by Astellas Pharma Inc., and it has been reported that this compound has not only both an activity of promoting insulin secretion and an activity of enhancing insulin sensitivity, but also an antiobestic activity and an antihyperlipemic activity based on an activity of selectively stimulating a β3 receptor, and is useful in treating diabetes (see, for example, patent literature 1).

Further, it has been reported that the compound can be used as a therapeutic agent for overactive bladder, such as overactive bladder accompanied by prostatic hyperplasia, or overactive bladder accompanied by urinary urgency, urinary incontinence, and urinary frequency (see, for example, patent literature 2).

A clinical trial of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide in the form of conventional formulations revealed disadvantages, for example, that pharmacokinetic data unexpectedly varied according to the presence or absence of the intake of food (not published). For example, the rate of decrease of Cmax in a fed state was 67%, and the rate of decrease of AUC in the fed state was 47%, in comparison with those in a fasted state. In this case, Cmax in the fasted state was three times higher than that in the fed state. These problems are considered to be raised by, for example, the changes in pharmacokinetics caused by food, and therefore, the development of a formulation capable of avoiding the effects by food intake is desired.

As a technique of preparing a formulation for modified release, a hydrogel sustained release tablet containing an additive which ensures penetration of water into the tablet, and a hydrogel-forming polymer is disclosed (see, for example, patent literature 3).

2

However, patent literature 3 does not refer to (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, and further improvements are needed to produce a pharmaceutical composition.

## CITATION LIST

### Patent Literature

[patent literature 1] International Publication No. WO 99/20607 (Example 41)

[patent literature 2] International Publication No. WO 2004/041276

[patent literature 3] International Publication No. WO 94/06414

## SUMMARY OF INVENTION

### Technical Problem

An object of the present invention is to provide a pharmaceutical composition for modified release comprising (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide or a pharmaceutically acceptable salt thereof, in which the pharmaceutical composition has efficacy the same as or higher than those of conventional formulations and has no limitations on food intake, and a process of manufacturing the pharmaceutical composition.

### Solution to Problem

The elimination half-life ($T_{1/2}$) of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide is long (approximately 18 to 24 hours), and thus, a formulation thereof for modified release is not necessarily needed to maintain its blood level. Taking into consideration the results of the clinical trial described above, the present inventors conducted intensive studies to design the formulation by paying attention to the control of a release rate of the drug from a formulation to the extent that the release is not affected by food intake or the like, rather than the addition of release control.

On the basis of blood concentration profiles (in a fasted state/after the intake of food) after administration of a conventional formulation (rapid release formulation), the absorption rate of the drug in a fed state was calculated by a deconvolution method to predict continuous absorption for about 4 hours. The present inventors considered from this result that a formulation capable of continuous drug release for 4 hours or more would be able to reduce the effects by food, because the drug release from the formulation would become the rate-limiting step for absorption.

The present inventors carried out a clinical trial in human using three types of formulations in which the release rate of the drug was controlled (Time when the release percentage of the drug from the unit formulation was 80% (T80%)=4 hr, 6 hr, and 10 hr), and found that all formulations could reduce the effects by food, to complete the present invention.

It is generally known that the retention time in the stomach and the release rate of formulations for modified release vary according to the presence or absence of food intake, and as a result, there is a possibility that blood concentration profiles is changed. However, surprisingly, when using this formulation, the change of the blood concentration profiles was small in the presence or absence of food intake.

3

The present invention is characterized by providing a pharmaceutical composition for modified release which is not affected by the effects of food intake and exhibits a decreased change in AUC or Cmax.

The present invention provides:

[1] a pharmaceutical composition for modified release, comprising (1) (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof, (2) at least one additive which ensures penetration of water into the pharmaceutical composition and which has a solubility such that the volume of water required for dissolving 1 g of the additive is 10 mL or less, and (3) a hydrogel-forming polymer having an average molecular weight of approximately 100,000 or more, or a viscosity of 12 mPa·s or more at a 5% aqueous solution at 25° C.;

[2] the pharmaceutical composition for modified release of [1], wherein the additive which ensures penetration of water into the pharmaceutical composition is one compound, or two or more compounds selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene hydrogenated castor oil, polyoxyethylene polyoxypropylene glycol, polyoxyethylene sorbitan higher fatty acid ester, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, β-alanine, lysine hydrochloride, and meglumine;

[3] the pharmaceutical composition for modified release of [2], wherein the additive which ensures penetration of water into the pharmaceutical composition is one compound, or two or more compounds selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, lactose, sucrose, sodium chloride, and polyoxyethylene polyoxypropylene glycol;

[4] the pharmaceutical composition for modified release of any one of [1] to [3], wherein an amount of the additive which ensures penetration of water into the pharmaceutical composition is 5% by weight to 75% by weight with respect to the total weight of the pharmaceutical composition;

[5] the pharmaceutical composition for modified release of [4], wherein an amount of the additive which ensures penetration of water into the pharmaceutical composition is 5% by weight to 70% by weight with respect to the total weight of the pharmaceutical composition;

[6] the pharmaceutical composition for modified release of any one of [1] to [5], wherein the hydrogel-forming polymer is one compound, or two or more compounds selected from the group consisting of polyethylene oxide, hydoxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and a carboxyvinyl polymer;

[7] the pharmaceutical composition for modified release of [6], wherein the hydrogel-forming polymer is one compound, or two or more compounds selected from the group consisting of polyethylene oxide, hydoxypropyl methylcellulose, and hydroxypropyl cellulose;

[8] the pharmaceutical composition for modified release of any one of [1] to [7], wherein an amount of the hydrogel-forming polymer is 1% by weight to 70% by weight with respect to the total weight of the pharmaceutical composition;

[9] the pharmaceutical composition for modified release of any one of [1] to [8], further comprising an antioxidant;

[10] the pharmaceutical composition for modified release of [9], wherein the antioxidant is one compound, or two or

4

more compounds selected from the group consisting of butyl hydroxytoluene, propyl gallate, and sodium ascorbate;

[11] the pharmaceutical composition for modified release of claim 10, wherein the antioxidant is butyl hydroxytoluene;

[12] the pharmaceutical composition for modified release of any one of [9] to [11], wherein an amount of the antioxidant is 0.025% by weight to 0.25% by weight;

[13] the pharmaceutical composition for modified release of any one of [1] to [12], further comprising a stabilizer;

[14] the pharmaceutical composition for modified release of [13], wherein the stabilizer is one compound, or two or more compounds selected from the group consisting of yellow ferric oxide, red ferric oxide, and black iron oxide;

[15] the pharmaceutical composition for modified release of [14], wherein the stabilizer is yellow ferric oxide and/or red ferric oxide;

[16] the pharmaceutical composition for modified release of any one of [13] to [15], wherein an amount of the stabilizer is 0.05% by weight to 1% by weight;

[17] a process of manufacturing a pharmaceutical composition for modified release, characterized by comprising mixing (1) (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof with (2) at least one additive which ensures penetration of water into the pharmaceutical composition and which has a solubility such that the volume of water required for dissolving 1 g of the additive is 10 mL or less and (3) a hydrogel-forming polymer having an average molecular weight of approximately 100,000 or more, or a viscosity of 12 mPa·s or more at a 5% aqueous solution at 25° C., wherein an amount of the additive is 5% by weight to 75% by weight with respect to the total weight of the pharmaceutical composition, and an amount of the hydrogel-forming polymer is 1% by weight to 70% by weight with respect to the total weight of the pharmaceutical composition;

[18] the process of [17], wherein the additive which ensures penetration of water into the pharmaceutical composition is one compound, or two or more compounds selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene hydrogenated castor oil, polyoxyethylene polyoxypropylene glycol, polyoxyethylene sorbitan higher fatty acid ester, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, β-alanine, lysine hydrochloride, and meglumine; and

[19] the process of [17] or [18], wherein the hydrogel-forming polymer is one compound, or two or more compounds selected from the group consisting of polyethylene oxide, hydoxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and a carboxyvinyl polymer.

