**No. 23-2032, 23-2063, 23-2089**

**IN THE**
# United States Court of Appeals
**FOR THE FEDERAL CIRCUIT**

**ASTELLAS PHARMA, INC., ASTELLAS IRELAND CO., LTD., ASTELLAS PHARMA GLOBAL DEVELOPMENT, INC.,**
*Plaintiffs-Appellants*

*v.*

**SANDOZ, INC., ZYDUS PHARMACEUTICALS (USA) INC., ZYDUS LIFESCIENCES LTD., dba Zydus Cadila, LUPIN LTD., LUPIN PHARMACEUTICALS, INC., LEK PHARMACEUTICALS, D.D.,**
*Defendant-Appellees*

**AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA, INC., AUROLIFE PHARMA LLC, ACTAVIS ELIZABETH LLC, PRINSTON PHARMACEUTICAL INC., ZHEJIANG HUAHAI PHARMACEUTICAL CO., LTD., HUAHAI US INC., SOLCO HEALTHCARE U.S., LLC, WINDLAS HEALTHCARE PVT. LTD., WINDLAS BIOTECH LTD., TEVA PHARMACEUTICALS USA, INC.,**
*Defendants*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE
CASE NOS. 1:20-CV-1589, 21-CV-0425, 21-CV-0664

## DEFENDANT-APPELLEES' RESPONSIVE BRIEF

William R. Zimmerman
Andrea L. Cheek
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Ave., NW, Suite 900
Washington, D.C. 20006
(949) 760-0404

Carol Pitzel Cruz
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
925 Fourth Ave., Suite 2500
Seattle, WA 98104
206-405-2000

*Attorneys for Defendant-Appellees Lupin Ltd. and Lupin Pharmaceuticals, Inc.*

*[see signature block for additional counsel]*

December 6, 2023

Claim 1 of U.S. Patent No. 10,842,780:

A pharmaceutical composition, comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4′-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof, in a sustained release hydrogel-forming formulation comprising a hydrogel-forming polymer having an average molecular weight of 100,000 to 8,000,000 and an additive having a water solubility of at least 0.1 g/mL at 20±5° C.,

wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and a carboxyvinyl polymer,

wherein the additive is at least one selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene hydrogenated castor oil, polyoxyethylene polyoxypropylene glycol, polyoxyethylene sorbitan higher fatty acid ester, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, (3-alanine, lysine hydrochloride, and meglumine, and

wherein a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm.

Claim 5 of U.S. Patent No. 10,842,780:

The pharmaceutical composition according to claim 1, wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydoxypropyl methylcellulose, and hydroxypropyl cellulose.

Claim 20 of U.S. Patent No. 10,842,780:

A method for treating overactive bladder comprising administering the tablet according to claim 18 to a subject in need thereof.

Claim 25 of U.S. Patent No. 10,842,780:

A tablet, comprising the pharmaceutical composition according to claim 23.

# CERTIFICATE OF INTEREST

<insert pdf form>

# TABLE OF CONTENTS

**Page No.**


STATEMENT OF RELATED CASES .......... iiiii

I. INTRODUCTION .......... 1

II. STATEMENT OF THE CASE AND FACTS .......... 3

A. The ’780 Patent and The Asserted Claims .......... 3

B. Procedural History .......... 4

C. Astellas Admitted the Claimed Sustained Release Hydrogel Formulations Were Well Understood, Conventional Components of Pharmaceutical Compositions .......... 8

D. Astellas Admitted that the Claimed Dissolution Limitation Was Easy To Obtain Through Routine Manipulation of the Conventional Formulation Elements .......... 11

III. SUMMARY OF THE ARGUMENT .......... 13

IV. ARGUMENT .......... 16

A. Standard of Review .......... 16

B. The District Court Did Not Abuse Its Discretion By Considering Whether The ’780 Patent Met The Requirements of § 101 .......... 17

1. Courts May Consider Patent Eligibility *Sua Sponte* .......... 18

2. The Principle of Party Presentation Is Not Absolute .......... 23

3. Astellas Was Not Denied Due Process .......... 24

C. The District Court Properly Applied the Well-Established Test for Subject Matter Eligibility .......... 26

# TABLE OF CONTENTS
**(*cont'd*)**

**Page No.**

1. The District Court Correctly Found that the Claims Are Directed to a Law of Nature ........ 27

2. The District Court Correctly Found that the Claims Do Not Contain an Inventive Concept ........ 36

3. Astellas's Other Criticisms of the District Court's Analysis Are Unavailing ........ 39

D. If the case is remanded, reassignment is not warranted ........ 41

V. CONCLUSION ........ 48

CERTIFICATE OF COMPLIANCE ........ 51

# TABLE OF AUTHORITIES

**Page No(s).**

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016) ....................28, 29, 31

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
573 U.S. 208 (2014).................... *passim*

*Arcadia v. Ohio Power Co.,*
498 U.S. 73 (1990)....................21

*Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*,
793 F.3d 313 (3d Cir. 2015) ....................41, 42, 45

*Barkeij v. Lockheed Aircraft Corp.,*
210 F.2d 1 (9th Cir. 1954) ....................19

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ....................16

*Bilski v. Kappos*,
561 U.S. 593 (2010)....................21

*Biodex Corp. v. Loredan Biomed., Inc.*,
946 F.2d 850 (Fed. Cir. 1991) ....................17

*Blasband v. Rales*,
979 F.2d 324 (3d Cir. 1992) ....................44

*Brown v. Piper*,
91 U.S. 37 (1875)....................18

*ChargePoint, Inc. v. SemaConnect, Inc.*,
920 F.3d 759 (Fed. Cir. 2019) ....................28

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
859 F.3d 1352 (Fed. Cir. 2017) ....................30

**TABLE OF AUTHORITIES**
**(*cont'd*)**

**Page No(s).**

*In re Comiskey*,
499 F.3d 1365 (Fed. Cir. 2007) .......... 21

*Constant v. Advanced Micro-Devices, Inc.*,
848 F.2d 1560 (Fed. Cir. 1988) .......... 24

*Coop. Ent. Inc. v. Kollective Tech., Inc.*,
50 F.4th 127 (Fed. Cir. 2022) .......... 25

*CR Bard Inc. v. AngioDynamics, Inc.*,
No. 15-218, 2023 WL 3750649 (D. Del. June 22, 2023) .......... 47

*Diamond v. Chakrabarty,*
447 U.S. 303 (1980) .......... 30, 31

*Diamond v. Diehr*,
450 US 175 (1981) .......... 21

*Dunbar v. Myers*,
94 U.S. 187 (1876) .......... 18, 19

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) .......... 36, 38, 39

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .......... 27

*Genetic Techs. Ltd. v. Merial LLC*,
818 F.3d 1369 (Fed. Cir. 2016) .......... 28, 30

*Howes v. Great Lakes Press Corp.*,
679 F.2d 1023 (2d Cir. 1982) .......... 20

*Intell. Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) .......... 38

**TABLE OF AUTHORITIES**
**(*cont'd*)**

**Page No(s).**

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
714 F.3d 1289 (Fed. Cir. 2013) ....................17, 41

*Liteky v. United States*,
510 U.S. 540 (1994)....................42

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
566 U.S. 66 (2012)....................5, 26

*Mobil Oil Corp. v. United States*,
991 F.2d 811, No. 92-5076, 1993 WL 76238
(Fed. Cir. Mar. 18, 1993)....................19

*Natural Alternatives International, Inc. v. Creative Compounds LLC.*
918 F.3d 1338 (Fed. Cir. 2019) ....................32, 35

*Nestier Corp. v. Menasha Corp.-Lewisystems Div.*,
739 F.2d 1576 (Fed. Cir. 1984) ....................24

*Olaplex, Inc. v. L'Oréal USA, Inc.*,
855 F.App'x 701 (Fed. Cir. 2021)....................46

*Par Pharm., Inc. v. Hospira, Inc.*,
420 F. Supp. 3d 256 (D. Del. 2019)....................43

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ....................16

*Pope Mfg. Co. v. Gormully*,
144 U.S. 224 (1892)....................24

*Rapid Litigation Management Ltd. v. CellzDirect, Inc.*,
827 F.3d 1042 (Fed. Cir. 2016) ....................33, 34

*Rsch. Corp. Techs. v. Microsoft Corp.*,
536 F.3d 1247 (Fed. Cir. 2008) ....................46, 47

**TABLE OF AUTHORITIES**
**(*cont'd*)**

**Page No(s).**

*In re School Asbestos Litigation,*
977 F.2d 764 (3d Cir. 1992) ....................................................................42

*Slawson v. Grand Street, P.P. & F.R. Co.*
107 U.S. 649 (1883).......................................................................18, 19

*SmithKline Beecham Corp. v. Apotex Corp.*
403 F.3d 1331 (Fed. Cir. 2005) ..............................................................32

*State St. Bank & Trust Co. v. Signature Fin. Group, Inc.*,
149 F.3d 1368 (Fed. Cir. 1998) ..............................................................21

*Svindland v. Nemours Found.*,
287 F.App'x 193 (3d Cir. 2008) ........................................................45, 46

