**Nos. 23-2032, 23-2063 & 23-2089**

***In the***

# United States Court of Appeals

***for the***

# Federal Circuit

---

ASTELLAS PHARMA, INC., ASTELLAS IRELAND CO., LTD., ASTELLAS PHARMA GLOBAL DEVELOPMENT, INC.,
*Plaintiffs-Appellants*,

– v. –

SANDOZ INC., ZYDUS PHARMACEUTICALS (USA) INC., ZYDUS LIFESCIENCES LTD., DBA ZYDUS CADILA, LUPIN LTD., LUPIN PHARMACEUTICALS, INC., LEK PHARMACEUTICALS, D.D.,
*Defendants-Appellees.*

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA, INC., AUROLIFE PHARMA LLC, ACTAVIS ELIZABETH LLC, PRINSTON PHARMACEUTICAL INC., ZHEJIANG HUAHAI PHARMACEUTICAL CO., LTD., HUAHAI US INC., SOLCO HEALTHCARE U.S., LLC, WINDLAS HEALTHCARE PVT. LTD., WINDLAS BIOTECH LTD., TEVA PHARMACEUTICALS USA, INC.,
*Defendants*

---

On appeal from a final judgment of the
United States District Court for the District of Delaware
Nos. 20-cv-1589, 21-cv-425, and 21-cv-664 (consolidated)
Hon. Joseph F. Bataillon

---

**CORRECTED PLAINTIFFS-APPELLANTS' REPLY BRIEF**

---

Simon D. Roberts
Jason A. Leonard
*McDermott Will & Emery LLP*
*One Vanderbilt Avenue*
*New York, NY 10017*
*(212) 547-5700*

Paul W. Hughes
Andrew A. Lyons-Berg
Charles Seidell
*McDermott Will & Emery LLP*
*500 North Capitol Street NW*
*Washington, DC 20001*
*(202) 756-8000*

*Counsel for Plaintiffs-Appellants*
*(additional counsel listed on inside cover)*

Daniel M. Silver
*McCarter & English, LLP*
*405 N. King St. 8th Floor*
*Wilmington, DE 19801*
*(302) 984-6331*

# TABLE OF CONTENTS

Table of Authorities ........ ii
Introduction ........ 1
Argument ........ 3
I. The district court abused its discretion by abandoning the party presentation principle. ........ 3
II. Defendants cannot rehabilitate the district court's fatally flawed Section 101 analysis. ........ 15
A. The district court cannot substitute its intuitions for doctrine. ........ 16
B. The claims are patent-eligible under Section 101. ........ 19
1. The asserted claims are not directed to any natural phenomenon, law of nature, or abstract idea ........ 20
2. The asserted claims contain sufficient inventive concept. ........ 26
III. The Court should remand with directions to reassign. ........ 30
Conclusion ........ 32

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Alexander v. Primerica Holdings, Inc.*,
10 F.3d 155 (3d Cir. 1993) .................................................................. 30

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ................................................................ *passim*

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
967 F.3d 1285 (Fed. Cir. 2020) ............................................................ 23

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
725 F.2d 1350 (Fed. Cir. 1984) .............................................................. 7

*Archer v. Caribbean Auto Mart, Inc.*,
379 Fed. App'x 157 (3d Cir. 2010) ....................................................... 11

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
569 U.S. 567 (2013) ................................................................ *passim*

*Barkeij v. Lockheed Aircraft Corp.*,
210 F.2d 1 (9th Cir. 1954) ...................................................................... 9

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .................................................... 26, 27

*Baude v. United States*,
955 F.3d 1290 (Fed. Cir. 2020) .............................................................. 3

*Bilski v. Kappos*,
561 U.S. 593 (2010) ................................................................................ 18

*Brown v. Piper*,
91 U.S. 37 (1875) ...................................................................................... 5

*Church of Scientology of Cal. v. IRS*,
792 F.2d 153 (D.C. Cir. 1986) ................................................................ 9

**Cases—Continued**

*Constant v. Advanced Micro-Devices, Inc.*,
848 F.2d 1560 (Fed. Cir. 1988) .................... 12, 14

*CR Bard Inc. v. AngioDynamics, Inc.*,
979 F.3d 1372 (Fed. Cir. 2020) .................... 31, 32

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) .................... 28

*Diamond v. Chakrabarty*,
447 U.S. 303 (1980) .................... 20, 21, 22

*Diamond v. Diehr*,
450 U.S. 175 (1981) .................... 26

*Dickerson v. United States*,
530 U.S. 428 (2000) .................... 6

*Dome Patent L.P. v. Lee*,
799 F.3d 1372 (Fed. Cir. 2015) .................... 8

*Dunbar v. Myers*,
94 U.S. 187 (1876) .................... 5

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .................... 20

*Ethicon, Inc. v. Quigg*,
849 F.2d 1422 (Fed. Cir. 1988) .................... 12

*Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*,
918 F.3d 928 (Fed. Cir. 2019) .................... 29

*Howes v. Great Lakes Press Corp.*,
679 F.2d 1023 (2d Cir. 1982) .................... 9

*In re Comiskey*,
554 F.3d 967 (Fed. Cir. 2009) .................... 8, 10

*In re Sch. Asbestos Litig.*,
977 F.2d 764 (3d Cir. 1992) .................... 31

**Cases—Continued**

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) .......... 13

*Kingdomware Techs., Inc. v. United States*,
579 U.S. 162 (2016) .......... 6

*Lannom Mfg. Co. v. U.S. Int'l Trade Comm'n*,
799 F.2d 1572 (Fed. Cir. 1986) .......... 8, 10

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
730 F.2d 1452 (Fed. Cir. 1984) .......... 10

*Massachusetts v. EPA*,
549 U.S. 497 (2007) .......... 13

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012) .......... 16, 19, 24

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) .......... 28

*Mendenhall v. Cedarapids, Inc.*,
5 F.3d 1557 (Fed. Cir. 1993) .......... 10

*Metabolite Lab'ys, Inc. v. Lab'y Corp. of Am. Holdings*,
370 F.3d 1354 (Fed. Cir. 2004) .......... 17