As formulation techniques for reducing or avoiding the changes in pharmacokinetics such as AUC or Cmax accompanied by food intake, a formulation technique concerning a sustained-release pharmaceutical composition containing tamsulosin hydrochloride is disclosed (see Japanese Unexamined Patent Publication (Kokai) No. 2005-162736 and Japanese Unexamined Patent Publication (Kokai) No. 2005-162737). This formulation technique is limited to tamsulosin, and applied to a formulation containing the drug at a low dose (0.4 mg per unit formulation). This formulation enables to control the release of tamsulosin therefrom by being mainly composed of a sustained-release base. By

US 10,842,780 B2

5

contrast, the pharmaceutical composition contains the drug at a high dose (i.e., high content per unit formulation), and it is considered difficult to control the release rate of the drug from a formulation containing the sustained-release base at a low content, and therefore, the present invention is technically quite different from the formulation disclosed in these references.

### Effects of Invention

According to the present invention, a pharmaceutical composition for modified release which has no limitations on food intake and is stable (for example, reduction of changes in a sequential dissolution profile) can be provided.

Further, a pharmaceutical composition for modified release in which AUC is not reduced can be provided.

With respect to a conventional formulation, the rate of decrease of Cmax in the fed state was 67% in comparison with that in a fasted state. By contrast, with respect to the pharmaceutical composition for modified release of the present invention, the rate of decrease of Cmax in the fed state was 42% in comparison with that in a fasted state, and this result showed that reduction of Cmax caused by food intake could be significantly alleviated by forming its formulation into the pharmaceutical formulation for modified release.

### BRIEF DESCRIPTION OF DRAWINGS

The FIGURE is a graph showing dissolution profiles of the pharmaceutical composition for modified release prepared in Example 11, and the time courses thereof.

### DESCRIPTION OF EMBODIMENTS

The pharmaceutical composition for modified release of the present invention will be explained hereinafter.

The term "rapid release formulation (conventional formulation)" as used herein means a formulation in which the dissolution rate of the drug from the formulation is 85% or more after 30 minutes from the beginning a dissolution test, which is carried out in accordance with a dissolution test (paddle method) described in the United States Pharmacopoeia under the conditions that 900 mL of an appropriate test fluid (such as a USP buffer, pH 6.8) is used and the paddle rotation speed is 100 rpm. Alternatively, the term means a formulation in which the dissolution rate of the drug from the formulation is 85% or more after 30 minutes from the beginning a dissolution test, which is carried out in accordance with a dissolution test, method 2 described in the Japanese Pharmacopoeia under the conditions that 900 mL of an appropriate test fluid (such as a Mc. Ilvain buffer, pH 6.8) is used and the paddle rotation speed is 50 rpm.

The term "pharmaceutical composition for modified release" as used herein means a formulation in which the dissolution rate of the drug from the formulation is less than 85% after 30 minutes from the beginning a dissolution test carried out under the above conditions, and the drug release is controlled to the extent that the effects by food are reduced. More particularly, it is a formulation in which an additive (hydrophilic base) which ensures penetration of water into the formulation is combined with a polymer which forms a hydrogel.

The wording "the effects by food are reduced" as used herein means, for example, a 10% reduction, a 20% reduction in another embodiment, and a 30% reduction in still another embodiment, in comparison with Cmax of a con-

6

ventional formulation. Alternatively, the term means, for example, a 10% reduction with respect to the rates of decrease of Cmax and AUC in administration after food intake, in comparison with Cmax and AUC in administration in the fasted state, a 20% reduction in another embodiment, and a 30% reduction in still another embodiment.

The rates of decrease of Cmax and AUC are calculated by the following equations:

$$Rd(Cmax)=[Cmax(FS)-Cmax(FI)]\times100/Cmax(FS)$$

$$Rd(AUC)=[AUC(FS)-AUC(FI)]1\times100/AUC(FS)$$

Rd(Cmax): Rate of decrease of Cmax (%)
Cmax(FS): Cmax in administration in the fasted state
Cmax(FI): Cmax in administration after food intake
Rd(AUC): Rate of decrease of AUC (%)
AUC(FS): AUC in administration in the fasted state
AUC(FI): AUC in administration after food intake

The term "formulation in which the effects by food are reduced" as used herein means a formulation in which the dissolution rate of the drug from the formulation is 75% or less after 1.5 hours and 100% or less after 4 hours from the beginning a dissolution test, which is carried out under the above conditions [in accordance with a dissolution test (paddle method) described in the United States Pharmacopoeia under the conditions that 900 mL of an appropriate test fluid (such as a USP buffer, pH 6.8) is used and the paddle rotation speed is 50 to 200 rpm]. In another embodiment, the term means a formulation in which the dissolution rate of the drug from the formulation is 75% or less after 1.5 hours and 75% or more to 100% or less after 7 hours.

The term "stable" as used herein means that it is stable against, for example, heat, temperature, humidity, or light. More particularly, the term means that, for example, when a plastic bottle is filled with a pharmaceutical composition and sealed, and then, the bottle is preserved for three months under the conditions at 40° C. and 75% RH or at 60° C., the change in the dissolution rate at the point showing a dissolution rate of 50% is within ±5% or less. Alternatively, the term means that, for example, when a pharmaceutical composition is exposed to 1.2 million Lux·hr of light, the change in the dissolution rate at the point showing a dissolution rate of 50% is within ±5% or less.

(R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide (hereinafter sometimes referred to as compound A) is represented by the following structural formula.

[Chem. 1]



Compound A may be used in a free form which is not a salt, and may form a salt with an acid in other embodiments. Examples of such a salt include an acid addition salt with a mineral acid such as hydrochloric acid, hydrobromic acid, hydroiodic acid, sulfuric acid, nitric acid, phosphoric acid, or the like; and an acid addition salt with an organic acid such as formic acid, acetic acid, propionic acid, oxalic acid, malonic acid, succinic acid, fumaric acid, maleic acid, lactic

US 10,842,780 B2

7                                                                                  8

acid, malic acid, citric acid, tartaric acid, carbonic acid, picric acid, methanesulfonic acid, ethanesulfonic acid, glutamic acid, or the like.

The dose of compound A may be appropriately selected in accordance with symptom, age, sex, and the like of the patient to be treated. The daily dose of compound A for oral administration to an adult is generally 0.01 to 100 mg/kg, which is administered once or divided into two to four doses per day.

The content of compound A per formulation is, for example, 1% by weight to 70% by weight, 5% by weight to 70% by weight in another embodiment, and 5% by weight to 50% by weight in still another embodiment. The content of compound A per formulation is 1 mg to 500 mg, and 10 mg to 200 mg in another embodiment.

It is necessary that the hydrogel-forming polymer used in the present invention can control the release rate of the drug, to the extent that the blood concentration profile of the drug is not affected by the presence or absence of food intake.

The molecular weight of the hydrogel-forming polymer is, for example, 100,000 or more, 100,000 to 8,000,000 in another embodiment, 100,000 to 5,000,000 in still another embodiment, and 100,000 to 2,000,000 in still another embodiment. The viscosity of the hydrogel-forming polymer is, for example, 12 mPa·s or more in a 5% aqueous solution at 25° C.; 12 mPa·s or more in a 5% aqueous solution at 25° C., and 40,000 mPa·s or less in a 5% aqueous solution at 25° C. in another embodiment; 400 mPa·s or more in a 2% aqueous solution at 25° C., and 7,500 mPa·s or less in a 1% aqueous solution at 25° C. in still another embodiment; and 400 mPa·s or more in a 2% aqueous solution at 25° C., and 5,500 mPa·s or less in a 1% aqueous solution at 25° C. in still another embodiment.