*Titanium Metals Corp. of Am. v. Banner*,
778 F.2d 775 (Fed. Cir. 1985) ................................................................21

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
508 U.S 439 (1993)..................................................................................21

*United States v. Bergrin*,
682 F.3d 261 (3d Cir. 2012) ....................................................................41

*United States v. Dowdell*,
70 F.4th 134 (3d Cir. 2023) .....................................................................17

*United States v. Kennedy*,
682 F.3d 244 (3d Cir. 2012) ....................................................................41

*United States v. Sineneng-Smith*,
140 S. Ct. 1575 (2020)........................................................................17, 23

*United States v. Wecht*,
541 F.3d 493 (3d Cir. 2008) ....................................................................45

**TABLE OF AUTHORITIES**
**(*cont'd*)**

**Page No(s).**

*Vanda Pharmaceuticals Inc. v. West-Ward Pharmaceuticals International Ltd.*,
887 F.3d 1117 (Fed. Cir. 2018) ....................................................34, 35

**OTHER AUTHORITIES**

35 U.S.C. § 101 .......................................................................*passim*

35 U.S.C. § 102 .......................................................................20

35 U.S.C. § 103 .......................................................................4, 20

35 U.S.C. § 112 .......................................................................5, 21, 22, 23

## STATEMENT OF RELATED CASES

This case has not previously been before this or any other appellate court. Appellees identify the following cases that may directly affect or be directedly affected by this court's decision in this case:

Astellas Pharma Inc. et al. v. Ascent Pharmaceuticals, Inc., No. 23-cv-486 (D. Del.);

Astellas Pharma Inc. et al. v. MSN Pharmaceuticals Inc. et al., No. 23-cv-689 (D. Del.);

Astellas Pharma Inc. et al. v. Lupin Ltd. et al., No. 23-cv-819 (D. Del.).

# I. INTRODUCTION

In this unusual case, Astellas, a branded pharmaceutical company that developed and markets Myrbetriq®, consistently emphasized throughout trial and in its post-trial briefing that the sustained release formulations in the asserted claims of its U.S. Patent No. 10,842,780 ("the '780 patent") were "well-known," "well-characterized," "well established," "well understood for decades, "predictable," "routine," and "not the invention." Astellas further explained that the claimed dissolution profile was so easy to obtain using these conventional sustained release formulations that a person of ordinary skill in the art would be able to achieve it "with ease using, at most, a handful of routine tests." Indeed, according to Astellas, even graduate students could achieve the claimed dissolution profile "within a single experiment."

Instead of pointing to any of the formulation aspects of the asserted claims as the "invention," Astellas asserted that "[t]he inventive concept of the '780 patent was discovering the dissolution rate that would address the food effect" resulting from administering mirabegron formulations with and without food.

Against the backdrop of these surprising and unexpected admissions, the district court acted well within the reasonable bounds of its discretion to consider whether the asserted claims of the '780 patent met the patent eligibility requirements of 35 U.S.C. § 101. Supported by a long, albeit infrequent, history of courts

addressing validity issues *sua sponte*, and recognizing the public interest in removing invalid patents to free up competition, the district court properly evaluated § 101 under controlling Supreme Court precedent. In doing so, the district court applied the *Alice* two-part test for patent eligibility. The district court found the asserted claims were directed to a natural law—the discovery of a dissolution rate that would address the food effect of mirabegron. The district court then found the remainder of the claim limitations merely recited elements that were well-known, routine, and conventional—namely, the claimed sustained release formulation. The district court made these findings based on Astellas's own admissions and characterization of its patent claims, accepting Astellas's version of the facts for the purposes of its § 101 analysis. In view of the record in this case and the unique factual situation presented, Appellees request that this Court affirm the judgment of the district court that the subject matter of the Asserted Claims fails to meet the threshold inquiry of § 101 and that the Asserted Claims therefore are invalid.

Focusing on perceived procedural errors and recognizing the numerous invalidity issues facing its patent, Astellas takes the unusual and drastic step of requesting reassignment to a new judge in the event that this Court remands this case. The remedy requested by Astellas is warranted in only the most extreme and egregious cases, where a reasonable person would not expect a district court judge to be able to render an impartial decision. Astellas falls far short of meeting the high

standard for reassignment. Accordingly, Appellees request that should a remand be necessary, which they do not believe it is, that the matter be returned to Judge Bataillon, given his familiarity with the case and the lack of any apparent reason for reassignment.

## II. STATEMENT OF THE CASE AND FACTS

### A. The ’780 Patent and The Asserted Claims

The ’780 patent describes and claims sustained release pharmaceutical compositions containing the drug mirabegron and methods of using these compositions. Mirabegron is a long-known pharmaceutical compound, disclosed in now-expired U.S. Patent No. 6,346,532. Appx2 (citing Complaint at ¶ 23, *Astellas Pharma Inc. v. Actavis Elizabeth LLC* (D. Del. 2016) (No. 16-cv-905)).

During trial, Astellas asserted only dependent claims 5, 20 and 25 (“the Asserted Claims”). The Asserted Claims and the claims from which they depend are related as follows: Claim 5 depends directly from Claim 1; Claim 20 depends from Claim 18, which depends from Claim 16, which depends from Claim 1; Claim 25 depends from Claim 23, which depends from Claim 22.

The Asserted Claims generally recite the following elements:

(1) mirabegron;

(2) a sustained release hydrogel-forming formulation comprising:

a. a hydrogel forming polymer

b. a hydrophilic additive, and

(3) a dissolution limitation.

## B. Procedural History

Appellees Lupin, Sandoz, and Zydus filed Abbreviated New Drug Applications ("ANDAs") in 2016 seeking approval to market generic versions of Astellas's Myrbetriq®. Astellas filed its first complaints against Lupin, Sandoz, and Zydus in October 2016, alleging infringement of four patents listed in the FDA's "Orange Book," which were consolidated as Civil Action No. 1:16-cv-905-JFB-CJB ("the 16-905 action"). Astellas independently settled the 16-905 action with each of the Appellees between 2018 to 2019.

On November 24, 2020, the '780 patent issued, and Astellas filed suit against Appellees that same day. *See* Appx188; Appx145-186. The case then proceeded through discovery and to trial. After the final pretrial conference, the district court limited the parties to 35 hours of trial time (five trial days), despite the defendants' request for more trial time. Appx4495 (requesting 45 hours of trial time); Appx6583 (limiting trial time to 35 hours). In response, the parties reached a stipulation whereby Astellas reduced the number of asserted claims and Appellees agreed not to assert at trial a defense of obviousness under 35 U.S.C. § 103.

In February 2023, the parties conducted a five-day bench trial before Judge Bataillon, presenting evidence regarding disputed issues of infringement and invalidity under 35 U.S.C. § 112. *See, e.g.*, Appx6702, Appx6716. Astellas proffered testimony from Dr. Steven Little, its sole expert witness for validity issues. Appx7414–7426; *see also* Appx7043 at 1366:16–18. After trial and post-trial briefing was completed, on June 9, 2023, the district court issued a Memorandum and Order and entered judgment in favor of Appellees, finding all Asserted Claims invalid under 35 U.S.C. § 101 for claiming patent ineligible subject matter. *See* Appx5–9.

In its opinion, the district court explained that "[f]or present purposes, the Court assumes Astellas's version of the facts and accepts its argument, which is distilled in the following statement: 'The inventive concept of the '780 Patent was *discovering* the dissolution rate that would address the food effect and achieving it using *previously known* formulation technology.'" Appx2 (citing Appx7416). The district court found independent Claim 1 directed to a natural law: "The extended release dissolution limitation . . . , as Astellas admits, reflects merely the discovery of the food-effect-resolving dissolution profile. Such relation, which 'exists in principle apart from any human action,' sets forth a natural law." Appx7 (citing *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 77 (2012)). The district court then applied the second step of the *Mayo* framework, stating that

"Astellas's Dr. Steven Little confirmed that the polymer and additive limitations amounted to no more than the directive, 'apply it[.]'" Appx7. In support, the district court quoted Dr. Little's trial testimony:

> Q. Were sustained release hydrogel formulations *well-known* as of September 2008?
>
> A. Yes, they were.
>
> Q. And were sustained release hydrogels *well characterized* as of September 2008?
>
> A. Yes, in fact, I think I would go so far to say *they were probably the most well characterized extended[-]release oral dosage form* for all of the different ones. There were more products approved, to my recollection, than any other of that type, they were the most well characterized.
>
> Q. In September 2008, were sustained release hydrogels difficult to formulate?
>
> A. Well, from a pharmaceutical formulator's standpoint, no.
>
> Q. Were, as of September 2008, were sustained release hydrogels difficult to tune to achieve a specific dissolution profile?
>
> A. No, they weren't. *It's not just that the mechanisms are well understood and taught to somebody even before they got out of college*, but that you would have experience doing it yourself just because of the number of products on the market. And just given the amount of time, there is a large, large body of literature that shows over and over again the same kind of things that you see stated in the patent specification.