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011) .......... 7

*Miken Composites, L.L.C. v. Wilson Sporting Goods Co.*,
515 F.3d 1331 (Fed. Cir. 2008) .......... 17

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) .......... 14

*Nat. Alternatives Int'l, Inc. v. Creative Compounds, LLC*,
918 F.3d 1338 (Fed. Cir. 2019) .......... *passim*

*Nestier Corp. v. Menasha Corp.-Lewisystems Div.*,
739 F.2d 1576 (Fed. Cir. 1984) .......... 13

**Cases—Continued**

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
827 F.3d 1042 (Fed. Cir. 2016) .......................................... 19, 21, 24, 25

*Sabinsa Corp. v. Creative Compounds, LLC*,
609 F.3d 175 (3d Cir. 2010) .............................................................. 15

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ............................................................................. 9

*Shelcore, Inc. v. Durham Indus., Inc.*,
745 F.2d 621 (Fed. Cir. 1984) ..................................................... 10, 12

*Silicon Graphics, Inc. v. ATI Tech., Inc.*,
607 F.3d 784 (Fed. Cir. 2010) ........................................................... 11

*Slawson v. Grant Street, P.P. & F.R. Co.*,
107 U.S. 649 (1883) ..................................................................... 4, 5, 6

*SmithKline Beecham Corp. v. Apotex Corp.*,
403 F.3d 1331 (Fed. Cir. 2005) ............................................. 16, 20, 23

*Strub v. Axon Corp.*,
168 F.3d 1321 (Fed. Cir. 1998) ......................................................... 11

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) ......................................................... 18

*Therasense v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011) ........................................................... 7

*Titanium Metals Corp. of Am. v. Banner*, 778
F.2d 775 (Fed. Cir. 1985) .................................................................... 8

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
508 U.S. 439 (1993) ........................................................................ 9, 10

*United States v. Albertson*,
645 F.3d 191 (3d Cir. 2011) .............................................................. 12

*United States v. Bergrin*,
682 F.3d 261 (3d Cir. 2012) .............................................................. 30

**Cases—Continued**

*United States v. Dowdell*,
70 F.4th 134 (3d Cir. 2023) .......... 4

*United States v. Jackson*,
2023 WL 2755578 (3d Cir. Apr. 3, 2023) .......... 31

*United States v. Sineneng-Smith*,
140 S. Ct. 1575 (2020) .......... *passim*

*Winsett v. Shinseki*,
527 F. App'x 965 (Fed. Cir. 2013) .......... 15

**Statutes**

35 U.S.C.
§ 144 .......... 8
§ 145 .......... 8
§ 282 .......... 6, 7, 8

Rev. Stat § 4920 (1874) .......... 5

An Act Revising and Amending the Statutes Relating to Patents,
29 Stat. 692 (1897) .......... 5

Patent Act of 1952, Pub. L. 82-593, 66 Stat. 792 .......... 6

**Rules**

Fed. R. Civ. P. 52(a)(1) .......... 15, 17

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) .......... 5

Francis Bacon, *Novum Organum* (1620) .......... 24

## INTRODUCTION

The district court invalidated Astellas' patent on a ground that Defendants had *never* raised—not throughout years of pretrial litigation, not at trial, and not in post-trial briefing. Unsurprisingly, no factual record had been developed. The court decided this unraised, unbriefed issue *sua sponte* believing that it "sits not [as] an arbiter to resolve disputes on the parties' favored terrain" (Appx3-4)—notwithstanding the Supreme Court's admonition that that is *exactly* the role federal courts are supposed to play. *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[O]ur adversarial system of adjudication … assign[s] to courts the role of *neutral arbiter of matters the parties present*.") (emphasis added). And the court specifically rejected any opportunity for Astellas to even *brief* the issue, thus destroying Astellas' valuable patent rights without notice or an opportunity to be heard. Appx4.

As we have explained, the district court's highly irregular, *sua sponte* invalidation of Astellas' claims was error many times over. The court fundamentally misunderstood the nature of patent litigation—which asks not whether a patent is valid against all comers, but only whether *these* challengers have proven it *invalid*. Opening Br. 24-28. It thus disregarded Defendants' waiver and departed from the party presentation principle without the slightest justification. *Id.* at 28-36.

This conduct deeply prejudiced Astellas, whose patent rights were destroyed on a theory that it never even had a chance to brief. *Id.* at 36-40.

Defendants have essentially two responses. *First*, they dredge up 150-year-old case law supposedly permitting courts to invalidate patents *sua sponte*—but those cases predate the 1952 enactment of the statutory presumption of patent validity and related pleading rules, and have therefore been abrogated by Congress. And even if they remained good law, Defendants' cases at most mean that there is no *absolute* prohibition on raising invalidity issues *sua sponte*—but as the Supreme Court has recently emphasized, courts must (at the very least) provide compelling justifications when departing from the parties' framing of a case. Here, such justifications are lacking.

*Second*, Defendants argue the merits of the Section 101 theory that the district court injected into the case. As described in our opening brief, the Court should not reach this question, which would require blessing the district court's grievous departure from Supreme Court precedent on the party presentation rule. But if the Court does address the merits, Astellas' patent claims only compositions of matter and methods of employing them, *not* the underlying natural law. That is the end of the Section 101 inquiry.

Defendants resist reassignment on remand. But the district court's highly irregular conduct of this case—not to mention its frank disclosure of apparent extrajudicial animus against the pharmaceutical industry—has irrevocably undermined the court's appearance of impartiality to the public, warranting reassignment. The Court should reverse and remand with instructions to reassign the case.