In the pharmaceutical composition for modified release of the present invention, the release period of time of the drug from the formulation can be arbitrarily controlled by adjusting the viscosity of the polymer which is used as the hydrogel-forming polymer.

The hydrogel-forming polymer used in the present invention is not particularly limited, so long as the release of the drug can be controlled to the extend that the effects of food on compound A may be reduced. Examples of the hydrogel-forming polymer include polyethylene oxide, hydroxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and carboxyvinyl polymers. Examples of the hydrogel-forming polymer in another embodiment include polyethylene oxide, hydroxypropyl methylcellulose, and hydroxypropyl cellulose.

Examples of polyethylene oxide (hereinafter sometimes referred to as PEO) include product names, Polyox WSR-308 [average molecular weight: 8,000,000, viscosity: 10,000-15,000 mPa·s (1% aqueous solution at 25° C.)], Polyox WSR-303 [average molecular weight: 7,000,000, viscosity: 7,500-10,000 mPa·s (1% aqueous solution at 25° C.)], Polyox WSR Coagulant [average molecular weight: 5,000,000, viscosity: 5,500-7,500 mPa·s (1% aqueous solution at 25° C.)], Polyox WSR-301 [average molecular weight: 4,000,000, viscosity: 1,650-5,500 mPa·s (1% aqueous solution at 25° C.)], Polyox WSR-N-60K [average molecular weight: 2,000,000, viscosity: 2,000-4,000 mPa·s (2% aqueous solution at 25° C.)], Polyox WSR-N-12K [average molecular weight: 1,000,000, viscosity: 400-800 mPa·s (2% aqueous solution at 25° C.)], Polyox WSR-1105 [average molecular weight: 900,000, viscosity: 8,800-17,600 mPa·s (5% aqueous solution at 25° C.)], Polyox WSR-205 [average molecular weight: 600,000, viscosity: 4,500-

8,800 mPa·s (5% aqueous solution at 25° C.)], Polyox WSR-N-750 [average molecular weight: 300,000, viscosity: 600-1200 mPa·s (5% aqueous solution at 25° C.)], Polyox WSR-N-80 [average molecular weight: 200,000, viscosity: 55-90 mPa·s (5% aqueous solution at 25° C.)], and Polyox WSR-N-10 [average molecular weight: 100,000, viscosity: 12-50 mPa·s (5% aqueous solution at 25° C.)] (DOW).

Examples of hydroxypropyl methylcellulose (hereinafter sometimes referred to as HPMC) include product name Metolose 90SH50000 [viscosity in a 2% aqueous solution at 20° C.: 2,900-3,900 mPa·s], Metolose SB-4 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4 mPa·S), TC-5RW (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 6 mPa·S), TC-5S (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 15 mPa·S), TC-5R (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 6 mPa·S), TC-5M (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4.5 mPa·S), TC-5E (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 3 mPa·S), Metolose 60SH-50 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 50 mPa·s), Metolose 65SH-50 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 50 mPa·s), Metolose 90SH-100 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 100 mPa·s), Metolose 90SH-100SR (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 100 mPa·s), Metolose 65SH-400 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 400 mPa·s), Metolose 90SH-400 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 400 mPa·s), Metolose 65SH-1500 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 1,500 mPa·s), Metolose 60SH-4000 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4,000 mPa·s), Metolose 65SH-4000 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4,000 mPa·s), Metolose 90SH-4000 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4,000 mPa·s), Metolose 90SH-4000SR (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4,000 mPa·s), Metolose 90SH-15000 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 15,000 mPa·s), Metolose 90SH-15000SR (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 15,000 mPa·s), and Metolose 90SH-30000 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 30,000 mPa·s).

Examples of hydroxypropyl cellulose (hereinafter sometimes referred to as HPC) include HPC-SSL (product name, Nippon Soda Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: 2.0-2.9 mPa·S), HPC-SL (product name, Nippon Soda Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: 3.0-5.9 mPa·S), HPC-L (product name, Nippon Soda Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: 6.0-10.0 mPa·S), HPC-M (product name, Nippon Soda Co.,

US 10,842,780 B2

9 10

Ltd.) (viscosity in a 2% aqueous solution at 20° C.: 150-400 mPa·S), and HPC-H (product name, Nippon Soda Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: 1,000-4,000 mPa·S).

Examples of methylcellulose (hereinafter sometimes referred to as MC) include Metolose SM15 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 15 mPa·S), Metolose SM25 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 25 mPa·S), Metolose SM100 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 100 mPa·S), Metolose SM400 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 400 mPa·S), Metolose SM1500 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 1,500 mPa·S), and Metolose SM4000 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4,000 mPa·S).

Examples of carboxymethyl cellulose sodium (hereinafter sometimes referred to as CMCNa) include product names, Sunrose F-30MC [viscosity: 250-350 mPa·s (1% aqueous solution at 25° C.)], Sunrose F-150MC [average molecular weight: 200,000, viscosity: 1,200-1,800 mPa·s (1% aqueous solution at 25° C.)], Sunrose F-600MC [viscosity: 6,000-8,000 mPa·s (1% aqueous solution at 25° C.)], Sunrose F-1000MC [average molecular weight: 420,000, viscosity: 8,000-12,000 mPa·s (the same)], Sunrose F-1400MC [viscosity: 12,000-15,000 mPa·s (1% aqueous solution at 25° C.)], and Sunrose F-300MC [average molecular weight: 300,000, viscosity: 2,500-3,000 mPa·s (the same)] (Nippon Paper Chemicals Co., Ltd.).

Examples of hydroxyethyl cellulose (hereinafter sometimes referred to as HEC) include product names, HEC DAICEL SE850 [average molecular weight: 1,480,000, viscosity: 2,400-3,000 mPa·s (1% aqueous solution at 25° C.)], and HEC DAICEL SE900 [average molecular weight: 1,560,000, viscosity: 4,000-5,000 mPa·s (1% aqueous solution at 25° C.)](Daicel chemical Industries, Ltd.).

Examples of carboxyvinyl polymers include Carbopol 71G (viscosity: 4,000-11,000 mPa·s), Carbopol 971P (viscosity: 4,000-11,000 mPa·s), Carbopol 981 (viscosity: 4,000-10,000 mPa·s), Carbopol 941 (viscosity: 4,000-10,000 mPa·s), Carbopol 934 (viscosity: 30,500-39,400 mPa·s), and Carbopol 934P (viscosity: 29,400-39,400 mPa·s)(B.F.-Goodrich Chemical).

These hydrogel-forming polymers may be used alone, or as an appropriate combination of two or more thereof. A combination of different lots may be used.

The content of the hydrogel-forming polymer is not particularly limited, so long as it is an amount to the extent that the blood concentration profile of the drug is not affected by the presence or absence of food intake. The content of the hydrogel-forming polymer is, for example, 1% by weight to 70% by weight with respect to the total weight of the formulation, and 3% by weight to 70% by weight in another embodiment. The content of the hydrogel-forming polymer is 5% by weight to 70% by weight with respect to the total weight of the formulation, 10% by weight to 60% by weight in another embodiment, and 10% by weight to 40% by weight in still another embodiment. The content of the hydrogel-forming polymer is 0.1% by weight to 1,000% by weight with respect to the weight of the drug, 1% by weight to 500% by weight in another embodiment, and 5% by weight to 300% by weight in still another embodiment.

A polymer of which the viscosity (before mixing) is beyond the specific range can be used as an appropriate combination with one or more other polymers, in case that the mixture obtained by mixing these plural polymers has a viscosity (as measured before the use) within the specific range.