Appx7–8 (citing Appx7012–7013). Finally, the district court analyzed the additional limitations present in the dependent Asserted Claims, finding that "[b]etween narrowing the list of hydrogel-forming polymers to employ, excluding salt forms of mirabegron, formulating the dosage into a tablet, and claiming a method which

employs the overactive-bladder remedy to treat, unsurprisingly, overactive bladder, asserted claims 5, 20, and 25 merely ease the skilled artisan's already routine task and tell doctors to administer the drug according to its intended use." Appx8. The district court concluded: "Astellas's zealous defense has conceded more fundamental ground. Embodying no more than the discovery of a natural law applied via 'well known techniques for formulating sustained release tablets,' D.I. 541 at 1 [Appx7412], the '780 patent claims ineligible subject matter," and the district court held Asserted Claims 5, 20, and 25 invalid. Appx9. Astellas appealed. Appx8501–8506.

Expecting Astellas to appeal the adverse decision and in an effort to obtain a full record on all issues addressed at trial for a single appeal, Appellees filed a motion under Federal Rule of Civil Procedure 52(b) requesting that the district court make additional findings in support of the Court's judgment in their favor and addressing the noninfringement and invalidity arguments presented by Appellees at trial. Appx8507–8511. Appellees recognized that without additional fact-finding on the non-infringement and invalidity issues, they would not be able to comprehensively address all disputed issues in a single, timely appeal. *See* Appx8509.

The district court denied Appellees' motion and supplemented its prior opinion. Appx8512–8514. The court explained that during the trial, "Astellas proclaimed that its asserted claims were so easy anyone of ordinary skill in the art

could do it without any more explanation than a general description coupled with a laundry list of compatible compounds." Appx8513. Astellas filed an amended notice of appeal following the court's opinion. Appx8551–8556.

### C. Astellas Admitted the Claimed Sustained Release Hydrogel Formulations Were Well Understood, Conventional Components of Pharmaceutical Compositions

Throughout the trial, Astellas repeatedly elicited testimony from its experts regarding how the hydrogel formulations described in the Asserted Claims were well understood, conventional components of pharmaceutical compositions. Astellas's post-trial submissions were replete with these admissions. With respect to the "sustained release hydrogel-forming formulation" comprising "a hydrogel forming polymer" and an "additive" recited in the Asserted Claims, Astellas emphasized that such formulations have been long known, well-characterized, and were *not* the inventive aspect of the Asserted Claims. For example, Astellas asserted:

- "By applying **well-known techniques for formulating sustained release tablets**, Astellas' inventors were able to sufficiently mitigate the food effect . . . ." Appx7412 (emphasis added);
- "Hydrogel forming sustained release formulations have been **well understood for decades**, and **a POSA possesses the skills and training to readily manipulate** the physical traits of such formulations . . . ." Appx7412 (emphasis added);

- "The '780 Patent also recognizes that **such hydrogel formulation technology is generally disclosed in the prior art**: 'As a technique of preparing a formulation for modified release, a hydrogel sustained release tablet containing an additive which ensures penetration of water into the tablet, and a hydrogel-forming polymer is disclosed (see, for example, patent literature 3 [International Publication No. WO 94/06414]).'" Appx7416 (emphasis added);
- "Sustained release hydrogel forming polymer formulations were well known in the art as of September 2008. Prof. Little testified that they 'were **probably the most well characterized extended release oral dosage form' at that time**." Appx7417 (emphasis added);
- "Nor would a POSA have been unfamiliar with the excipients and additives listed in the Asserted Claims. Prof. Little noted that these 'are not things that are new chemical entities . . . . They are things that **have been used and well characterized over quite a long period of time**.'" Appx7418 (emphasis added);
- "As Prof. Little explained, the specification lays out in detail exactly how the inventors solved [the food effect] problem: by **using sustained release hydrogel technology already well known in the art** to develop mirabegron

formulations with particular dissolution characteristics." Appx7423 (emphasis added);

- "There is little doubt that preparing hydrogel formulations with specific dissolution characteristics was **known, predictable technology** as of the '780 Patent's filing date." Appx7438 (emphasis added);
- "This is particularly the case, where, as here, **the invention is directed to technology that was well characterized and routine**." Appx7454 (emphasis added)
- "It is also uncontested that the claimed hydrogel polymers and other formulation components were **well-known and well-understood in the art**." Appx7465 (emphasis added).

In addition to its repeated admissions of how well known, well characterized and predictable its claimed formulations were, Astellas also repeatedly admitted that the formulation did not form part of its purported invention:

- "The invention is directed to the use of **a well known, well established sustained hydrogel formulation**, that, with the claimed dissolution profile, overcomes mirabegron's undesirable food effect. **The invention is thus not a new type of formulation** . . . ." Appx7452 (internal citations omitted) (emphasis added);

- "As Prof. Little [Astellas's expert] explained, the invention of the '780 Patent is the use of 'well-known systems that are hydrogel forming polymers . . . . The '780 Patent makes it clear that the sustained release systems are merely 'background art' and '**the hydrogel forming polymers . . . are not the invention**.'" Appx7415–-7416 (emphasis added)
- "The inventive concept of the '780 patent was *discovering* the dissolution rate that would address the food effect and achieving it using *previously known* formulation technology." Appx7416 (internal citation omitted) (emphasis in original).

### D. Astellas Admitted that the Claimed Dissolution Limitation Was Easy To Obtain Through Routine Manipulation of the Conventional Formulation Elements

Just as the formulation elements did not form part of Astellas's purported invention, Astellas repeatedly admitted that using the well-known hydrogel formulations recited in the Asserted Claims to achieve a particular dissolution profile was not inventive:

- "Defendants' analysis of the precedent elides the key difference between the Asserted Claims and the cited cases—that **the dissolution rate claimed here was a long-studied and predictable property that results from physical phenomena well-understood in the art**." Appx7467 (emphasis added).

- "Both the patent specification and prior art disclose the relationship between viscosity and dissolution rate; **a POSA would thus be able to adjust (i.e., "tune") any given formulation to meet the Dissolution Limitation with ease using, at most, a handful of routine tests**." Appx7412–-7413 (emphasis added);
- "**Nor was it difficult to achieve a specific dissolution profile** (i.e., "tune" the formulation), because the POSA is taught how to use such systems, would have experience working with them, and is **aided by a large body of literature that teaches the POSA how to use and manipulate the components of such systems**." Appx7418 (emphasis added);
- "The '780 Patent also discloses that the physical relationships between the various structural components of the claimed sustained release hydrogels **were known**, such that **a POSA would know how to control the functional dissolution rate of such a hydrogel**." Appx7423 (emphasis added);
- "As Prof. Little testified, **even students** with far less experience than a POSA **could—within a single experiment** involving one to five formulations—prepare a hydrogel formulation meeting a desired dissolution profile." Appx7438 (emphasis added);

- "Numerous handbooks, publications, patents, and trade materials **extensively detail** how to use different hydrogel formulation components **to affect dissolution rate**, dating back decades." Appx7438 (emphasis added);
- "DOE [Design of Experiments] software was available as of September 2008 to assist the POSA in tuning those formulations to achieve the target dissolution rate. Thus, **the need for experimentation might be obviated** due to the high degree of experience the POSA has with these types of hydrogel sustained release formulations in combination with DOE, as **it is possible that the first formulation made meets the Dissolution Limitation**." Appx7438 (internal citations omitted) (emphasis added);
- "The claimed hydrogel forming polymers and hydrophilic additives were similarly well understood and well characterized. **A POSA would be very familiar with** how those components acted and interacted in a hydrogel formulation as well as **how those components would be adjusted to achieve the claimed dissolution profile**." Appx7452 (internal citations omitted) (emphasis added);

## III. SUMMARY OF THE ARGUMENT

Astellas seeks to avoid the patent-invalidating impact of its proffered trial testimony and post-trial submissions, which repeatedly emphasized the routine, conventional, and predictable nature of its claims. After Appellees agreed not to

present an obviousness case at trial, Astellas readily admitted that it invented nothing, instead purportedly discovering a food-effect-resolving dissolution profile associated with the known drug compound, mirabegron.

The district court was operating well within its purview when it considered *sua sponte* whether the Asserted Claims met the patent eligibility requirements of § 101. Though infrequent, there is a long history of courts considering patent validity issues not raised by the parties. As Astellas concedes, the principle of party presentation is not absolute. Additionally, public policy considerations support the district court's departure from the parties' framing of the issues in order to eliminate an invalid patent and reduce barriers to lower cost generic versions of Myrbetriq®. In the unusual circumstances of this case, where the patentee readily conceded that its invention was its purported discovery of a food-effect-resolving dissolution profile, but its claims recited nothing more than conventional, routine, and predictable elements, the district court did not abuse its discretion by considering patent eligibility.

Astellas was not prejudiced by the district court's consideration of §101. The district court ***adopted Astellas's version of the facts*** when conducting its § 101 analysis, relying only on well-established legal principles and Astellas's proffered facts to reach its judgment of patent ineligibility. Astellas does not dispute any of the facts relied on by the district court in reaching its judgment that the Asserted

Claims are invalid under § 101, nor does Astellas identify any factual disputes requiring resolution by the factfinder.