## ARGUMENT

### I. The district court abused its discretion by abandoning the party presentation principle.

The district court's unprompted decision to invalidate Astellas' patent on Section 101 grounds violated the foundational principle that "it is not the job of the court, the 'neutral arbiter,' to raise questions that are not presented by the parties." *Baude v. United States*, 955 F.3d 1290, 1303 (Fed. Cir. 2020); *accord Sineneng-Smith*, 140 S. Ct. at 1582 (vacating and remanding "for reconsideration shorn of the [new legal] inquiry interjected by the appellate panel"). Indeed, if it was an abuse of discretion for the Ninth Circuit in *Sineneng-Smith* to appoint an *amicus* to argue an issue and then decide the case on those grounds (*id.* at 1578), the district court's conduct here was even more egregious: It invalidated Astellas' patent on grounds that *no one* had raised, let alone briefed. *See*

Appx4 (finding "briefing" on Section 101 "to be an unnecessary delay and unduly prejudicial").

Defendants do not argue that the district court did *not* violate the "bedrock" party presentation rule. *United States v. Dowdell*, 70 F.4th 134, 145 (3d Cir. 2023). Nor could they seriously do so. Instead, they unearth cases from the 1800s to argue that the district court's departure from that fundamental principle was permissible. But those ancient cases are of doubtful validity given intervening statutory changes to patent law, and at most say that it is not *categorically forbidden* for a court to raise a validity issue *sua sponte*; Defendants offer no response to our demonstration that the district court's decision to do so here was an abuse of discretion.

**a.** Defendants' principal attempt to justify the district court's express departure from the parties' arguments is to suggest that this approach is technically permissible based on three Supreme Court opinions issued in short succession nearly 150 years ago. To be sure, the Court once stated that "the question whether [an] invention is patentable or not, is always open to the consideration of the court, whether the point is raised by the answer or not." *Slawson v. Grant Street, P.P. & F.R. Co.*, 107 U.S. 649, 652 (1883); *see also Dunbar v. Myers*, 94 U.S. 187, 200

(1876); *Brown v. Piper*, 91 U.S. 37, 44 (1875). But the topography of patent law has shifted dramatically since 1883, abrogating these decisions.

When these three cases were decided, the Revised Statutes of 1874 governed patent law. As relevant here, the statute provided that "[i]n any action for infringement the defendant may plead the general issue," and would simply need to provide notice of certain defenses immediately prior to trial. Rev. Stat § 4920 (1874); *accord* An Act Revising and Amending the Statutes Relating to Patents, ch. 391, 29 Stat. 692 (1897) (preserving the defendant's right to "plead the general issue").

That is, patent defendants in the 1800s expressly were *not* required to raise their defenses, including invalidity, in their pleadings. *See, e.g.*, Issue, *Black's Law Dictionary* (11th ed. 2019) (explaining that the "general issue" was "[a] plea (often a general denial) by which a party denies the truth of every material allegation in an opposing party's pleading," "enabl[ing] the defendant" to proceed "without specific averments of the defense[s] to be asserted"). *That* was the legal context in which the Court stated that patent validity remains an open question "whether the point is raised by the answer or not." *Slawson*, 107 U.S. at 652.

The Patent Act of 1952, however, substantially changed the law on this point. Rather than permitting a defendant to rely on pleading of the general issue, the 1952 Act for the first time provided that "defenses"—

including "[i]nvalidity of the patent"—"*shall be pleaded*." Patent Act of 1952, Pub. L. 82-593, § 282, 66 Stat. 792, 812 (emphasis added); *see also* 35 U.S.C. § 282(b) (current law, providing same).

By requiring that invalidity defenses "shall be pleaded" (66 Stat. at 812), Congress in the 1952 Act thus abrogated Defendants' cases, which had held precisely the opposite: that invalidity is "open to the consideration of the court, *whether the point is raised by the answer or not*" (*Slawson*, 107 U.S. at 652 (emphasis added)). The word "shall" is "mandatory," and thus "normally creates an obligation impervious to judicial discretion." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016). And of course, "Congress retains the ultimate authority to modify or set aside any judicially created rules of evidence and procedure that are not required by the Constitution." *Dickerson v. United States*, 530 U.S. 428, 437 (2000). The cases on which Defendants rely are therefore no longer good law.

Similarly, the 1952 Act also prescribed for the first time that "[a] patent shall be presumed valid" and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on a party asserting it." 66 Stat. at 812; *see* 35 U.S.C. § 282 (same). Before 1952, by contrast, courts loosely applied a common-law presumption of regularity

characterized by inconsistent "force" and "varying expression." *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 101 (2011).

Congress thus intended the new Section 282 "to codify the judge-made presumption of validity" (*Microsoft*, 564 U.S. at 107 n.8) "for the benefit of those cynical judges who [then said] the presumption is the other way around" (*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984), *abrogated on other grounds by Therasense v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011)). *See also id.* (explaining that, prior to the 1952 Act, "the case law was far from consistent—even contradictory—about the presumption").[1] The statutory presumption clarified that, as a matter of statute, "the burden is on the attacker" and "never shifts." *Id.* Because of this new statutory presumption, too, Defendants' cases—providing that the Court may relieve a defendant of the burden to prove invalidity—were overruled by the 1952 Act.

**b.** All of that is why, as this Court has more recently explained, "it is beyond cavil that a district court *does not* have authority to invalidate a patent at its own initiative if validity is not challenged by a party."

---

[1] Judge Rich, the author of *American Hoist*, was "a principal drafter of the 1952 Act." *Microsoft*, 564 U.S. at 97.

*Lannom Mfg. Co. v. U.S. Int'l Trade Comm'n*, 799 F.2d 1572, 1579 (Fed. Cir. 1986) (emphasis added). That principle resolves this appeal.

Tellingly, in the face of this plain statement of the law, Defendants have identified *not a single case* in which this Court has *sua sponte* invalidated a patent on grounds never raised by the parties (or affirmed a district court's decision to do so), let alone under Section 101. Their two attempts are inapposite, because each involved a statutory appeal from denial of a patent *application*. *See* Resp. Br. 20-21 (citing *Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 780 (Fed. Cir. 1985) (statutory action under 35 U.S.C. § 145), and *In re Comiskey*, 554 F.3d 967, 975 (Fed. Cir. 2009) (appeal under 35 U.S.C. § 144)).