In the additive which ensures penetration of water into the pharmaceutical composition of the present invention (hydrophilic base), the amount of water necessary to dissolve 1 g of the hydrophilic base at 20±5° C. is 10 mL or less, 6 mL or less in another embodiment, 5 mL or less in still another embodiment, and 4 mL or less in still another embodiment. When the hydrophilic base has a high solubility to water, the effect that allows water to penetrate into the formulation is high.

Examples of the hydrophilic base include water-soluble polymers, such as polyethylene glycol [PEG: for example, product names PEG 400, PEG 1500, PEG 4000, PEG 6000, and PEG 20000 (NOF Corporation)], polyvinyl pyrrolidone (PVP: for example, product name PVP K30 (BASF), and the like; sugar alcohols, such as D-mannitol, D-sorbitol, xylitol, and the like; saccharides, such as lactose, sucrose, anhydrous maltose, D-fructose, dextran (for example, Dextran 40), glucose, and the like; surfactants, such as polyoxyethylene hydrogenated castor oil [HCO: for example, Cremophor RH40 (BASF), HCO-40, HCO-60 (Nikko Chemicals)], polyoxyethylene polyoxypropylene glycol [for example, Pluronic F68 (Asahi Denka and the like)], polyoxyethylene sorbitan higher fatty acid esters [Tween: for example, Tween 80 (Kanto Chemical)], and the like; salts, such as sodium chloride, magnesium chloride, and the like; organic acids, such as citric acid, tartaric acid, and the like; amino acids, such as glycine, β-alanine, lysine hydrochloride, and the like; and aminosaccharides, such as meglumine and the like.

As another embodiment, PEG, PVP, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene polyoxypropylene glycol, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, β-alanine, lysine hydrochloride, or meglumine may be used. As still another embodiment, PEG, PVP, D-mannitol, lactose, sucrose, sodium chloride, polyoxyethylene polyoxypropylene glycol, or the like may be used.

These hydrophilic bases may be used alone, or as an appropriate combination of two or more thereof.

The content of the hydrophilic base is not particularly limited, so long as it is an amount capable of controlling the release of the drug to the extent that the release of the drug is not affected by food. The content of the hydrophilic base is, for example, 5% by weight to 75% by weight, 5% by weight to 70% by weight in another embodiment, and 20% by weight to 60% by weight in still another embodiment.

The pharmaceutical composition for modified release of the present invention may be prepared as various dosage forms, which include, for example, formulations for oral administration such as tablets, capsules (including microcapsules), granules, and powder, and formulations for parenteral administration such as suppositories (for example, rectal suppositories or vaginal suppositories). These formulations may be safely administered orally or parenterally. Formulations for oral administration such as tablets, capsules, and granules may be selected in another embodiment.

The pharmaceutical composition for modified release of the present invention may be prepared by mixing the drug, the hydrogel-forming polymers, and the hydrophilic base, and forming the mixture into a predetermined shape. The mixing and forming may be carried out in accordance with

US 10,842,780 B2

11

conventional methods widely used in the technical field for formulation. A pharmaceutically acceptable carrier may be used in the mixing and/or forming, if desired.

In the preparation of the pharmaceutical composition for modified release of the present invention, further various pharmaceutical additives may be used, if desired. Such pharmaceutical additives are not particularly limited, so long as they are pharmaceutically acceptable. Examples of the pharmaceutical additives include various organic or inorganic carrier substances which are widely used as formulation materials, such as fillers, lubricants, binders, and disintegrating agents. Other formulation additives such as preservatives, antioxidants, stabilizers, film coating agents, coloring agents, and sweeteners may be used, if desired.

Examples of the fillers include lactose, sucrose, D-mannitol, D-sorbitol, starch, gelatinized starch, dextrin, crystalline cellulose, low substituted hydroxypropyl cellulose, carboxymethyl cellulose sodium, gum arabic, dextrin, pullulan, light anhydrous silicic acid, synthetic aluminum silicate, magnesium aluminate metasilicate, and the like.

Examples of the lubricants include magnesium stearate, calcium stearate, talc, colloidal silica, and the like.

Examples of the binders include gelatinized starch, sucrose, gelatin, gum arabic, methylcellulose, carboxymethyl cellulose, carboxymethyl cellulose sodium, crystalline cellulose, sucrose, D-mannitol, trehalose, dextrin, pullulan, hydroxypropyl cellulose, hydroxypropyl methylcellulose, polyvinylpyrrolidone, and the like.

Examples of the disintegrating agents include lactose, sucrose, starch, carboxymethyl cellulose, carboxymethyl cellulose calcium, croscarmellose sodium, carboxymethyl starch sodium, light anhydrous silicic acid, low substituted hydroxypropylcellulose, and the like.

Examples of the preservatives include p-hydroxybenzoate esters, chlorobutanol, benzyl alcohol, phenethyl alcohol, dehydroacetic acid, sorbic acid, and the like.

The antioxidants are not particularly limited, so long as it can avoid the effects of dissolution behavior. Examples of the antioxidants include butylated hydroxytoluene (BHT), propyl gallate (PG), butylhydroxyanisol (BHA), ascorbic acid, sodium ascorbate, erythorbic acid, sodium nitrite, sodium bisulfite, sodium pyrosulfite, citric acid, and edetate sodium; BHT, PG, and sodium ascorbate in another embodiment; and BHT in still another embodiment.

Examples of the stabilizers include yellow ferric oxide, red ferric oxide, black iron oxide, and the like.

Examples of the film coating agents include pharmaceutically commonly-used bases, such as water-soluble polymers, plasticizers, and inorganic substances, or a combination thereof.

Examples of the coloring agents include water-soluble edible tar pigments (examples: edible pigments such as food red No. 2, food red No. 3, food yellow No. 4, food yellow No. 5, food blue No. 1, and food blue No. 2), water-insoluble lake pigments (examples: aluminum salts of the above water-soluble edible tar pigments), natural pigments (examples: β-carotene, chlorophyll, and colcothar), and the like.

Examples of the sweeteners include saccharin sodium, dipotassium glycyrrhizinate, aspartame, stevia, and the like.

These carriers or formulation additives may be used alone, or as an appropriate combination of two or more thereof.

With respect to the contents thereof, they may be used in appropriate amounts. For example, the content of the antioxidant is 0.025% by weight to 0.25% by weight with respect to the total weight of the formulation, and that of the

12

stabilizer is 0.05% by weight to 1% by weight with respect to the total weight of the formulation.

Hereinafter, the process of manufacturing the pharmaceutical composition for modified release of the present invention will be explained, the present invention is not limited to the following particular embodiments.

The pharmaceutical composition for modified release of the present invention may be prepared by known methods per se, such as dry granulation, wet granulation, fluidized bed granulation, intermittent granulation, agitation granulation, or the like.

As a method of de-lumping or pulverizing the drug, conventional crushing or pulverizing methods may be applied, for example, using an impact mill (Hosokawa Micron Corporation; Fine Impact Mill), a dry & wet mill (Powrex Corporation: Comil), or a cutting mill granulator (Dalton Corporation: Power Mill).

As a method of pulverizing the hydrophilic base, the hydrogel-forming polymer, or the formulation additives, conventional pulverizing methods may be applied, for example, using an impact mill (Hosokawa Micron Corporation; Fine Impact Mill or Sample Mill) or a jet mill (Horkos Corp; Jet Mill).