On the merits, the district court correctly concluded that the Asserted Claims are invalid under § 101. The district court applied the well-established two-part test for patent eligibility, first finding the claims directed to a patent ineligible law of nature, and next finding the claims do not contain an inventive concept sufficient to transform the claims into patent-eligible subject matter because, setting aside the patent-ineligible natural law, the remainder of the claims recite limitations that are well-understood, routine, and conventional.

At step one, the district court found the claims directed to "the discovery of the food-effect-resolving dissolution profile," which is "a natural law." Appx2. This conclusion is supported by Astellas's admission in its post-trial submissions that the "inventive concept of the '780 patent" is "*discovering* the dissolution rate that would address the food effect." Appx7416.

Proceeding to step two, the district court correctly concluded that the claims do not contain an inventive concept sufficient to transform the claims into patent-eligible subject matter, because the remainder of the claim limitations are well understood, routine, and conventional. The drug mirabegron was well known and its use to treat overactive bladder was routine and conventional. The hydrogel forming polymer and additive limitations were similarly well-known, routine, and

conventional, as Astellas repeatedly emphasized at trial and in its post-trial submissions. That these claim elements provide "structure" is irrelevant—the question is whether these claim elements are well-known, routine, and conventional. The district court correctly found, based on Astellas's own admissions, that they are.

Finally, even if this Court were to disagree with the district court's judgment, the drastic remedy of reassignment is not warranted and would create significant inefficiencies and duplication of effort on remand. A reasonable observer would not find the district court judge biased against Astellas. Indeed, judicial rulings are rarely the basis for reassignment, even if incorrect. To the extent the district court judge expressed any disapproval of the pharmaceutical industry, it was directed equally at both sides and does not suggest the judge would be unable to fairly consider the remaining issues on remand.

# IV. ARGUMENT

## A. Standard of Review

Patent eligibility is a question of law reviewed de novo. *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1315 (Fed. Cir. 2021). While patent eligibility may involve underlying questions of fact, "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

This Court reviews procedural issues not unique to patent law under the law of the regional circuit.[1] *See Biodex Corp. v. Loredan Biomed., Inc.*, 946 F.2d 850, 856 (Fed. Cir. 1991). Departures from the principle of party presentation are reviewed for abuse of discretion. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1578 (2020) ; *United States v. Dowdell*, 70 F.4th 134, 146 (3d Cir. 2023). This Court assesses requests for reassignment "under the law of the regional circuit in which the district court sits." *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 714 F.3d 1289, 1298 (Fed. Cir. 2013).

### B. The District Court Did Not Abuse Its Discretion By Considering Whether The '780 Patent Met The Requirements of § 101

Unconstrained by obviousness concerns, Astellas took unusual and unexpected positions during trial and in its post-trial briefs regarding the state of the art and the knowledge of a person of ordinary skill in the art. Astellas advocated that the formulation elements of the Asserted Claims were all well-known in the art and could easily be manipulated to achieve a desired dissolution profile. *See* § II.C, D., above. Astellas went so far as to argue that "***[t]he inventive concept of the '780 Patent was discovering the dissolution rate that would address the food effect and achieving it using previously known formulation technology***." Appx7416 (emphasis added). Astellas did not stop there. Astellas also asserted that the claimed

[1] Because Judge Bataillon was sitting by designation in Delaware, Third Circuit law applies.

dissolution rate "was a long-studied and predictable property that results from physical phenomena well-understood in the art." Appx7467. Against that backdrop, the district court did not abuse its discretion in considering whether the Asserted Claims recited ineligible subject matter under § 101.

### 1. Courts May Consider Patent Eligibility *Sua Sponte*

The Supreme Court has long held that a court may consider the eligibility or validity of a patent, even if such a defense is not raised by the defendant in the action. In *Slawson v. Grand Street, P.P. & F.R. Co.*, the Supreme Court explained:

> If letters patent are void because the device or contrivance described therein is not patentable, it is the duty of the court to dismiss the cause on that ground whether the defense be made or not. It would ill become a court of equity to render money decrees in favor of a complainant for the infringement of a patent which the court could see was void on its face for want of invention. Every suitor in a cause founded on letters patent should, therefore, understand that the question of whether his invention is patentable or not, is always open to the consideration of the court, whether the point is raised by the answer or not.

107 U.S. 649, 652 (1883). The Court disagreed with the patentee's position that it was improper and unfair for the circuit court to consider whether the inventions were patentable when no such defense was made in the answer. *Id.* Similarly, in *Brown v. Piper*, the Court found the claimed invention invalid on a basis of invalidity had not been raised in the proceedings below. *See Brown v. Piper*, 91 U.S. 37, 43–44 (1875). In *Dunbar v. Myers*, 94 U.S. 187 (1876), the Supreme Court noted various invalidity defenses raised in the answer (e.g., lack of utility, that the patentees were not the first inventor, that the alleged improvement was known and in public use

before the purported invention by the patentees, and that the invention was described in certain printed publications). *Id.* at 188. The Court, however, invalidated the patent for a different reason, finding that the improvement described in the patent did not constitute a patentable invention. *Id.* at 200; *see also Slawson*, 107 U.S. at 652 (explaining that in *Dunbar*, the Supreme Court "reversed, with directions to the court below to dismiss the bill on the ground, not set up in the answer, that the improvement described in the patent sued on did not embody or require invention and was not patentable, and the patent was therefore void.").

Prior to the advent of the Federal Circuit, several circuit courts considered the validity of patents, even if not addressed by the parties.[2] For example, in *Barkeij v. Lockheed Aircraft Corp.*, the Ninth Circuit found, based on admissions of the plaintiff's witnesses and without hearing from any defense witnesses, that the asserted patents were invalid. 210 F.2d 1, 1 (9th Cir. 1954), *cert. denied*, 348 U.S. 847 (1954). The court rejected the plaintiff's contention that the district court erred by finding the patents invalid before hearing from defendant's witnesses, explaining that "it is the duty of the court to dismiss a patent infringement suit whenever it affirmatively appears that the patent is invalid." *Id.* at 2 (citing *Slawson*, 107 U.S.

[2] Although not binding precedent, these cases remain persuasive. *See, e.g.*, *Mobil Oil Corp. v. United States*, 991 F.2d 811 (Table), No. 92-5076, 1993 WL 76238, at *3 (Fed. Cir. Mar. 18, 1993) ("Although a decision of a sister circuit is only persuasive authority, not binding precedent, we give it weight in accordance with the soundness of its reasoning.")

649). Similarly, in *Howes v. Great Lakes Press Corp.*, 679 F.2d 1023, 1028 (2d Cir. 1982), the Second Circuit held:

> [e]ven were section 101 not raised by appellees, it was not error for the district court to consider it since it had the power to do so. Section 101 deals with the subject matter of patents and, as such, it is "always open to the consideration of the court, whether the point is raised by answer or not."

*Howes*, 679 F.2d at 1028 (quoting *Slawson*, 107 U.S. at 652). In *Howes*, the patentee contended that the defendants had not raised a § 101 defense in its post-trial motion and asserted that the district court had erred by raising 101 *sua sponte*. *Id.* at 1028. To the extent there was any dispute over whether the defendants had raised a § 101 defense, the Second Circuit found it unnecessary to resolve that issue since it would not have been erroneous for the district court to have considered subject matter eligibility on its own. *Id.*

The Federal Circuit has also considered § 101 issues without prompting from the parties. In a case stemming from a district court's reversal of §§ 102 and 103 rejections during prosecution of a patent, the Federal Circuit injected consideration of § 101 into the anticipation analysis, explaining:

> The patent law imposes certain fundamental conditions for patentability, paramount among them being the condition that what is sought to be patented, as determined by the claims, be new. The basic provision of Title 35 applicable here is § 101 . . . . Surprisingly, in all of the evidence, nobody discussed the key issue of whether the alloy was new . . . .

*Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 780 (Fed. Cir. 1985). Similarly, in *In re Comiskey*, the Federal Circuit raised § 101 *sua sponte*, explaining that "[a]s a question of law, lack of statutory subject matter is a 'ground [for affirmance] within the power of the appellate court to formulate.'" *See In re Comiskey*, 499 F.3d 1365, 1373 (Fed. Cir. 2007), *abrogated on other grounds*, 554 F.3d 967 (Fed. Cir. 2009). The Court further explained that § 101 is a "threshold" issue, such that "[o]nly if the requirements of § 101 are satisfied is the inventor 'allowed to pass through to' the other requirements for patentability . . . ." *Id.* at 1371 (citing *Diamond v. Diehr*, 450 US 175, 188 (1981) and *State St. Bank & Trust Co. v. Signature Fin. Group, Inc.*, 149 F.3d 1368, 1372 n.2 (Fed. Cir. 1998)); *see also Bilski v. Kappos*, 561 U.S. 593, 602 (2010) (noting that patent eligibility under § 101 is a "threshold test").