This is a critical distinction, because "Section 282"—with its patent-validity presumption and requirement to expressly plead affirmative defenses—"does not apply" to challenges to the PTO's denial of a patent application. *Dome Patent L.P. v. Lee*, 799 F.3d 1372, 1378 (Fed. Cir. 2015). Indeed, the language Defendants seize on from *Comiskey*—that "lack of statutory subject matter" is "within the power of the appellate court to formulate"—is a statement about the Court's powers as a matter of *administrative law* in an appeal from the PTO; it says nothing about the role of a district court in patent-infringement litigation. *In re Comiskey*, 554 F.3d at 975 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88

(1943)); *see, e.g.*, *Church of Scientology of Cal. v. IRS*, 792 F.2d 153, 165 (D.C. Cir. 1986) (Silberman, J., concurring) (describing *Chenery* as a "seminal case" in administrative law).

Defendants' non-binding, out-of-circuit cases are no more helpful. *Cf.* Resp. Br. 19-20. *Barkeij*, for one, is completely inapt; there, the district court had dismissed a complaint based on invalidity "without first having heard *defendant's* witnesses"—but in a case where the relevant invalidity theories were raised by the defendant. *Barkeij v. Lockheed Aircraft Corp.*, 210 F.2d 1, 2 (9th Cir. 1954) (emphasis added). That leaves only *Howes v. Great Lakes Press Corp.*, 679 F.2d 1023, 1028 (2d Cir. 1982)—but that case (a) simply relied on *Slawson*, which we have explained was superseded by statute (*see* pages 4-7, *supra*); and (b) was dicta in any event, because the court of appeals ultimately *reversed* the district court's Section 101 invalidity holding on its merits. *Id.*

Nor is there any substance to Defendants' suggestion that Section 101 is the sort of "antecedent" issue that a court may properly consider *sua sponte*. Resp. Br. 21 (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993)). As we have explained, patent validity writ large is *not* a threshold issue in patent-infringement litigation, which asks only "whether the patent's *challenger* carried the burden of establishing *in*validity." *Lindemann Maschinenfabrik GmbH*

*v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1457 n.1 (Fed. Cir. 1984) (emphases added); *see also, e.g.*, *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1571 (Fed. Cir. 1993) ("A patent is not held valid for all purposes but, rather, not invalid on the record before the court.") (quoting *Shelcore, Inc. v. Durham Indus., Inc.*, 745 F.2d 621, 627 (Fed. Cir. 1984)); Opening Br. 24-28 & n.3.[2]

In any event, the Supreme Court in *U.S. National Bank* upheld the court of appeals' decision to reach an unraised "antecedent" issue only where the lower court did so "[a]fter giving the parties ample opportunity to address the issue" (508 U.S. at 448)—which the district court decidedly did not do here. Appx3 (rejecting any "briefing on this matter" because it would "bring unnecessary delay and undue prejudice").

In sum, the district court abused its discretion by doing exactly what this Court has said "it is beyond cavil" that district courts "do[] not have authority" to do: "invalidate a patent at its own initiative if validity is not challenged by a party." *Lannom Mfg.*, 799 F.2d at 1579; *accord, e.g.*, *Sineneng-Smith*, 140 S. Ct. at 1579 ("Courts are essentially passive

---

[2] *Comiskey* described Section 101 as a "threshold" issue in the context of the PTO's adjudication of a patent application (where "the examiner" *does* have an "obligation" to "address[] the predicate issue of patentable subject matter" (*Comiskey*, 554 F.3d at 973))—*not* in the very different context of an infringement suit. *Cf.* Resp. Br. 21.

instruments of government. They do not, or should not, sally forth each day looking for wrongs to right.") (alterations incorporated).

**c.** Even if the 1800s trio of *Slawson*, *Brown*, and *Piper* remained good law (they do not), notably missing from Defendants' brief is any argument that *this* case presents the sort of "extraordinary circumstances" that might "justif[y]" the district court's "takeover" of the litigation. *Sineneng-Smith*, 140 S. Ct. at 1581. That is, even if those cases mean that raising invalidity theories *sua sponte* is not *per se* reversible error, Defendants have not rebutted our demonstration that the court abused its discretion by doing so on the facts of this case.

Most blatantly, Defendants offer *no* response to our argument that they voluntarily waived any Section 101 defense. Abandonment of the party presentation principle is generally inappropriate when issues were not presented to the court because of a party's "strategic decision[s] to concentrate what little time it had for trial" on its preferred theories. *Strub v. Axon Corp.*, 168 F.3d 1321 (Table), at *11 (Fed. Cir. 1998). Instead, "[i]t is a claimant's burden to keep the district court clearly apprised of what parts of its claim it wishes to pursue and which parts, if any, it wishes to reserve for another day." *Silicon Graphics, Inc. v. ATI Tech., Inc.*, 607 F.3d 784, 801 (Fed. Cir. 2010); *accord Archer v. Caribbean Auto Mart, Inc.*, 379 Fed. App'x 157, 160 (3d Cir. 2010). Defendants'

intentional, strategic choice not to assert a Section 101 defense at any point throughout the litigation below therefore does not come close to the "extraordinary circumstances" the Third Circuit requires to excuse waiver (*United States v. Albertson*, 645 F.3d 191, 195 (3d Cir. 2011))—or the "extraordinary circumstances" required for a departure from party presentation (*Sineneng-Smith*, 140 S. Ct. at 1581).

The district court's actions were particularly inexplicable given that a district court cannot hold a patent "valid for all purposes but, rather, not invalid on the record before the court." *Shelcore*, 745 F.2d at 627; Opening Br. at 26 & n.3. Because decisions upholding validity are "not ordinarily binding on another challenge to the patent's validity" (*Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1429 n.3 (Fed. Cir. 1988)), deciding only the questions presented by the parties would not prevent any *other* party from raising Section 101 in any future litigation. There is thus no compelling systemic reason to depart from party presentation here.