As a method of granulating the drug, conventional granulation methods may be used. Examples of such methods include a fluidized bed granulation method, an intermittent granulation method, an agitation granulation method, a high-speed agitation granulation method, a tumbling fluidized bed granulation method, an extrusion granulation method, a pulverization granulation method, a dry granulation method, and the like. In another embodiment, examples thereof include a fluidized bed granulation method, an intermittent granulation method, an agitation granulation method, a high-speed agitation granulation method, a tumbling fluidized bed granulation method, and a dry granulation method, and any method capable of granulating the drug may be used. Examples of a granulator include a fluidized bed granulator (for example, Flow Coater; Freund Corporation, or GPCG; Glatt GmbH), a granulation and coating apparatus equipped with a horizontal rotating disc having a flat powder contact portion [for example, a centrifugal fluidizing granulator (for example, CF granulator; Freund Corporation)], a granulation and coating apparatus having a rotating disk with a flat surface placed at the bottom of a fluidized bed and having an aeration portion (for example, Spiralflow, or Flowcoater with a rotor container; Freund Corporation), and a dry granulator in which material powder is directly compressed, molded, crushed, and sieved (for example, Roller Compactor; Freund Corporation).

In the dry granulation, for example, the drug, the hydrogel-forming polymer, the hydrophilic base, and additives such as a filler may be compression-molded using a dry granulator, and then, may be crushed and sieved to obtain granulated products having a desired size.

In the wet granulation, for example, while the drug, the hydrogel-forming polymer, the hydrophilic base, and additives such as a filler is fluidized, an appropriate amount of water or a liquid containing the hydrophilic base and the binder may be sprayed. The liquid containing the hydrophilic base may be prepared by dissolving or dispersing the essential component in a solvent such as water, ethanol, methanol, or the like. These solvents may be used as an appropriate mixture thereof.

The amount of water used in the granulation is not particularly limited, so long as the binder or formulation additives may be uniformly dissolved and/or suspended (dispersed) in the water. When the hydrophilic base is used

US 10,842,780 B2

13                                                                    14

in the solid form, the amount of water is not particularly limited, so long as the hydrogel-forming polymer can be granulated.

When the hydrophilic base is used in the liquid form, the amount of water to the hydrogel-forming polymer is generally 10% by weight or less, 8% by weight or less in another embodiment, and 5% by weight or less in still another embodiment. A method of adding water in the granulation is not particularly limited, so long as a nonuniform mixture consisting of untreated powder and aggregates, which are generally powdery, is not generated. Examples thereof include a continuous spray method in which water is continuously added, an intermittent spray method in which a dry step (and a shaking step, if desired) is carried out during the granulation step, and the like.

The addition rate of water in the granulation is not particularly limited, so long as a nonuniform mixture consisting of untreated powder and aggregates, which are generally powdery, is not generated. In the fluidized bed granulation, the addition rate of water to the hydrogel-forming polymer is generally 0.1% by weight/min. to 1% by weight/min., 0.2% by weight/min. to 0.8% by weight/min. in another embodiment, and 0.4% by weight/min. to 0.6% by weight/min. in still another embodiment.

The temperature of the powder in the granulation is not particularly limited, so long as it does not induce thermal denaturation of the hydrogel-forming polymer. The temperature is, for example, 20° C. to the melting point (62° C. to 67° C.) of the hydrogel-forming polymer, 20° C. to 50° C. in another embodiment, 20° C. to 35° C. in still another embodiment, and 25° C. to 30° C. in still another embodiment.

The concentration of the binder liquid as a solid content which may be used in the granulation is, for example, 1% to 20% as a formulation amount. The binder is not particularly limited, so long as it is pharmaceutically acceptable.

The binder may be added in the solid form to a granulator, and then, water may be sprayed as the binder liquid. Alternatively, the binder may be dissolved in water, and then, the resulting binder liquid may be sprayed.

An appropriate spray rate of the binder liquid varies according to a production method to be applied or its production scale. In a 1-kg scale production by the fluidized bed granulation, the spray rate is 2 g/min. to 20 g/min., and 5 g/min. to 15 g/min. in another embodiment.

An appropriate temperature of the product in the granulation is 15° C. to 50° C., and 15° C. to 40° C. in another embodiment.

The resulting granulated products may be, for example, dried or heated.

In the drying step, an apparatus and a method are not particularly limited, so long as the granulated products can be dried. Examples of an apparatus for drying include a fluidized bed granulator (for example, Flow Coater; Freund Corporation, or GPCG; Glatt GmbH), a granulation and coating apparatus equipped with a horizontal rotating disc having a flat powder contact portion [for example, a centrifugal fluidizing granulator (for example, CF granulator; Freund Corporation)], a granulation and coating apparatus having a rotating disk with a flat surface placed at the bottom of a fluidized bed and having an aeration portion (for example, Spiraflow, or Flowcoater with a rotor container; Freund Corporation), and the like. The conditions for drying are not particularly limited, so long as the granulated products may be generally dried in the fluidized bed. The drying of the granulated products will be almost completed, for example, under the conditions in which the dry inlet air

temperature is 50° C. and the drying is carried out until the temperature of the granulated products becomes 40° C. and, in another embodiment, under the conditions in which the dry inlet air temperature is 40° C. and the drying is carried out until the temperature of the granulated products becomes 30° C. As the drying method, forced-air drying or drying under reduced pressure may be used.

After the completion of the granulation, an anti-oxidant may be added.

The granulated products may be sieved.

In the sieving step, an apparatus and a method are not particularly limited, so long as the granulated products can be sieved. Examples of an apparatus for sieving include a screen, a dry & wet mill (Powrex Corporation: Comil), a cutting mill granulator (Dalton Corporation; Power Mill), and the like. The conditions for sieving are not particularly limited, so long as the granulated products may be generally sieved to obtain particles having a desired size.

After the completion of the sieving, an anti-oxidant may be added.

Examples of tabletting include a direct tabletting method in which the drug, the hydrophilic base, and the hydrogel-forming polymer are mixed with an appropriate additive(s), and the mixture is compression-molded to obtain tablets; a method in which a composition obtained by a wet granulation (the granulation is carried out by spraying a mixture of the drug, the hydrophilic base, the hydrogel-forming polymer, and additives with a binder liquid) or a melting granulation (the granulation is carried out by heating a mixture of the drug, the hydrophilic base, the hydrogel-forming polymer, and an appropriate low-melting substance) is formed into tablets; and the like.

A rotary tabletting machine, a single punch tabletting machine, and the like may be used as a tabletting machine. A method as well as an apparatus is not particularly limited, so long as a compression-molded product (preferably tablets) can be pharmaceutically produced.

After the tabletting, the obtained tablets may be dried. The initial water content of the tablet is, for example, 2% by weight/tablet or less, 1.5% by weight/tablet or less in another embodiment, and 0.9% by weight/tablet or less in still another embodiment.

After the tabletting, the obtained tablets may be film coated using a pan coating machine at an amount of 1% by weight to 5% by weight per tablet.

EXAMPLES

The present invention will now be further illustrated by, but is by no means limited to, the following Examples.

Example 1

In a mortar, 10 g of compound A, 2.5 g of polyethylene oxide (Dow chemical; product name: WSR N-60K; The same compound was used in the following Examples, unless otherwise specified.), and 7.5 g of polyethylene glycol (Sanyo Chemical Industries, Ltd.; PEG 6000; The same compound was used in the following Examples.) were mixed well. The mixture was formed into tablets using Autograph (Shimadzu; The same apparatus was used in the following Examples.) to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 400 mg.

Example 2

In a mortar, 10 g of compound A, 3.5 g of polyethylene oxide, and 6.5 g of polyethylene glycol were mixed well,

US 10,842,780 B2

<table>
<tr><td>15</td><td>16</td></tr>
</table>

and the mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 400 mg.

### Example 3

In a mortar, 10 g of compound A, 6.25 g of polyethylene oxide, and 5 g of polyethylene glycol were mixed well, and the mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 425 mg.

### Example 4

In a mortar, 10 g of compound A, 5 g of hydroxypropyl methylcellulose (Shin-Etsu Chemical Co., Ltd.; HPMC90SH-4000SR), and 5 g of polyethylene glycol were mixed well, and the mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 400 mg.