Moreover, "a court may consider an issue 'antecedent to . . . and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S 439, 447 (1993) (citing *Arcadia v. Ohio Power Co.,* 498 U.S. 73, 77 (1990)). Because patent eligibility under § 101 is a "threshold" issue of patent validity, the district court was operating within its province when considering a patent eligibility question that was not addressed by the parties before considering other disputed issues of patent validity. In its attempt to save the '780 patent from the § 112 invalidity issues

addressed during trial (enablement, written description, and indefiniteness), Astellas made numerous admissions during trial and in its post-trial submissions that formed the basis for the district court's patent ineligibility decision. Astellas spends most of its opening brief complaining of perceived procedural issues and unfairness, but Astellas should not be permitted to avoid the clear patent eligibility problem illuminated by its trial presentation and post-trial submissions.

Astellas assumes motivations for the district court that are not supported by the record. Astellas suggests that the "primary motivation" for the district court's decision was "the court's concern for 'the obviousness implication' of claims like those in the '780 patent." *See* Op. Br. at 27. But the district court did not decide this case on obviousness grounds. The court's decision applied the Supreme Court's § 101 jurisprudence in finding the Asserted Claims patent ineligible. Astellas also suggests that the district court found the § 112 arguments presented at trial inadequate and instead "repackaged" those arguments into a § 101 argument. *See id*. The district court, however, did not yet pass judgment on the § 112 issues and certainly has not rejected them.

Astellas points to the fact that some non-party to this case would be free to challenge the validity of the '780 patent anew in a separate proceeding. *See, e.g.*, Op. Br. at 25–27. But another party's ability to challenge validity in some separate, future proceeding is not relevant to whether the district court abused its discretion in

considering § 101 based on the evidence and Astellas's arguments in the case or whether it properly applied the § 101 test to the Asserted Claims. The district court did not misapply the burden of proof for finding a patent invalid and require Astellas to prove its patent valid. Instead, as discussed below, the district court properly applied the test for patent ineligibility after adopting Astellas's version of the facts.

#### 2. The Principle of Party Presentation Is Not Absolute

While Appellees do not dispute that the principle of party presentation generally governs civil litigation, the principle is not an absolute bar precluding courts from ever considering issues *sua sponte*. *See Sineneng-Smith*, 140 S.Ct. at 1579 ("The party presentation principle is supple, not ironclad. There are no doubt circumstances in which a modest initiating role for a court is appropriate.") As discussed above, there is a history of courts considering patent validity issues not raised by parties. *See* § IV.B.1., above. The validity of the '780 patent was indisputably at issue before the district court. In the unusual circumstances of this case, in which Astellas made stunning admissions regarding its lack of invention after the parties narrowed the disputed validity issues to those falling under § 112, the district court was justified in exercising its discretion to consider invalidity of the '780 patent under § 101.

Moreover, strong public policy considerations support the district court's departure from the principle of party presentation. "Public policy requires that only

inventions which fully meet the statutory standards are entitled to patents." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1564 (Fed. Cir. 1988). Indeed, "[t]here is a stronger public interest in the elimination of invalid patents than in the affirmation of a patent as valid." *Nestier Corp. v. Menasha Corp.-Lewisystems Div.*, 739 F.2d 1576, 1581 (Fed. Cir. 1984); *see also Pope Mfg. Co. v. Gormully*, 144 U.S. 224, 234 (1892) ("It is as important to the public that competition should not be repressed by worthless patents, as that the patentee of a really valuable invention should be protected in his monopoly . . . ."). The public has a strong interest in the elimination of invalid pharmaceutical patents that delay or deter low-cost generic alternatives.

### 3. Astellas Was Not Denied Due Process

Astellas's purported due process concerns do not justify disturbing the district court's judgment. Patent eligibility under § 101 is a matter of law. Although there may be subsidiary factual findings necessary in certain cases, here the district court ***adopted Astellas's version of the facts*** for the purposes of considering § 101. Appx7 ("For present purposes, the Court assumes Astellas's version of the facts and accepts its argument . . . ."). Astellas cannot be heard to complain when its own proposed facts lead to a legal conclusion of patent invalidity.

As part of its due process analysis, Astellas asserts that the district court erred under Federal Rule of Civil Procedure 52(a)(1) by failing to make findings of fact.

*See* Op. Br. at 38. The district court did, however, specifically state the factual findings supporting its legal conclusion. The district court's opinion cited Astellas's expert's testimony and Astellas's factual assertions in its post-trial briefing, and adopted those facts for purposes of its § 101 analysis. *See* Appx6–8.

Astellas can hardly complain that it was prejudiced by the district court adopting Astellas's own version of the facts. Astellas notes that "courts will consider extrinsic factual evidence, such as expert testimony and information instructive of what a skilled artisan would believe to have been well-understood, routine or conventional." Op. Br. at 39 (citing *Coop. Ent. Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 133 (Fed. Cir. 2022)). But Astellas presented, and the district court adopted, Astellas's evidence and arguments, and those of its expert, that the formulation aspects of the Asserted Claims were well-understood, routine and conventional. For example, in its post-trial submissions, Astellas stated that the claimed hydrogel formulations were a "known, predictable technology" (Appx7438) and that the "claimed hydrogel polymers and other formulation components were well-known and well-understood in the art." (Appx7465). Astellas does not attempt to retreat from those admissions or raise any other potential issues of fact that were allegedly undeveloped at trial. Instead, Astellas's analysis of whether its claims satisfy § 101 raises only legal issues and not any factual issues or potential factual issues requiring resolution by a fact-finder.

### C. <u>The District Court Properly Applied the Well-Established Test for Subject Matter Eligibility</u>

Astellas accuses the district court of failing to "undertake a legitimate Section 101 analysis." Op. Br. at 41. But the district court performed the familiar analysis from the Supreme Court's *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014) and *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012) decisions and correctly held that the claims are directed to ineligible subject matter.

Section 101 defines the subject matter eligible for patent protection: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has long recognized that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable" because they fall within an exception to otherwise patentable subject matter under 35 U.S.C. § 101. *Alice*, 573 U.S. at 216. In *Alice*, the Supreme Court articulated a two-part test for identifying claims that fall within that exception and are not patent eligible. First, a court must "determine whether the claims at issue are directed to a patent-ineligible concept." *Id.* at 218. If they are, then the court must move to the second step and "consider the elements of each claim . . . to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* at 217

(quoting *Mayo*, 565 U.S. at 78). Elements that represent a "well-understood, routine, [or] conventional activit[y]" cannot transform the claim into a patent-eligible application. *Id.* at 225. The district court applied exactly this test. As discussed below, when a patent claim is directed to a patent-ineligible concept, such as a law of nature, a claim is not saved from ineligibility by merely reciting, for example, a composition of matter. The claim must contain an inventive concept that is more than just well-understood, routine, and conventional claim elements.

### 1. <u>The District Court Correctly Found that the Claims Are Directed to a Law of Nature</u>

The district court applied Step 1 of the *Alice* test and determined that the claims are directed to "the discovery of the food-effect-resolving dissolution profile," which is "a natural law." Appx2. Notably, although the claims do not explicitly recite a "food effect," Astellas characterized the "inventive concept of the '780 patent" as "*discovering* the dissolution rate that would address the food effect." Appx7416 (emphasis in original). In view of this admission, the district court concluded that the claims are directed to a patent-ineligible concept.

In Step 1 of the *Alice* test, "the 'directed to' inquiry" asks whether, "considered in light of the specification," the "character" of the claims at issue are directed "as a whole . . . to [patent-ineligible] subject matter." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). This Court has often framed that inquiry as asking whether the "focus of the claimed advance over the prior art"

is directed to patent-ineligible subject matter. *E.g.*, *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016); *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1375 (Fed. Cir. 2016). To that end, "[t]he 'directed to' inquiry may also involve looking to the specification to understand the problem facing the inventor and, ultimately, what the patent describes as the invention." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019) (internal quotation marks omitted).

Here, Astellas admits that "[t]he inventive concept of the '780 Patent was discovering the dissolution rate that would address the food effect" and then "achieving it using previously known formulation technology." Appx7416. Thus, the claims are "directed to" the particular dissolution rate that addresses the food effect, as this was the problem facing the inventor and the focus of the claimed advance over the prior art. As Astellas admits in its brief, this is a natural law that "exists in principle apart from any human action." Op. Br. at 48 (internal quotation marks omitted).

The specification supports this analysis. For example, the specification states that "[t]he present invention relates to a pharmaceutical composition for modified release capable of reducing food effects, which are observed in conventional tablets[.]" Appx193 at 1:16–18; *see also id.* at 2:21–29 ("An object of the present invention is to provide a pharmaceutical composition . . . in which the

pharmaceutical composition . . . has no limitations on food intake . . . ."). The specification maintains this focus on the food effect throughout. *E.g.*, Appx194 at 3:1–4 ("The present invention is characterized by providing a pharmaceutical composition for modified release which is not affected by the effects of food intake . . . ."); Appx195 at 5:11–14 ("According to the present invention, a pharmaceutical composition for modified release which has no limitations on food intake . . . can be provided."). The specification does not provide any new methods for creating the composition; instead, it states that the composition "may be prepared by known methods per se." Appx198 at 12:7–11.