Defendants' sole rejoinder is to gerrymander quotations to wrongly imply that invalidating patents is an overriding priority for the courts. Resp. Br. 23-24. Not so. Of course "only inventions which fully meet the statutory standards are entitled to patents" (*Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1564 (Fed. Cir. 1988))—but as discussed at length, "our adversarial system of adjudication … rel[ies] on the

parties to frame the issues" with respect to this and countless other equally or even more important interests (*Sineneng-Smith*, 140 S. Ct. at 1579). And, as just noted, any "public interest in the elimination of invalid patents" (*Nestier Corp. v. Menasha Corp.-Lewisystems Div.*, 739 F.2d 1576, 1581 (Fed. Cir. 1984)) does not require departure from party presentation, since any future infringement defendant remains free to raise Section 101 arguments without res judicata constraints.

In any event, Defendants' policy concerns are outweighed by the countervailing interests served by party presentation. "[A] party's argument should not be a moving target … thereby ensuring a clear presentation of the issue to be resolved, an adequate opportunity for response and evidentiary development by the opposing party, and a record reviewable by the appellate court that is properly crystallized around and responsive to the asserted argument." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1346-47 (Fed. Cir. 2001). Moreover, adversarial argument tends to ensure accuracy in decisionmaking, since "court[s] … so largely depend[] for illumination" on the parties' self-interested "presentation of issues." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).

Nor do Defendants have any response to our very real concern that the district court's approach would place patent-holders in an untenable

position at trial: Not only would they need to present evidence to rebut their opponents' actual invalidity contentions, but they would also need to present evidence to rebut *every* possible invalidity argument to prevent the court from invalidating claims on a barren record—precisely what happened here. The result would be a wildly inefficient system measured in both time and expense.

Finally, Defendants attempt to minimize the due process values at play. Resp. Br. 24-25. But the '780 patent is immensely valuable—invalidating its claims clearly necessitates a "constitutionally required degree of due process." *Constant*, 848 F.2d at 1565. And the most "fundamental requirement of due process"—"notice" and "an opportunity to present … objections" (*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950))—is missing here: Neither party had prior notice that the district court was even *considering* Section 101, and even Defendants cannot muster an argument that Astellas was somehow afforded an opportunity to be heard when the district court expressly rejected "further briefing" on the (never-briefed) Section 101 issue. Appx3-4.

In sum, nothing justifies the district court's extraordinary departure from basic principles of waiver, forfeiture, and party presentation—even if such a departure were technically permissible.[3]

## II. Defendants cannot rehabilitate the district court's fatally flawed Section 101 analysis.

For all these reasons, the Court need not, and should not, reach the substance of the district court's Section 101 holding. But if the Court were to do so, that holding is fatally flawed in multiple respects.

It appears that the parties generally agree on the appropriate test: the two-part *Alice/Mayo* framework. First, a court must "determine whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014). If (and only if) the first step is met, the court then "consider[s] the elements of each claim

---

[3] Defendants' only response to the district court's separate violation of Rule 52 (*see* Opening Br. 38) is to brazenly assert that the court actually *did* "specifically state the factual findings supporting its legal conclusion." Resp. Br. 25. But Rule 52 requires a court in a bench trial to "find the facts *specially* and state its conclusions of law *separately*." Fed. R. Civ. P. 52(a)(1) (emphasis added). It "is not satisfied 'by the statement of the ultimate fact without the subordinate factual foundations for it which also must be the subject of specific findings.'" *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 182 (3d Cir. 2010)). Mere "reference to the record does not constitute a factual finding." *Winsett v. Shinseki*, 527 F. App'x 965, 970 (Fed. Cir. 2013). That is, at most, all that is present here.

both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 78, 79 (2012)). Despite Defendants' claim (at 27), this test appears nowhere in the district court's four-page opinion. And when properly applied, it makes unmistakably clear that the '780 patent claims eligible subject matter.

### A. The district court cannot substitute its intuitions for doctrine.

Most obviously, the district court disregarded this Court's admonitions that the Section 101 analysis must remain focused on the claims themselves. Claims that sweep too broadly risk monopolizing "the basic tools of scientific and technological work," and so the inquiry focuses on the breadth of claims. *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 567, 576 (2013) (quoting *Mayo*, 566 U.S. at 86). Evaluating the breadth of a claim without considering the claim's language is impossible, because the claim language defines the scope of the claim. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1338-1339 (Fed. Cir. 2005) ("Of course, at all times, the language of the claims governs their scope and meaning.").

The district court's opinion contains *not a single word* of claim language from the '780 patent. Appx1-4. Defendants recognized as much, urging the court to conduct the proper analysis after the fact, because the Section 101 holding was "not set forth in the Court's opinion in terms of the claim language itself." Appx8509. The district court did not analyze what the claims were directed to, and certainly did not discuss whether the claims added sufficient inventive material or structure. Defendants' assertion that "the district court applied exactly" the *Alice/Mayo* test (Resp. Br. 27) is simply incredible.[4]

Rather than actually addressing the claims themselves, Defendants and the district court focus on statements in Astellas' post-trial briefing. But this Court has long held that in understanding the scope of claims "[i]t is the language of the claims not the argument that governs." *Miken Composites, L.L.C. v. Wilson Sporting Goods Co.*, 515 F.3d 1331, 1337 (Fed. Cir. 2008); *Metabolite Lab'ys, Inc. v. Lab'y Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004). A statement in briefing—on a

[4] Any difficulty determining what the district court actually held is due to the court's failure to make specific factual findings separate from its legal conclusions as required by Rule 52(a)—an independently sufficient ground for reversal. *See supra* page 15 & n.3; Opening Br. 38.

completely separate issue, no less—cannot take the place of the claim analysis demanded in the Section 101 inquiry.

Adherence to the *Alice/Mayo* framework is critical lest Section 101 "swallow all of patent law." *Alice*, 573 U.S. at 217. The district court's opinion is illustrative of the dangers that lurk should this Court not carefully police that line: "[C]haracterizing the claims at 'a high level of abstraction' that is 'untethered from the language of the claims all but ensures that the exceptions to [Section] 101 swallow the rule.'" *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020). It was thus error for the district court to invoke Section 101 merely to "confirm[] [its] preconceived notions of what should be patentable." *Bilski v. Kappos*, 561 U.S. 593, 624 (2010) (Stevens, J., concurring).