### Example 5

In a mortar, 10 g of compound A, 5 g of hydroxypropyl methylcellulose (Shin-Etsu Chemical Co., Ltd.; HPMC90SH-100000SR), and 5 g of polyethylene glycol were mixed well, and the mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 400 mg.

### Example 6

In a mortar, 10 g of compound A, 7.5 g of hydroxypropyl methylcellulose (Shin-Etsu Chemical Co., Ltd.; HPMC90SH-100SR), and 2.5 g of polyethylene glycol were mixed well, and the mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 400 mg.

### Example 7

After 400 g of compound A, 140 g of polyethylene oxide, 251.2 g of polyethylene glycol, 0.8 g of finely ground BHT (Merck; The same compound was used in the following Examples.) and 8 g of magnesium stearate were weighed out, these compounds were mixed using a mixer. The mixture was compression-molded using Roller Compactor Mini (Freund Corporation) and sieved to obtain a pharmaceutical composition for modified release (granules) of the present invention. The obtained granules were formed into tablets using a rotary tabletting machine (Hata Iron Works Co., Ltd.; The same apparatus was used in the following Examples.) to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 400 mg.

### Example 8

The tablets obtained in Example 7 were coated with a film coating agent [Colorcon; Opadry (containing yellow ferric oxide as a stabilizer); The same agent was used in the following Examples, unless otherwise specified.] dispersed into water to obtain a pharmaceutical composition for modified release (tablets) of the present invention.

### Example 9

Into a fluidized bed granulating apparatus GPCG-5 (Freund Corporation; The same apparatus was used in the following Examples.), 1500 g of de-lumped compound A, 1050 g of polyethylene oxide, and 1764 g of polyethylene glycol were loaded, and granulated with 1350 g of a 10% by weight aqueous solution of hydroxypropyl cellulose (Nippon Soda Co., Ltd.; HPC-SL; The same compound was used in the following Examples.) to obtain a pharmaceutical composition for modified release (granules) of the present invention. The resulting pharmaceutical composition for modified release (granules) of the present invention was sieved and mixed with 4 g of finely ground BHT and 30 g of magnesium stearate, and the mixture was formed into tablets using a rotary tabletting machine to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 300 mg. The obtained tablets were spray-coated with an aqueous dispersion of the film coating agent using HiCoater to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 309 mg.

### Example 10

Into a fluidized bed granulating apparatus GPCG-5, 1500 g of de-lumped compound A, 1050 g of polyethylene oxide, 1764 g of polyethylene glycol, and 135 g of hydroxypropyl cellulose (HPC-SL) were loaded, and granulated with purified water to obtain a pharmaceutical composition for modified release (granules) of the present invention. The resulting pharmaceutical composition for modified release (granules) of the present invention was sieved and mixed with 4 g of finely ground BHT and 30 g of magnesium stearate, and the mixture was formed into tablets using a rotary tabletting machine to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 300 mg. The obtained tablets were spray-coated with an aqueous dispersion of the film coating agent using HiCoater to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 309 mg.

### Example 11

After 400 g of compound A, 100 g of polyethylene oxide, 290 g of polyethylene glycol, 2 g of finely ground BHT, and 8 g of magnesium stearate were weighed out, these compounds were mixed using a mixer. The mixture was compression-molded using Roller Compactor Mini and sieved to obtain a pharmaceutical composition for modified release (granules) of the present invention. The obtained granules were formed into tablets using a rotary tabletting machine to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 400 mg.

### Example 12

In a mortar, 10 g of compound A, 2.5 g of polyethylene oxide (Dow chemical; product name: WSR Coagulant), and 12.5 g of polyethylene glycol were mixed well. The mixture was formed into tablets using Autograph to obtain a phar-

US 10,842,780 B2

17

maceutical composition for modified release of the present invention having a tablet weight of 400 mg.

Example 13

In a mortar, 10 g of compound A, 0.5 g of polyethylene oxide (Dow chemical; product name: WSR 301), and 5 g of polyethylene glycol were mixed well. The mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 310 mg.

Example 14

In a mortar, 5 g of compound A, 15 g of polyethylene oxide, and 5 g of polyethylene glycol were mixed well. The mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 250 mg.

Example 15

In a mortar, 10 g of compound A, 10 g of polyethylene oxide (Dow chemical; product name: WSR N-12K), and 5 g of D-mannitol (Towa Chemical Industry Co., Ltd; product name: Mannit P) were mixed well. The mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 500 mg.

Example 16

In a mortar, 2 g of compound A, 2 g of polyethylene oxide, and 10 g of polyethylene glycol were mixed well. The mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 350 mg.

Example 17

Into a fluidized bed granulating apparatus GPCG-5, 400 g of de-lumped compound A, 1120 g of polyethylene oxide, and 2313.6 g of polyethylene glycol were loaded, and granulated with 1200 g of a 10% by weight aqueous solution of hydroxypropyl cellulose to obtain a pharmaceutical composition for modified release (granules) of the present invention. The resulting pharmaceutical composition for modified release (granules) of the present invention was sieved and mixed with 6.4 g of finely ground BHT and 40 g of magnesium stearate, and the mixture was formed into tablets using a rotary tabletting machine to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 250 mg. The obtained tablets were spray-coated with an aqueous dispersion of the film coating agent (containing yellow ferric oxide and red ferric oxide as stabilizers) using HiCoater to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 257.5 mg.

The formulations in Examples 1 to 17 are shown in Tables 1 to 3.

TABLE 1

| Examples | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| compound A (g) | 10 | 10 | 10 | 10 | 10 | 10 |
| PEO WSR N-60K (g) | 2.5 | 3.5 | 6.25 | — | — | — |
| HPMC 90SH-4000SR (g) | — | — | — | 5 | — | — |
| HPMC 90SH-100000SR (g) | — | — | — | — | 5 | — |
| HPMC 90SH-100SR (g) | — | — | — | — | — | 7.5 |
| PEG (g) | 7.5 | 6.5 | 5 | 5 | 5 | 2.5 |

18

TABLE 2

| Examples | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|
| compound A (g) | 400 | 400 | 1500 | 1500 | 400 |
| PEO WSR N-60K (g) | 140 | 140 | 1050 | 1050 | 100 |
| PEG (g) | 251.2 | 251.2 | 1764 | 1764 | 290 |
| HPC-SL (g) | — | — | 135 | 135 | — |
| magnesium stearate (g) | 8 | 8 | 30 | 30 | 8 |
| BHT (g) | 0.8 | 0.8 | 4 | 4 | 2 |
| film coating agent (g) | — | 23.7 | 134 | 134 | — |

TABLE 3

| Examples | 12 | 13 | 14 | 15 | 16 | 17 |
|---|---|---|---|---|---|---|
| compound A (g) | 10 | 10 | 5 | 10 | 2 | 400 |
| PEO WSR N-60K (g) | — | — | 15 | — | 2 | 1120 |
| PEO WSR coagulant (g) | 2.5 | — | — | — | — | — |
| PEO WSR 301 (g) | — | 0.5 | — | — | — | — |
| PEO WSR N-12K (g) | — | — | — | 10 | — | — |
| PEG (g) | 12.5 | 5 | 5 | — | 10 | 2313.6 |
| D-mannitol | — | — | — | 5 | — | — |
| HPC-SL (g) | — | — | — | — | — | 120 |
| magnesium stearate (g) | — | — | — | — | — | 40 |
| BHT (g) | — | — | — | — | — | 6.4 |
| film coating agent (g) | — | — | — | — | — | 120 |

Comparative Example 1

After 400 g of pulverized compound A was mixed with 1200 g of D-mannitol, 320 g of purified water was further added, and the whole was kneaded using an agitation granulator (Powrex Corporation; VG-25). The resulting aggregate was sieved through a screen having an opening of 850 μm, and dried using a fluidized bed granulating apparatus (Freund Corporation; FLO-1). The dried products were sieved through a screen having an opening of 500 μm, and filled into No. 1 capsules at a content of 320 mg per capsule to obtain a pharmaceutical composition for comparison containing 80 mg of compound A.