The claims—read in light of the specification, from the perspective of the person of ordinary skill in the art—also support the district court's finding that they are directed to the food-effect-resolving natural law. As the district court found, the claims recite (1) "the extended-release formulation of mirabegron" comprising (2) "a hydrogel-forming polymer," (3) "hydrophilic additive, and" (4) "a dissolution limitation." Appx1. The specification admits that "conventional formulations" of mirabegron were known. *E.g.*, Appx193 at 1:49–52. Accepting Astellas's version of the facts as true, a person of ordinary skill in the art reading the specification would have understood that the polymer and additive limitations amounted to nothing more than well-known techniques. *E.g.*, Appx12–13. Thus, those limitations cannot be the focus of the claimed advance over the prior art. *Affinity*

*Labs*, 838 F.3d at 1257; *Genetic Techs.*, 818 F.3d at 1375; *see also Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1361 (Fed. Cir. 2017) (holding claim "directed to a natural law" where "the [claim] starts and ends with naturally occurring phenomena with no meaningful non-routine steps in between"). That leaves only the dissolution limitation—which is a product of the conventional formulation and applies the food-effect-resolving natural law. Thus, the district court correctly found that the claims are directed to the food-effect-resolving natural law.

Astellas's arguments to the contrary are unavailing. First, Astellas argues that the claims cannot be directed to ineligible subject matter merely because they recite a "pharmaceutical composition" that is non-naturally occurring. Op. Br. at 46–47. But that is not the law. Astellas relies on the Supreme Court's pre-*Alice* decision in *Diamond v. Chakrabarty* to argue that the claimed compositions are "a nonnaturally occurring manufacture or composition of matter—a product of human ingenuity" and thus patent-eligible. Op. Br. at 47 (citing 447 U.S. 303, 309 (1980)). The court in *Diamond* did not apply the Supreme Court's newer *Alice* test—the test Astellas accuses the district court of failing to apply here—and did not determine to what the claims at issue were directed. 447 U.S. at 309–10; *see, e.g.*, Op. Br. at 42–44. Furthermore, the *Diamond* court was analyzing a claim that was alleged to be a *product* of nature (i.e., naturally occurring), rather than a claim directed to a *law of*

*nature*. 447 U.S. at 309–10. Accordingly, the court's analysis in that case is of little relevance here, where the question is whether the Asserted Claims are directed to a law of nature. Here, the claims cannot be *directed to* any non-naturally occurring manufacture or composition of matter, because an analysis of the patent reveals that is not the focus of the claimed advance over the prior art or the problem faced by the inventor. *E.g.*, *Affinity Labs*, 838 F.3d at 1257.

Astellas also argues that, "[j]ust as in *Diamond*, Astellas has 'produced a new [formulation] with markedly different characteristics from any found in nature and one having the potential for significant utility.'" Op. Br. at 47 (quoting 447 U.S. at 310). But Astellas has not produced a "new" formulation. At most, the formulation that had "markedly different characteristics from any found in nature" and had "potential for significant utility" was mirabegron itself, which "had long been known" and was previously patented by Astellas in a now-expired patent. Appx2. Thus, the Asserted Claims are not "directed to" mirabegron, which is not the focus of the claimed advance over the prior art. *E.g.*, *Affinity Labs*, 838 F.3d at 1257. Similarly, the Asserted Claims are not "directed to" a mirabegron sustained release formulation, as Astellas admits that too was conventional. *Id; see also* Appx7412 ("By applying well-known techniques for formulating sustained release tablets, Astellas's inventors were able to sufficiently mitigate the food effect . . . .");

Appx7454 ("This is particularly the case, where, as here, the invention is directed to technology that was well characterized and routine.").

Next, Astellas relies on another pre-*Alice* decision of this Court, *SmithKline Beecham Corp. v. Apotex Corp.*, to argue that "'a synthetic, man-made compound' is 'eligible for patent protection' since it 'is without question a 'composition of matter' or an article of 'manufacture' within the terms of § 101.'" Op. Br. at 47 (quoting 403 F.3d 1331, 1342 (Fed. Cir. 2005)). As with *Diamond*, the Court in *SmithKline Beecham* did not apply the Supreme Court's *Alice* test and did not determine the subject matter to which the claims at issue were directed. *SmithKline Beecham*, 403 F.3d at 1342. There is no dispute that the Asserted Claims here recite compositions of matter or methods of treatment, but that is also not the relevant question. The relevant question is whether those claims are nevertheless directed to an ineligible exception, such as a natural law—and they are.

Astellas argues that this Court "expressly rejected the argument that 'a claim to the manufacture of a non-natural [composition] would be directed to [a] law of nature or natural product'" in *Natural Alternatives International, Inc. v. Creative Compounds LLC*. Op. Br. at 47 (quoting 918 F.3d 1338, 1350 (Fed. Cir. 2019)). But here, Astellas admitted that its "invention" was not a new drug or pharmaceutical composition, but instead "was *discovering* the dissolution rate that would address the food effect [] and achieving it using *previously known* formulation technology."

Appx7416. Indeed, Astellas insisted "[t]he invention is thus not a new type of formulation." Appx7452.

This Court's decision in *Rapid Litigation Management Ltd. v. CellzDirect, Inc.* ("*Rapid*") does not alter the analysis, as Astellas suggests. Op. Br. at 48–49 (citing 827 F.3d 1042 (Fed. Cir. 2016)). Astellas argues that this Court "has distinguished between directing claims to the natural principle discovered and directing them to a 'constructive process, carried out by an artisan to achieve a 'new and useful end'' *using* the discovery of the natural process." Op. Br. at 48 (quoting *Rapid*, 827 F.3d at 1048). Astellas further observes "'[t]hat one way of describing the [invention] is to describe the natural' principle underlying it 'does not make the claim 'directed to' that' principle." *Id.* (quoting *Rapid*, 827 F.3d at 1049). But these arguments merely establish that claims that recite pharmaceutical compounds, or their manufacture or use, are not *always* patent-ineligible. When such claims are not directed to a natural law or a product of nature, they may be patent eligible. But nothing in *Rapid* suggests that such claims can never be directed to a natural law. The claims at issue lack the "constructive process" "to achieve a new and useful end" that the court relied on in *Rapid*. 827 F.3d at 1048. Rather, the claims merely apply well-understood, routine, and conventional methods to embody the natural law to which they are directed.

Astellas's attempt to equate the claims at issue with the claims in *Rapid* is likewise unavailing. In *Rapid*, the patent claimed a novel process that operated in accordance with a newly discovered natural law to achieve results that were not possible using then-conventional processes. *Id.* at 1049. But here, the patent claims compositions that operate using entirely conventional processes, as Astellas admits. Appx7416. The *only* thing that is arguably new is the food-effect-resolving natural law. Astellas claims it "did not attempt to patent [the food-effect] discovery" but instead "claimed a narrow new category of pharmaceutical formations, whose utility derived in large part from their ability to combat the food effect." Op. Br. at 49. Not so. Instead, Astellas applied a natural law—"that delivering mirabegron at a certain rate ameliorates its food effect"—and then claimed an entire class of formulations of the known drug that dissolve at the effective rate dictated by the natural law. Op. Br. at 48–49; Appx202–203. Far from a narrow category, Astellas's claims preempt a substantial portion of formulations that employ the food-effect-resolving natural law.

Astellas's discussion of this Court's decision in *Vanda Pharmaceuticals Inc. v. West-Ward Pharmaceuticals International Ltd.* and its application to Asserted Claim 20 shows exactly why *Vanda* is inapposite here. Op. Br. at 49–50 (citing 887 F.3d 1117 (Fed. Cir. 2018)). In *Vanda*, the Court found that the claims were "directed to a specific method of treatment for specific patients using a specific

compound at specific doses to achieve a specific outcome," not a natural law, and were thus patent-eligible. *Vanda*, 887 F.3d at 1136. Astellas argues claim 20 is likewise patent-eligible. Op. Br. at 49–50. But Astellas's argument assumes the conclusion—that claim 20 is directed to a "specific method of treatment for specific patients using a specific compound at specific doses to achieve a specific outcome." Even if claim 20 recites such a method, that is not what claim 20 is *directed to*—as discussed above, claim 20 is directed to a natural law. Thus, the situation here is not the same as in *Vanda*.

For the same reason, Astellas's reliance on *Natural Alternatives* is misplaced. Op. Br. at 50 (citing 918 F.3d at 1344). Astellas argues that claim 20 "is 'directed to [a] particular method[] of treatment' which is 'patent eligible'" and that "[i]t is typical and appropriate for inventors to 'recognize[] the underlying relationships,' so long as 'those were not what was claimed.'" *Id.* Again, this assumes the conclusion. Claim 20 is not patent eligible because it is directed to the underlying relationship between the dissolution rate of mirabegron and the food effect—that is, to the natural law.

Astellas's many arguments are reminiscent of the arguments the Supreme Court and this Court have so often rejected in the software arts. As the Supreme Court held in *Alice*, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." 573 U.S. at 223.

"Stating an abstract idea while adding the words 'apply it with a computer'" is not sufficient to confer eligibility. *Id.* Indeed,

> [t]he fact that a computer "necessarily exist[s] in the physical, rather than purely conceptual, realm" is beside the point. There is no dispute that a computer is a tangible system (in § 101 terms, a "machine"), or that many computer-implemented claims are formally addressed to patent-eligible subject matter. But if that were the end of the § 101 inquiry, an applicant could claim any principle of the physical or social sciences by reciting a computer system configured to implement the relevant concept.