More, the district court's rule threatens to undermine countless unquestionably valid patents. The language seized on by the district court states only that in attempting to solve a biological problem, Astellas invented a small set of pharmaceutical formulations that were effective in ameliorating mirabegron's food effect. But Section 101 does not bar patents for inventions *inspired* by natural phenomena or which solve natural problems, so long as the patents do not attempt to monopolize the natural phenomenon or concept itself. *See Alice*, 573 U.S. at 217 ("[A]n invention is not rendered ineligible for patent simply because it involves

an abstract concept."). Indeed, this *must* be the case: "At some level, 'all inventions … embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Id.* (quoting *Mayo*, 566 U.S. at 71).

It is unclear what patents, if any, would survive the scrutiny the district court applied below—certainly most pharmaceutical patents for synthetic compounds would be suspect. This is likely why Defendants fail to identify *a single case* where this Court or the Supreme Court has *ever* found a patent claiming synthetic pharmaceutical formulations (or, indeed, any other specific, non-naturally occurring composition of matter) to be directed to invalid subject matter.

As this Court has warned, overgeneralizing Section 101 as the district court did below to "preclude the patenting of an invention simply because it touches on something natural would 'eviscerate patent law.'" *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016) (quoting *Mayo*, 566 U.S. at 71). The district court's decision cannot stand.

**B. The claims are patent-eligible under Section 101.**

As we explained, a proper application of the *Alice*/*Mayo* two-part framework compels the conclusion that the '780 patent claims patent-

eligible subject matter. Opening Br. 46-51. Defendants' arguments fail to persuade on either step of the two-step inquiry.

### 1. *The asserted claims are not directed to any natural phenomenon, law of nature, or abstract idea.*

The '780 patent is not directed to ineligible subject matter. The "directed to" inquiry does not ask whether the claims "*involve*" a law of nature. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). *Every* patent claim "involving physical products … *involves* a law of nature and/or natural phenomenon" because we exist "in the physical world." *Id.* Rather, step one of the *Alice*/*Mayo* framework is meant to exclude claims that are "simply reciting a natural law," while maintaining patent-eligibility for claims that are "doing more." *Nat. Alternatives Int'l, Inc. v. Creative Compounds, LLC*, 918 F.3d 1338, 1345 (Fed. Cir. 2019).

**a.** These claims do more. As we explained, under Supreme Court and Federal Circuit precedent, a patent claiming a new, non-naturally occurring physical structure or substance (like Astellas' claim here) is not "directed to" the law of nature that makes it useful. Opening Br. 47-49; *see, e.g.*, *Diamond v. Chakrabarty*, 447 U.S. 303, 309-310 (1980); *SmithKline Beecham Corp.*, 403 F.3d at 1342.

Thus, in *Diamond*, for example, a "human-made, genetically engineered bacterium" was found to satisfy Section 101: Because "the patentee has produced a new bacterium with markedly different characteristics from any found in nature … [h]is discovery is not nature's handiwork, but his own; accordingly it is patentable subject matter under § 101." 447 U.S. at 305, 310; *see also Myriad*, 569 U.S. at 590-591, 594-595 (concluding that particular naturally occurring human genes "fell squarely within the law of nature exception" despite the "[g]roundbreaking … discovery" involved in finding and isolating them, because "[t]he location and order of the nucleotides existed in nature before Myriad found them"—while human-synthesized cDNA "does not present the same obstacles … and is patent eligible under § 101").

Defendants suggest that the Supreme Court's analysis in *Diamond* and *Myriad* is "not the law" because those cases predated *Alice*. Resp. Br. 30. But this Court has continued to rely on these cases routinely post-*Alice*. *See, e.g.*, *Rapid*, 827 F.3d at 1050 (relying on *Myriad*); *Nat. Alternatives*, 918 F.3d at 1348 (relying on *Diamond*). Nothing in *Alice* remotely suggests that these holdings have been abrogated.[5]

[5] Defendants also assert that *Diamond* "is of little relevance," because the Court "was analyzing a claim that was alleged to be a *product* of nature …

Indeed, *Natural Alternatives* confirms that our application of *Alice* to composition claims is correct. *See* 918 F.3d at 1348. Even after *Alice*, this Court held that "a claim to the manufacture of a non-natural [formulation]" cannot "be directed to [a] law of nature or natural product." *Id.* at 1350. While the bulk of the Court's analysis was devoted to the method claims, the composition claims were far easier to deal with: The invention "is not a product of nature and the use of the [formulation] to achieve a given result is not directed to a law of nature." *Id.*; *see also id.* at 1347-1349.

Just so here. The claims at issue describe unique formulations containing specific hydrogel-forming polymers. It is undisputed that these compositions of matter are not "naturally occurring" (*Myriad*, 569 U.S. at

---

rather than a claim directed to a *law of nature*." Resp. Br. 30-31. First, after *Myriad*, it is not clear that those are distinct categories. *See Myriad*, 569 U.S. at 590 ("We must … determine whether Myriad's patents claim any 'new and useful … composition of matter,' § 101, or instead claim naturally occurring *phenomena*.") (emphasis added). In any event, both *Diamond* and *Myriad* would have come out the other way if Defendants were correct that an invention is ineligible because a natural phenomenon is what inspired it or makes it useful. *See Diamond*, 447 U.S. at 305 & n.2 (natural phenomenon that "a bacterium … containing" multiple "plasmids providing a separate hydrocarbon degradative pathway" would break down oil more effectively than single-pathway bacteria); *Myriad*, 569 U.S. at 582-583 (natural law that specific gene mutations "can dramatically increase" cancer risk).