EXPERIMENTAL EXAMPLES

1. Dissolution test

The pharmaceutical compositions prepared in Examples 2, 8, and 9 were subjected to a dissolution test carried out in accordance with a USP dissolution test (paddle method). As a test fluid, 900 mL of a phosphate buffer (pH 6.8) was used. The pharmaceutical composition prepared in Comparative Example 1 was tested in accordance with a dissolution test, method 2 described in the Japanese Pharmacopoeia. As a test fluid, 900 mL of a Mc. Ilvain buffer (pH 6.8) was used, and the paddle rotation speed was 50 rpm.

The results are shown in Table 4. The dissolution rate after 1.5 hours of the pharmaceutical composition for modified release prepared in each Example was less than 40%. By contrast, the composition prepared in Comparative Example 1 showed a high dissolution rate of 85% or more after 0.5 hour.

US 10,842,780 B2

19

TABLE 4

|  | Example 2 | Example 8 | Example 9 | Comparative Example 1 |
|---|---|---|---|---|
| 0.5 hr. | — | — | — | 95% |
| 1.5 hr. | 35% | 39% | 32% | — |
| 2.5 hr. | 57% | 61% | 54% | — |
| 4.5 hr. | 93% | 95% | 92% | — |

2. Stability Test

Plastic bottles were filled with the pharmaceutical composition for modified release prepared in Example 11, and sealed. These bottles were preserved under the conditions at 40° C. and 75% RH or at 60° C. for 3 months. After the preservation, each pharmaceutical composition was subjected to a dissolution test carried out in accordance with a USP dissolution test (paddle method). As a test fluid, 900 mL of a phosphate buffer (pH 6.8) was used. The results are shown in FIG. **1**. The acceleration of a dissolution rate was not observed after the preservation for 3 months under the conditions at 40° C. and 75% RH or at 60° C., and the results were indicative that the pharmaceutical composition was stable.

The pharmaceutical compositions for modified release prepared in Examples 8 and 9 were packed with aluminum/ aluminum blister, and preserved under the conditions at 40° C. and 75% RH for 6 months. After the preservation, each pharmaceutical composition was subjected to a dissolution test carried out in accordance with a USP dissolution test (paddle method). As a test fluid, 900 mL of a phosphate buffer (pH 6.8) was used. As a result, changes in the dissolution rate at the point showing a dissolution rate of approximately 50% were 2% and 3%, with respect to the pharmaceutical compositions prepared in Examples 8 and 9, respectively, and the results were indicative that the pharmaceutical compositions were stable.

The pharmaceutical composition for modified release prepared in Example 17 was exposed to 1.2 million Lux·hr of light. After the exposure, the pharmaceutical composition was subjected to a dissolution test carried out in accordance with a USP dissolution test (paddle method). As a test fluid, 900 mL of a phosphate buffer (pH 6.8) was used. As a result, the change in the dissolution rate at the point showing a dissolution rate of approximately 50% was less than 1%, and the result was indicative that the pharmaceutical composition was stable.

3. Pharmacokinetics (PK) Test in Human

The pharmaceutical composition for modified release prepared in Example 8, which contained the equivalent corresponding to 200 mg of compound A, was administered to healthy persons in a fasted state or after 30 minutes from the intake of food, and the plasma levels of the drug were measured.

For comparison, 2 capsules of the pharmaceutical composition (conventional formulation) prepared in Comparative Example 1, which contained the equivalent corresponding to 160 mg of compound A, was administered to healthy persons in a fasted state or after 30 minutes from the intake of food, and the plasma levels of the drug were measured.

With respect to the conventional formulation, the rate of decrease of Cmax in the fed state was 67%, in comparison with that in a fasted state, and the rate of decrease of AUC was 47% (Cmax in the fasted state was approximately three times higher than that in the fed state). With respect to the pharmaceutical composition for modified release of the present invention, the rate of decrease of Cmax in free-feeding was 42%, in comparison with that in a fasted state,

20

and the rate of decrease of AUC was 25%. These results indicated that the reductions of Cmax and AUC caused by food intake could be significantly alleviated by the pharmaceutical composition for modified release of the present invention.

INDUSTRIAL APPLICABILITY

According to the present invention, a pharmaceutical composition for modified release in which the changes in AUC and Cmax caused by food intake can be decreased by controlling a releasing rate of the active ingredient can be provided.

As above, the present invention was explained with reference to particular embodiments, but modifications and improvements obvious to those skilled in the art are included in the scope of the present invention.

The invention claimed is:

**1.** A pharmaceutical composition, comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof, in a sustained release hydrogel-forming formulation comprising a hydrogel-forming polymer having an average molecular weight of 100,000 to 8,000,000 and an additive having a water solubility of at least 0.1 g/mL at 20±5° C.,

wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and a carboxyvinyl polymer,

wherein the additive is at least one selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene hydrogenated castor oil, polyoxyethylene polyoxypropylene glycol, polyoxyethylene sorbitan higher fatty acid ester, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, (3-alanine, lysine hydrochloride, and meglumine, and

wherein a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm.

**2.** The pharmaceutical composition according to claim **1**, wherein the additive is at least one selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, lactose, sucrose, sodium chloride, and polyoxyethylene polyoxypropylene glycol.

**3.** The pharmaceutical composition according to claim **1**, wherein an amount of the additive is 5% by weight to 75% by weight with respect to a total weight of the pharmaceutical composition.

**4.** The pharmaceutical composition according to claim **3**, wherein the amount of the additive is 5% by weight to 70% by weight with respect to the total weight of the pharmaceutical composition.

**5.** The pharmaceutical composition according to claim claim **1**, wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, and hydroxypropyl cellulose.

**6.** The pharmaceutical composition according to claim **1**, further comprising an antioxidant.

US 10,842,780 B2

21

**7.** The pharmaceutical composition according to claim **6,** wherein the antioxidant is at least one compound selected from the group consisting of butyl hydroxytoluene, propyl gallate, and sodium ascorbate.

**8.** The pharmaceutical composition according to claim **7,** wherein the antioxidant is butyl hydroxytoluene.

**9.** The pharmaceutical composition according to claim **6,** wherein an amount of the antioxidant is 0.025% by weight to 0.25% by weight with respect to a total weight of the pharmaceutical composition.

**10.** The pharmaceutical composition according to claim **1,** further comprising a stabilizer.

**11.** The pharmaceutical composition according to claim **10,** wherein the stabilizer is at least one compound selected from the group consisting of yellow ferric oxide, red ferric oxide, and black iron oxide.

**12.** The pharmaceutical composition according to claim **11,** wherein the stabilizer is yellow ferric oxide and/or red ferric oxide.

**13.** The pharmaceutical composition according to claim **10,** wherein an amount of the stabilizer is 0.05% by weight to 1% by weight with respect to a total weight of the pharmaceutical composition.

**14.** The pharmaceutical composition according to claim **1,** wherein the drug dissolution rate from the pharmaceutical composition is at least 92% after 4.5 hours.

**15.** The pharmaceutical composition according to claim **1,** wherein the average molecular weight of the hydrogel-forming polymer is 100,000 to 2,000,000.

**16.** The pharmaceutical composition according to claim **1,** comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide.

**17.** A tablet, comprising the pharmaceutical composition according to claim **1.**

**18.** A tablet, comprising the pharmaceutical composition according to claim **16.**

**19.** A method for treating overactive bladder comprising administering the tablet according to claim **17** to a subject in need thereof.