*Id.* at 224 (internal citations omitted). This Court has consistently applied the Supreme Court's guidance in *Alice* to find claims directed to abstract ideas where "the focus of the claims is not on . . . an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016). Here, Astellas argues, in essence, that stating a natural law while adding the words "apply it using a pharmaceutical composition" or "use it to treat a patient" is sufficient to confer eligibility. That would be inconsistent with the Supreme Court and this Court's settled caselaw.

### 2. <u>The District Court Correctly Found that the Claims Do Not Contain an Inventive Concept</u>

Because the district court correctly concluded at Step 1 of the *Alice* test that the claims are directed to a patent-ineligible natural law, the court proceeded to Step 2 and considered whether the claims contain an inventive concept sufficient to transform the claims into patent-eligible subject matter. *Alice*, 573 U.S. at 217. The

district court correctly concluded that the claims do not contain such an inventive concept because, setting aside the patent-ineligible natural law, the remainder of the claims recite limitations that are well-understood, routine, and conventional. Appx2 (claims recite "a natural law applied via routine, conventional, and well-known methods"); *see Alice*, 573 U.S. at 225.

As discussed above, the district court found that the patent's independent claims recite (1) "the extended-release formulation of mirabegron" comprising (2) "a hydrogel-forming polymer," (3) "hydrophilic additive, and" (4) "a dissolution limitation." Appx1. There is no dispute that mirabegron was well-known and that its use was routine and conventional. Appx2. Nor is there any dispute that the polymer and additive limitations were well-known, routine, and conventional. Appx2–3 (quoting testimony of Astellas's expert); Appx7416 (Astellas admitting the composition was created "using *previously known* formulation technology") (emphasis in original). As the district court found, any portion of the dissolution limitation that is not merely a natural law was also well-known, routine, and conventional. Appx2. Thus, the independent claims contain nothing more than a natural law implemented using well-known, routine, and conventional technology. The dependent Asserted Claims add limitations that were likewise well-known, routine, and conventional, as the district court noted. Appx3. Nothing remains to provide a suitable inventive concept.

In an attempt to locate an inventive concept in its claims, Astellas resorts to reciting a long list of limitations it suggests "provide substantial additional structure." Op. Br. at 51. But the question is whether those limitations were well-known, routine, and conventional, not whether they provide additional structure—and Astellas has already admitted that these limitations represent "previously known formulation technology." Appx7416. Moreover, the district court expressly found that these limitations "merely ease the skilled artisan's already routine task"—that is, that they are well-understood, routine, and conventional. Appx3.

Astellas's last-ditch attempt to save its claims is an argument that "there is no evidence that these formulations existed before Astellas invented them." Op. Br. at 51. But as Astellas correctly notes in its brief, the novelty of an invention "is of *no relevance*" in a Section 101 analysis. Op. Br. at 44 (citing *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016)). Instead, the question is whether the limitations were well-known, routine, and conventional, and thus incapable of providing an inventive concept, as the limitations are in this case.

As discussed above, this Court's Section 101 jurisprudence in the software arts is instructive. Astellas keenly reminds the Court of the many generic formulation limitations its claims contain, just as software patentees keenly reminded the Court of the many generic computer components their claims recited. *See, e.g.*, *Elec. Power Grp.*, 830 F.3d at 1355. But it is now well-established that

limitations reciting generic computer components do not imbue a claim with an inventive concept. *Id.* (collecting cases holding that "invocations of computers and networks . . . are 'insufficient to pass the test of an inventive concept'"). This Court should meet Astellas's attempt to make the same argument with the same response.

### 3. <u>Astellas's Other Criticisms of the District Court's Analysis Are Unavailing</u>

Astellas's other criticisms of the district court's analysis are misleading and unpersuasive. First, Astellas argues that the district court failed to analyze the claims themselves, suggesting that the district court's opinion "contains not a single quotation" from the claims and "contains no discussion of whether that claim language is directed to ineligible subject matter" or whether the claims contain an inventive concept. Op. Br. at 43. As discussed above, this is not so. The district court analyzed the language of the independent claims and summarized their limitations. Appx1. The district court also discussed and analyzed the additional limitations of the Asserted Claims. Appx3. Astellas does not dispute the district court's characterization of the claims or identify any way in which the district court overgeneralized or improperly abstracted the claim limitations.[3] *See* Op. Br. at 43–

[3] Astellas complains that "the court cast doubt on all pharmaceutical patents except 'a patent claiming an active ingredient.'" Op. Br. at 45 (citing Appx8513). But even if Astellas's characterization is correct, which it is not, the district court's statement to which Astellas refers is dicta contained in an order on a different subject. *See* Appx8513. It does not call into question the district court's Section 101 analysis.

45. The court analyzed the claims in the context of the familiar *Alice* test, as discussed above. The district court clearly displayed that it had a command of the claims' language and content.

Astellas also argues that the district court "based its opinion on" some "obviousness implications" of extended-release formulations. Op. Br. at 43–44 (citing Appx8513); *see also id.* at 45 n.8. But this was not the *basis* of the court's ineligibility decision. Appx1–4. Rather, Astellas quotes from a single statement in the district court's order denying a supplemental ruling on the other invalidity issues presented at trial. *See* Appx8513. There, the court merely noted that the USPTO has accommodated the practice of patenting extended-release formulations for soon-to-expire active-ingredient patents, despite the obviousness implications. *Id.* Although the court's supplemental order mentioned obviousness, nothing in the court's decision suggests that it "substituted" or "backdoor[ed]" an obviousness analysis in place of the patent-eligibility analysis. Op. Br. at 41, 45 n.8. Rather, as discussed above, the district court's decision applied the prevailing law on patent eligibility.

Because the district court correctly applied the Supreme Court's precedents regarding subject-matter eligibility, this Court should affirm.

**D. <u>If the case is remanded, reassignment is not warranted</u>**

In the event that the case is remanded to the district court, the exceptional remedy of reassignment is not warranted based on the record, as a reasonable person would not reasonably question the judge's impartiality.

This Court assesses requests for reassignment "under the law of the regional circuit in which the district court sits."[4] *Lazare Kaplan*, 714 F.3d at 1298. In the Third Circuit, reassignment is "an exceptional remedy," which is "weigh[ed] seriously and order[ed] sparingly." *United States v. Kennedy*, 682 F.3d 244, 258 (3d Cir. 2012). The Third Circuit applies "a standard that calls for reassignment when 'a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned.'" *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 329 (3d Cir. 2015) (citing *United States v. Bergrin*, 682 F.3d 261, 282 (3d Cir. 2012)) (internal quotations omitted). Astellas has not shown that the district court's impartiality would reasonably be questioned under the Third Circuit's high bar for reassignment.

Astellas conflates its quarrels with the district court's judicial philosophy with bias. For example, it complains that the district court should not have raised Section 101 *sua sponte*. Op. Br. at 55–56. But as explained above, courts can—and have—

[4] Judge Bataillon was sitting by designation in Delaware in the cases leading to this appeal. Accordingly, Third Circuit law applies.

raised such issues *sua sponte*. *See* § IV.B.1, above. Regardless of whether this Court ultimately agrees with the district court's approach, the Third Circuit has made it clear that "adverse rulings—even if they are erroneous—are not in themselves proof of prejudice or bias." *Arrowpoint*, 793 F.3d at 330 (citing *Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion [under § 455(a)]" since they rarely "evidence the degree of favoritism or antagonism required ... when no extrajudicial source is involved").)

Instead, the Third Circuit assesses the "partiality" element by evaluating a judge's bias (or perceived bias) against a party. For example, in *In re School Asbestos Litigation,* the trial court judge had "attended, and had many of his expenses paid for," a pro-plaintiff scientific conference "at which most of the plaintiffs' expected expert witnesses presented views similar to those they intended to express at trial." 977 F.2d 764, 770 (3d Cir. 1992). Even the trial court judge "recognized that some people could reasonably suspect a taint," and the Third Circuit held that together the facts "create an appearance of partiality that mandates disqualification." *Id.* at 782, 783. These are hardly "similar circumstances," as Astellas alleges, to the present case. Op. Br. at 58.

The district court's opinion and supplemental opinion do not evidence such a bias against Astellas. For example, in the opinions, the district court noted that it

"assume[d] Astellas's version of the facts and accept[ed] its argument." Appx2. Indeed, to the extent that the district court was critical, it was critical of the Appellees, as much as Appellants. As Astellas admits, the district court "admonished the defendants for failing to pick up on its hints at trial" and "expressed 'surprise' at 'defendants' failure to articulate' a Section 101 'defense." Op. Br. at 56 (citing Appx8513–8514). At trial, the court did not display favoritism toward either party as it expressed hesitance to accept defendants' opening arguments and ruled against defendants on several evidentiary disputes. *e.g.*, Appx6713 at 49:18–52:21, Appx6716–6717 at 64:24-65:23, Appx6717 at 68:6–9; Appx6780–6781 at 317:22-–318:25, Appx6799 at 391:3–21 and 392:7–23, Appx6800 at 395:2–7, Appx6823–6825 at 489:17–494:25, Appx6849 at 590:5–8, Appx6850–6851 at 597:2–598:3, Appx6851–6852 at 601:11–602:5. And to the extent that the district court's opinions expressed a frustration with the pharmaceutical industry, both "brand and generic manufacturers" were mentioned. Appx8513. Indeed, Judge Bataillon has not shown a bias against the pharmaceutical industry or branded pharmaceutical companies, and has ruled in favor of brand manufacturers in other ANDA cases. *E.g.*, *Par Pharm., Inc. v. Hospira, Inc.,* 420 F. Supp. 3d 256, 260 (D. Del. 2019) (finding the asserted patents related to injectable epinephrine formulations infringed and not obvious), *aff'd*, 835 F.App'x 578 (Fed. Cir. 2020). Thus, the district court's opinions

do not show a bias against Astellas, and the request for reassignment should be denied.