590), but are "synthetic, man-made compound[s]" that must be created in a laboratory (*SmithKline*, 403 F.3d at 1342). The product is so composed to have "the potential for significant utility" in ameliorating the food effect (*Nat. Alternatives*, 918 F.3d at 1348), but Astellas' patent does not claim the *result* of "reducing the food effect." It claims specific, man-made hydrogel-forming polymer formulations.

That is the dispositive test: Patents claiming "only a result" risk being directed to a natural law, while those claiming "a way of achieving it" do not. *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1296 (Fed. Cir. 2020); *id.* at 1295 (finding patent ineligible because "[t]he focus of the claimed advance … is simply the concept of achieving [a] result" described by a natural law; "[w]hat is missing is any physical structure or steps for achieving the claimed result"). Under binding precedent, therefore, the asserted claims are "directed to specific treatment formulations" and are thus patent-eligible. *Nat. Alternatives*, 918 F.3d at 1348.[6]

[6] Defendants' invocation of cases about "the software arts" (Resp. Br. 35-36) is beside the point. True, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223. But much more than "generic computer implementation" (*id.*) is offered here; as described, Astellas claims a limited subset of specific physical formulations that does not attempt to monopolize *all* solutions to mirabegron's food effect. The properties of these formulations are fully and adequately defined by the details of the claims.

**b.** Like the district court, Defendants hinge their argument not on this analysis, but on Astellas' statement, in a brief, that "[t]he inventive concept of the '780 Patent was discovering the dissolution rate that would address the food effect" and then "achieving it using previously known formulation technology." Resp. Br. at 28. Nowhere do they assert that the formulation Astellas achieved is naturally occurring. Nor do they deny that it is a unique and effective means of reducing the food effect. Instead, they bypass the issue and simply assert that the claims are "'directed to' the particular dissolution rate that addresses the food effect." *Id.*

It says nothing that the formulation's *usefulness* stems from the "discovery" of a dissolution rate. All physical inventions derive their utility from playing on some law of nature. *Mayo*, 566 U.S. at 71. "For we cannot command nature except by obeying her." Francis Bacon, *Novum Organum* (1620). In other words, the fact that patent claims "utilize an underlying natural law" is "not sufficient to establish that they are directed to that law." *Nat. Alternatives*, 918 F.3d at 1345; *see also Rapid*, 827 F.3d at 1050 ("It is not enough to merely identify a patent-ineligible concept underlying the claim."). Rather, inventions that "employ a natural law" to achieve new treatments are patent-eligible (*Nat. Alternatives*, 918 F.3d at 1348), so long as the natural law "is not where [the inventors] stopped, nor is it what they patented." *Rapid*, 827 F.3d at 1048.

This is precisely how invention *should* work: "[A]s the first part[ies] with knowledge of" a natural principle, inventors are often "in an excellent position to claim applications of that knowledge." *Rapid*, 827 F.3d at 1048 (quoting *Myriad*, 569 U.S. at 596). Because the '780 patent is limited to a particular, circumscribed set of "applications" of the discovered solution to mirabegron's food effect, it is not directed to ineligible subject matter.

Defendants attempt to escape the implications of *Rapid* by insisting that it "merely establish[es] that claims that recite pharmaceutical compounds … are not *always* patent-ineligible." Resp. Br. 33-34. But *Rapid* says more than that. There, the Court observed that inventions are patentable when the inventors "employed their natural discovery to create" something new and useful. 827 F.3d at 1048. The method claims were not "directed to the ability of hepatocytes to survive multiple freeze-thaw cycles" where they *created* a "new and improved way of preserving hepatocyte cells for later use." *Id.* Similarly, Astellas' composition claims are not directed to the dissolution rate because Astellas *created* specific physical formulations that *achieved* that dissolution rate—and the method claims use these new and improved formulations as a treatment.

As much as Defendants try to contort a single sentence in Astellas' briefing below as some sort of Section 101 admission, they must concede

that there "is no dispute that the Asserted Claims here recite compositions of matter." Resp. Br. 32. The unique formulations Astellas produced and claimed *are* the invention, and the statements on which Defendants fixate merely explain why the *specific* formulations Astellas produced and claimed have "characteristics [that] provide significant utility." *Nat. Alternatives*, 918 F.3d at 1349. The claims plainly cover "the means or method of producing a certain result or effect, and not the result or effect produced." *Diamond v. Diehr*, 450 U.S. 175, 182 n.7 (1981). That is dispositive.

*2. The asserted claims contain sufficient inventive concept.*

Even if Astellas' invention were directed to a law of nature (it is not), it would still be patent-eligible because it contains an "inventive concept" beyond any natural law involved. *Alice*, 573 U.S. at 217-218; *see* Opening Br. 51.

The second step of the *Alice/Mayo* inquiry asks: Besides the law of nature, "[w]hat else is there in the claims before us?" *Alice*, 573 U.S. at 217. The invention's additional elements can "transform the nature of the claim into a patent-eligible application." *Id.* Finding patent-ineligibility "requires more" than recognizing that the claim elements were "known in the art." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Rather, "an inventive concept can be

found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.*

Before Astellas invented the formulations at issue, Mirabegron's undiscovered food effect caused an unacceptable risk of toxicity. Appx6725-6727. The inventors created new substances that ameliorated the food effect. Those substances are specific and composite: They involve certain specified hydrogel-forming polymers and certain specified water-soluble additives that work together to control dissolution by regulating viscosity levels. The resulting formulations were unique products that did not exist before, though they were created using technology that did.

In other words, even if directed to a natural law, Astellas' patent claims "a specific, discrete implementation" of that natural law (*Bascom*, 827 F.3d at 1350): the particular new formulations that take advantage of that law for patients' benefit. *See id.* (while a website filtering tool was directed to "the abstract idea of filtering content," the claims possessed sufficient inventive concept because they achieved filtering through a "particular arrangement of elements" that was an "improvement over prior art ways of filtering," and did not "preempt all ways of filtering content on the Internet").