**20.** A method for treating overactive bladder comprising administering the tablet according to claim **18** to a subject in need thereof.

**21.** The pharmaceutical composition according to claim **1,** wherein the average molecular weight of the hydrogel-forming polymer is 100,000 to 5,000,000.

**22.** A pharmaceutical composition, comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof, in a sustained release hydrogel-forming formulation comprising a means for forming a hydrogel and a means for ensuring penetration of water into the pharmaceutical composition,

wherein a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm.

**23.** The pharmaceutical composition according to claim **22,** comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide.

**24.** A tablet, comprising the pharmaceutical composition according to claim **22.**

**25.** A tablet, comprising the pharmaceutical composition according to claim **23.**

\* \* \* \* \*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ASTELLAS PHARMA INC., *et al.*

                    Plaintiffs,

          v.

SANDOZ INC., *et. al.*
                    Defendants.

1:20CV1589

ORDER

      Defendants move the Court to supplement a prior ruling, D.I. 571, with findings of fact and conclusions of law favoring defendants' preferred theory of the case. Specifically, they invite the Court to further rule in their favor by finding several asserted patent claims, which recite ineligible subject matter, to also lack sufficient written description and enablement. D.I. 576.

      Politely put, defendants worry the parties inadequately raised the matter of subject-matter eligibility at trial or in briefing. The Court disagrees. Certainly, in the ordinary course, courts defer to parties' framing of issues—particularly when resolving questions of law. *United States v. Sineneng-Smith*, 590 U.S. ___, 140 S. Ct. 1575 (2020). But it prizes form over substance to conclude that a party must utter either magic words or a page number in the United States Reports to invoke a settled point of foundational patent law, as patent owner did repeatedly here.

      The Court senses a more fundamental flaw in the assertion that patent litigants may, in essence, consent around the bounds of patent eligibility. By the Hatch-Waxman Act of 1984, Congress sought to remedy the dysfunctional market for pharmaceutical drugs, *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 645–47 (2d Cir. 2015), enacting a scheme of interlocking incentives to speed low-cost generic drugs to

1

Appx8512

market, while still driving new (brand) drug development, *F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013). The pharmaceutical industry, to put it mildly, has perverted this intent. With alarming regularity since, brand and generic drug manufacturers have colluded to protect weak or invalid patents and share in the startling profits. *E.g.*, *In re Glumetza Antitrust Litig.*, No. C 19-05822 WHA, 2021 WL 1817092 (N.D. Cal. May 6, 2021).

This case is not about a patent claiming an active ingredient. Those have already begun to expire. *See Astellas Pharma Inc. v. Actavis Elizabeth LLC*, No. 16-cv-905, D.I. 1. *This case* is about the pharmaceutical industry's long-standing "innovation" of patenting extended-release formulas for soon-to-expire active-ingredient patents. Despite the obviousness implications, 35 U.S.C. § 103, the USPTO has accommodated this practice. Astellas went a step further here, specifying the dissolution profile that it *discovered* would address the troublesome food effect. Or, as Astellas put it: "The inventive concept of the '780 Patent was discovering the dissolution rate that would address the food effect and achieving it using previously known formulation technology." D.I. 541 at 5. Yet the claims remain invalid. The Court could not have better invoked *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66 (2012).

To be sure, this admission hardly surprised the Court since it was the fundamental theme of the Astellas case. Defendants challenged the asserted claims as insufficiently enabled and not adequately described. And across five days of trial, Astellas proclaimed that its asserted claims were so easy anyone of ordinary skill in the art could do it without any more explanation than a general description coupled with a laundry list of compatible compounds. What *did* surprise the Court was defendants' failure to articulate this critical defense despite Astellas's clear and repeated admission that the asserted claims were

invalid as a matter of settled, basic patent law.  Accordingly, and to no avail, the Court made explicit its concern about validity.

The Court of Appeals for the Federal Circuit has a sufficient record to disagree. But the subsequent history of the Hatch-Waxman Act cautions that if there be only one realm in which courts ought to tack closer to Congress's word than to the parties' presentation of the case, it is pharmaceutical-patent cases arising under the Hatch-Waxman Act.

The Court notes this matter is currently on appeal to the Federal Circuit.  To the extent this Court has any jurisdiction to supplement its earlier ruling, this order supplements the Court's prior ruling, D.I. 571, otherwise the Defendant's motion, D.I. 576, is denied.

Dated this 27th day of June, 2023.

BY THE COURT:

s/ Joseph F. Bataillon_____
Senior United States District Judge

**Appx8514**

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 10,842,780 B2                                     Page 1 of 2
APPLICATION NO.  : 15/432854
DATED               : November 24, 2020
INVENTOR(S)      : Yuuki Takaishi et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

Item [56] REFERENCES CITED:

Page 2
Column 1:
Line 4, Foreign References "JP 2008-532953 8/2006" should read --JP 2008-532953 8/2008--;
Line 26, Other Publications "tion Report, 4 pages (English translation)." should read --tion Report, received Feb. 4, 2014, 4 pages (English translation).--;
Line 30, "Japanese Patent Application No. 2010-531838, first Office Action, dated Dec. 28, 2010, 4 pages (English translation)." should read --Japanese Patent Application No. 2010-531838, second Office Action, dated Dec. 28, 2010, 4 pages (English translation).--;
Column 2:
Line 17, "dated Aug. 1, 2018," should read --mailed Aug. 1, 2018,--;
Line 70, "Humans" should read --Humans:--;

Page 3
Column 2:
Lines 9-10, "Wolfers Klower" should read --Wolters Kluwer--;

Page 4
Column 1:
Line 21, "Nov. 2015)." should read --Nov. 9, 2015).--;
Column 2:
Line 22, "Stephen Bym et al.," should read --Stephen Byrn et al.,--; and
Line 64, "World J. Ural." should read --World J. Urol.--.

Signed and Sealed this
Thirteenth Day of July, 2021

Drew Hirshfeld
*Performing the Functions and Duties of the*
*Under Secretary of Commerce for Intellectual Property and*
*Director of the United States Patent and Trademark Office*

ASTMIRA_00002897

**CERTIFICATE OF CORRECTION (continued)**                                    Page 2 of 2
**U.S. Pat. No. 10,842,780 B2**

In the Specification

Column 2:
Line 54, "a clinical trial in human" should read --a human clinical trial--; and
Line 64, "profiles is" should read --profiles are--.

Column 5:
Line 52, "Mc. Ilvain buffer," should read --McIlvaine buffer,--.

Column 6:
Line 13, "$Rd$(AUC)=[AUC(FS)-AUC(FI)]1×100/AUC(FS)" should read --$Rd$(AUC)=[AUC(FS)-AUC(FI)]×100/AUC(FS)--.

Column 7:
Line 41, "extend" should read --extent--.

Column 10:
Line 3, "in case" should read --in the case--.

Column 12:
Line 57, "is fluidized," should read --are fluidized,--.

Column 18:
Line 60, "Mc. Ilvain buffer" should read --McIlvaine buffer--.

Column 19:
Line 25, "alminum/" should read --aluminum/--; and
Line 26, "alminum blister," should read --aluminum blister,--.

In the Claims

Column 20:
Line 41, "(3-alanine," should read --β-alanine,--; and
Line 61, "claim" should be deleted.

ASTMIRA_00002898

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel for Petitioner certifies that this brief:

(i)    complies with the type-volume limitation of Rule 32(a)(7)(B) and Circuit Rule 32(b)(1) because it contains 12,930 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(f); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in New Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: October 27, 2023                    */s/ Paul W. Hughes*

**CERTIFICATE OF SERVICE**

I certify that on October 27, 2023, I caused the foregoing brief to be served electronically on all parties via the Court's CM/ECF system.

Dated: October 27, 2023                                    */s/ Paul W. Hughes*