Even if this Court finds that the trial court misapplied the law or that its opinions were an unusual step in the progression of the case, this is not proof of bias or grounds for reassignment. In *Blasband*, after the district court's dismissal of a shareholder derivative suit was reversed by the Third Circuit, the district court "took an unusual step" and certified the matter to the Delaware Supreme Court. *Blasband v. Rales*, 979 F.2d 324, 325–26 (3d Cir. 1992). In the subsequent appeal, the Third Circuit held that although the district court's actions "reflect[ed] a misunderstanding" of the federal judicial system, there was "no basis for ordering a reassignment of the case" as its was "evident that the district court's frustration [was] with what it viewed as an incorrect determination of Delaware law . . . and not with" the Appellant specifically. *Id.* at 328–329. Similarly, even if an unusual step, the trial court's opinions at most revealed a frustration with what it viewed as a significant invalidity issue not raised by the parties, and not with Astellas specifically.

Although Astellas complains that the district court denied Astellas the opportunity to submit supplemental briefing, a court denying a party the opportunity to supplement its arguments does not provide grounds for reassignment. Op. Br. at 15, 36-37. In *Arrowpoint,* a party moved for preliminary injunction, and the trial

court did not rule on the motion for more than four years, despite multiple intervening motions to supplement the record, which were denied after significant delays and without explanation. *Arrowpoint*, 793 F.3d at 318, 327–28. Even though the Third Circuit vacated the denials of the motions to supplement and the motion for preliminary injunction, the Third Circuit held there was "no evidence of bias in the district judge's handling of the case" and denied the request for reassignment. *Id.* at 329–30. Here, too, the trial court's opinion that further briefing was unnecessary does not provide evidence of partiality. *See* Appx3.

While reassignment sometimes may be warranted when the "case has progressed so unusually," the Third Circuit's caselaw reveals that such cases involve multiple points of significant departure from the standard, not an isolated incident. *See United States v. Wecht*, 541 F.3d 493, 511 (3d Cir. 2008); *see also Svindland v. Nemours Found.*, 287 F.App'x 193 (3d Cir. 2008). For example, in *Wecht*, reassignment was ordered after the first appeal involved the issue of the trial judge's potential recusal for bias, the second appeal noted that the judge had failed to follow the Third Circuit's mandate, and the third appeal held that the judge violated a Federal Rule of Criminal Procedure and did not follow the guidance of the model criminal jury procedures. *Wecht*, 541 F.3d at 501–02, 511. Here, there are no prior appeals, the judge's impartiality has never been previously questioned in the lengthy

proceedings between the parties, and the judge has not violated any rules or model procedures.

Here the record does not reflect, and Astellas does not allege, unexplained rulings and contentious proceedings at trial that would require reassignment. In *Svindland*, the Third Circuit noted that the judge "consistently failed to exercise appropriate discretion by not giving reasons for his rulings and by the manner in which he conducted the trial" such that the Third Circuit could not review the rationale for the rulings. *Svindland*, 287 F.App'x at 195.[5] Moreover, the record "reveal[ed] numerous instances of . . . impatience and precipitous rulings" and "countless interruptions of counsel's arguments." *Id.* In the instant case, Astellas has not pointed to any unexplained rulings or heated moments at trial. Indeed, Astellas points to no event on the record other than the final opinion and supplemental opinion as showing any alleged unusual progression of the present case.

Astellas's citation to *Research Corp. Technologies* is inapposite for involving both a different legal standard and different facts. *Rsch. Corp. Techs. v. Microsoft Corp.*, 536 F.3d 1247 (Fed. Cir. 2008) (applying Ninth Circuit law). To the extent that this Court finds the case instructive, it compels the conclusion that reassignment

[5] *See also Olaplex, Inc. v. L'Oréal USA, Inc.*, 855 F.App'x 701, 715–16 (Fed. Cir. 2021) (further discussing *Svindland* and denying the request to reassign the case away from Judge Bataillon).

may be based on "a *pattern* of error based on previously-expressed views or findings." *Id.* at 1255 (emphasis added) (where the trial judge repeatedly made summary judgment decisions without issuing an opinion, cancelled the scheduled jury trial, and ordered a trial on inequitable conduct which ignored the materiality prong). Unlike in *Research Corp. Technologies*, it is clear that in the event this Court reverses and remands, Judge Bataillon is able to "approach a remanded case with an open mind." *Id.*; *see also CR Bard Inc. v. AngioDynamics, Inc.*, No. 15-218, 2023 WL 3750649 (D. Del. June 22, 2023) (Judge Bataillon holding a new trial on the defendants' asserted invalidity theories after reversal and remand for a *sua sponte* 101 invalidation).

A reasonable person reviewing the record would find that Judge Bataillon has presided over this complex case, including multiple defendants and a five-day trial featuring several witnesses, with fairness and without prejudice. Irrespective of this Court's ultimate conclusions as to the substantive patent issues on appeal, a reasonable person would not find that Judge Bataillon's impartiality would reasonably be questioned.

Moreover, Judge Bataillon has invested significant time with this case, the parties, and the underlying products involved in the dispute. Judge Bataillon presided over a five-day bench trial, receiving detailed technical testimony and documentary evidence regarding infringement and invalidity issues. He had the

opportunity to assess the credibility of the numerous live witnesses, which cannot be duplicated by another judge reviewing a cold record. Judge Bataillon is also currently presiding over two additional cases in which Astellas has asserted the ’780 patent against separate Defendants, and reassigning this case in the event of a remand would risk potentially inconsistent results with different judges considering the same or similar validity issues.[6] Additionally, Judge Bataillon presided over prior litigation in which Astellas asserted four separate patents allegedly covering its Myrbetriq® product against Appellees (the 16-905 action). Reassigning this case to a new judge would require a significant duplication of effort and loss of nearly seven years of presiding over disputes between the parties involving the same drug products. Accordingly, Astellas has not shown that the exceptional remedy of reassignment is warranted by the facts of this case, and the request for reassignment should be denied.

## V. CONCLUSION

For the foregoing reasons, the Court should affirm the district court’s judgment of invalidity of Asserted Claims 5, 20, and 25 of the ’780 patent. The district court did not abuse its discretion in considering whether the Asserted Claims met the patent eligibility requirements of § 101 and properly applied the § 101

[6] Astellas Pharma Inc. v. Ascent Pharmaceuticals, Inc., No. 23-cv-486 (D. Del. 2023); Astellas Pharma Inc. v. MSN Pharmaceuticals, Inc., No. 23-cv-689 (D. Del. 2023).

analysis to the Asserted Claims. In the event that this Court remands to the district court for further proceedings, the drastic remedy of reassignment is not warranted.

Dated: December 6, 2023 By: */s/ William R. Zimmerman*

William R. Zimmerman
Andrea L. Cheek
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Ave., NW, Suite 900
Washington, D.C. 20006
(949) 760-0404

Carol Pitzel Cruz
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
925 Fourth Ave., Suite 2500
Seattle, WA 98104
206-405-2000

*Attorneys for Defendant-Appellees*
*Lupin Ltd. and Lupin Pharmaceuticals, Inc.*

William A. Rakoczy
Deanne M. Mazzochi
Rachel Pernic Waldron
Kevin P. Burke
**RAKOCZY MOLINO MAZZOCHI SIWIK LLP**
6 W. Hubbard St.,
Chicago, IL 60654
(312) 222-6301
wrakoczy@rmmslegal.com
dmazzochi@rmmslegal.com
rwaldron@rmmslegal.com
kburke@rmmslegal.com

*Attorneys for Defendants-Appellees*
*Sandoz Inc. and Lek Pharmaceuticals d.d.*

Michael J. Gaertner
David B. Abramowitz
Hugh S. Balsam
Carolyn A. Blessing
Emily L. Savas
Jonathan B. Turpin
**LOCKE LORD LLP**
111 South Wacker Dr., Suite 4300
Chicago, IL 60606
(312) 443-1722
mgaertner@lockelord.com
dabramowitz@lockelord.com
hbalsam@lockelord.com
cblessing@lockelord.com
esavas@lockelord.com
jonathan.turpin@lockelord.com

*Counsel for Defendants-Appellees Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). This brief contains 11,335 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font Times New Roman.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: December 6, 2023 By: */s/ William R. Zimmerman*