Similarly, Astellas' patent claims specific formulations that improved on prior art. *No* product previously existed that successfully

reduced mirabegron's food effect, nor had mirabegron ever been formulated for extended release. *Cf. DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014) (finding sufficient "inventive concept" in claims detailing a novel solution to a technological problem). And the claims do not preempt other ways to achieve the same result, even using the dissolution specification. *Cf. McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (patents claiming only an effect "would prohibit all other persons from making the same thing by any means whatsoever"). Indeed, Astellas' expert testified that there are other potential ways to achieve the correct sustained release—some of which would take advantage of the same natural principle—but those other means are not covered by the patent here. *See* Appx6822 (describing "several possible mechanisms of sustaining release," including controlling dissolution, electrostatic interactions, and osmotic pressures).

Defendants seem to take issue primarily with Astellas' recognition that it made use of "previously known" technology to make the product. Resp. Br. 32. That is a red herring. If the use of "previously known" technology in constructing a new and unique product was fatal to patentability, then nothing would ever be patented. It would be preposterous to say that a new, helpful machine created using well-understood blacksmithing or metallurgical techniques contained no "inventive concept." If

anything, the arguments pressed by Defendants (and the thrust of the district court's analysis) sound in obviousness, not patentable subject matter—but Defendants expressly waived any obviousness defense below. Opening Br. 12-13.[7]

While the use of hydrogel-forming polymers was known to artisans including the inventors here, it was *inventive* to use OCAS technology to synthesize a unique product that ameliorates an unknown property of mirabegron. The district court's Section 101 holding was thus wrong on both prongs of the *Alice*/*Mayo* test—even setting aside that the court abused its discretion in reaching that unraised, unbriefed issue in the first place.

---

[7] Nor could such a defense succeed. Mirabegron's food effect was not known in the prior art, and therefore cannot serve as motivation to render the claims obvious. *See, e.g.*, *Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, 918 F.3d 928, 935 (Fed. Cir. 2019) ("We have recognized that where a problem was not known in the art, the solution to that problem may not be obvious, because 'ordinary artisans would not have thought to try at all because they would not have recognized the problem.'"). Here, the amelioration of the food effect was the unexpected result of using known formulation technology in an unconventional way, to solve a previously undiscovered problem with mirabegron.

## III. The Court should remand with directions to reassign.

Finally, we explained that the district court's irregular conduct warrants reassignment on remand to ensure the appearance of impartiality. Opening Br. 53-59.

Defendants mistakenly focus their response on whether the court actually harbored bias against Astellas. Resp. Br. 41-44. But this is emphatically "not the test." *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 167 (3d Cir. 1993). While "reassignment under § 455(a) … generally must involve apparent bias deriving from an extrajudicial source," the Court's supervisory authority is "not necessarily constrained by that limitation." *United States v. Bergrin*, 682 F.3d 261, 282 (3d Cir. 2012). The Third Circuit thus employs reassignment to "preserve not only the reality but also the appearance of the proper functioning of the judiciary as a neutral, impartial administrator of justice." *Alexander*, 10 F.3d at 167.

Defendants cannot credibly downplay the district court's conduct and statements below. The court explicitly disclaimed the traditional judicial role (Appx8512-8513), injected its own beliefs and concerns into the case (Appx8512), and admonished Defendants for failing to pick up on its hints at trial (Appx8513-8514). The court accused "the pharmaceutical industry" of "pervert[ing]" the "intent" of the Hatch-Waxman Amendments. Appx8513. And it charged "brand and generic manufacturers"

with "collud[ing] to protect weak or invalid patents and shar[ing] in the startling profits." *Id.* For support, the court cited an unrelated opinion from a separate district court with absolutely no relevance to the case at bar—demonstrating that its dispositive opinion was untethered from this case. Appx8513.

In view of all this, "reasonable but suspicious minds might question whether [the court] had already concluded this issue prior to trial and whether [its] views were influenced by" factors other than the evidence. *In re Sch. Asbestos Litig.*, 977 F.2d 764, 782 (3d Cir. 1992); *see also United States v. Jackson*, 2023 WL 2755578, at *4 (3d Cir. Apr. 3, 2023) (finding reassignment "a necessity" where "it appears the District Court judge will have substantial difficulty in putting out of her mind her previously expressed views of the evidence and the [parties]."). Reassignment is warranted.[8]

---

[8] This is not the first case in which this same district judge has made a similar error. In *CR Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1378 (Fed. Cir. 2020), this district judge raised invalidity under Section 101 *sua sponte* and summarily granted judgment as a matter of law on that basis. *Id.*; *see* Appendix, *CR Bard*, No. 19-1756, at Appx25877 ("This case is done, kids. We're done. See you next time.").

This Court had no difficulty concluding that this conduct was "procedurally improper" because the patent-holder "had not had the opportunity to defend the validity of its asserted claims." *CR Bard*, 979 F.3d at 1380. And,

## CONCLUSION

The Court should reverse the district court's order and remand with instructions to reassign.

Respectfully submitted,

Dated: March 5, 2024

/s/ Paul W. Hughes

Paul W. Hughes
Andrew A. Lyons-Berg
Charles Seidell
*McDermott Will & Emery LLP*
*500 North Capitol Street NW*
*Washington, DC 20001*
*(202) 756-8000*

Simon D. Roberts
Jason A. Leonard
*McDermott Will & Emery LLP*
*One Vanderbilt Avenue*
*New York, NY 10017*
*(212) 547-5700*

Daniel M. Silver
*McCarter & English, LLP*
*405 N. King St. 8th Floor*
*Wilmington, DE 19801*
*(302) 984-6331*

*Counsel for Appellants*

without the benefit of full briefing, the district court's Section 101 holding was totally incorrect. *Id.* at 1382-1384. Just so here.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel for Petitioner certifies that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) and Circuit Rule 32(b)(1) because it contains 6,971 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in New Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: March 5, 2024 /s/ *Paul W. Hughes*

## CERTIFICATE OF SERVICE

I certify that on March 5, 2024, I caused the foregoing brief to be served electronically on all parties via the Court's CM/ECF system.

Dated: March 5, 2024 /s/ *Paul W. Hughes*